FILED

2005 Mar-04  AM 11:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **WENDELL F. GILLEY**, an | ) |
| individual and as class representative, | ) |
| | ) |
|       Plaintiffs, | ) |
| | ) |
| v. | )    Civil Action No.: **CV-04-PT-0562-M** |
| | ) |
| **MONSANTO COMPANY, INC.,** | ) |
| **a corporation; MONSANTO** | ) |
| **COMPANY SALARIED EMPLOYEES'** | ) |
| **PENSION PLAN; EMPLOYEE** | ) |
| **BENEFITS PLAN COMMITTEE;** | ) |
| **MONSANTO COMPANY EMPLOYEE** | ) |
| **BENEFITS EXECUTIVE** | ) |
| **COMMITTEE; AND PHARMACIA** | ) |
| **CORPORATION, a corporation,** | ) |
| | ) |
|       Defendants. | ) |

## MEMORANDUM OPINION

This cause comes on to be heard upon plaintiff Wendell F. Gilley's Motion for Class

Certification, filed on December 10, 2004.

## FACTS[1] AND PROCEDURAL HISTORY[2]

**I.        The Parties.**

Plaintiff Wendell F. Gilley ("Gilley") is a former employee of Monsanto Company, Inc.

---

[1] The court notes where facts appear disputed.

[2] Unless otherwise indicated, the facts attributed to the plaintiff are given as they were
asserted in plaintiff's "Brief in Support of Motion for Class Certification."  Plaintiff has not cited
to any evidentiary submissions to support the facts asserted in his brief.

("Monsanto") who resides in Marshall County, Alabama.  (Amd. Cmpt. ¶ 2).  Monsanto is a

corporation having done business or presently doing business in Alabama.  (*Id.* at ¶ 3).  On or

about March 31, 2000, Monsanto merged into Pharmacia & Upjohn, Inc., changing its name to

Pharmacia Corporation ("Pharmacia").  (*Id.* at ¶ 7).  At the same time, Monsanto Ag Company,

Inc., a wholly owned subsidiary of Monsanto, changed its name to simply Monsanto Company,

Inc. ("New Monsanto").  (*Id.*)

## II.    The Sand Mountain Facility.

In late 1971, Monsanto opened its Sand Mountain facility located on the Tennessee River

near Guntersville, Alabama for the purpose of manufacturing nylon and polyester yarn.[3]

According to Monsanto's 1980 Annual Report, changing styles and consumer tastes had

drastically reduced the demand for the yarn by the mid-1970s.  (1980 Monsanto Annual Report,

p. 3).  During this time, the company also experienced increasing foreign manufacturing

competition.  (*Id.*)  These problems led to Monsanto withdrawing from the entire line of

business.  (*Id.*)  Production at the Sand Mountain plant ended in 1981.  (Carver Depo., p. 22).

Monsanto was unable to sell the plant until 1995, when a local resident and former employee of

the plant bought the property.  (Hutcheson Depo., p. 8).

## III.   The Pension Plans.

In 1971 Monsanto maintained a defined pension plan for its employees, the "Monsanto

Company Salaried Employes' (*sic*) Pension Plan" ("1971 Plan").  In 1976, to comply with the

recently enacted ERISA statute, Monsanto amended and restated the 1971 Plan ("1976 Plan").

---

[3] Defendants assert that the Guntersville plant produced polyester fiber used in double-knit garments.  According to plaintiff, when the Sand Mountain facility was shut down in February 1981 it was no longer producing nylon.

Thereafter, the plan was amended occasionally, often in response to changing ERISA regulations.[4]

All relevant versions of the Plan required an employee to amass ten years of "Credited Service" or "Vesting Service" to qualify for a pension. (1971 Plan, Art. II § 1(a); 1976 Plan, § 6.1; Amd. 1976 Plan, § 6.1). Under the Plan, employees with ten or more years of Vesting Service are entitled to a pension even if they leave the company before retirement age. (*Id.*) However, employees who leave the company before accruing ten years of Vesting Service are not entitled to a pension. (1976 Plan, § 6.3; Amd. 1976 Plan, § 6.3).

The 1971 Plan used the employee's period of "continuous service" for calculating vesting credit. (1971 Plan, Art. II § 1). Participants received credit for the length of time they worked based on calendar days. (*Id.* at Art. III § 1). According to defendants, this method awarded no credit for a partial year of service. Therefore, if an employee worked one day short of ten years from his starting date, the employee would not be vested.

On the other hand, the 1976 Plan gave credit for partial years of service, as required under ERISA. Defendants assert that the 1976 Plan used ERISA's "elapsed time method" of calculating "Hours of Service" in lieu of counting actual hours worked. (1976 Plan, §§ 18.1, 18.5). According to defendants, the 1976 Plan awarded vesting credit by multiplying the fraction of a year during which an employee was employed by a standard work year (2080 hours). (*Id.* at §§ 18.1, 18.5, 18.7). When the resulting number exceeded 1,000, an employee received a full year's vesting credit. (*Id.* at § 18.1(a)(i)). Thus, a participant earned a full year of Vesting

---

[4] Defendants have submitted an amended version of the 1976 Plan ("Amended 1976 Plan") entitled "Monsanto Company Salaried Employees Pension Plan (1976) (Conformed August, 1980)." Collectively, the three versions of the plan are herein referred to as "the Plan."

Service by working just over 25 weeks (or .48 years).

The plaintiff gives a different version of the vesting procedure under the 1976 Plan. According to plaintiff, under this Plan, an Hour of Service was defined as an hour for which an employee is directly or indirectly compensated by the employer for the performance of his/her job duties.  (1976 Plan, § 18.5).  Furthermore, an Hour of Service included: overtime clock hours; hours of service required to be taken into account to satisfy federal military service laws; hours of absence from active work because of regular paid vacations or holidays; hours of absence from active work because of occupational or non-occupational illness or disability or layoff.  (Id. at § 18.5(a)).  Plaintiff appears to take the position that, under the 1976 Plan, an employee received a year of Vesting Service for every 1,000 hours actually worked, without regard to the "elapsed time method" of calculation.[5]

_____

[5] Section 18.1(a)(i) of the 1976 Plan states:

> A participant will be credited with one year of Vesting Service for each Plan Year during which he completes at least 1,000 "Hours of Service" (as defined in subsection 18.5) with the Employers and the Subsidiaries.

Section 18.5 of the 1976 Plan states:

> An "Hour of Service" means an hour for which an employe (sic) is directly or indirectly compensated by the Employers or by a Subsidiary in the case of service with such Subsidiary, for the performance of duties for the Employers or such Subsidiary (including hours for which an employe (sic) has been awarded backpay by the Employers or such Subsidiary or by any governmental agency or judicial body to the extent such hours are not otherwise treated as Hours of Service). Notwithstanding the preceding sentence, the following special rules shall apply:
> (a)    To the extent not otherwise treated as Hours of Service the following shall constitute Hours of Service:
>    (i)    Overtime clock hours;
>    (ii)   Hours of service required to be taken into account to satisfy federal military service laws or regulations or to satisfy any other federal laws;

4

According to defendants, in 1979, the Plan was amended again following the issuance of federal regulations that provided "equivalencies" to count Hours of Service.  (Amd. 1976 Plan). The Plan's definition of "Hours of Service" was amended to use the regulation's 95 Hour Rule. (Amd. 1976 Plan, § 18.5(f)).[6]  Under this rule, participants are credited with 95 Hours of Service

---

    (iii) Hours of absence from active work because of regular paid vacations or holidays;

    (iv) Hours of absence from active work because of occupational illness or disability not yet determined to constitute total and permanent disability;

    (v) Hours of absence from active work during the first 12 months of an absence due to non-occupational illness or disability not yet determined to constitute total and permanent disability or due to a layoff;

    (vi) Hours during an authorized leave of absence or during such shorter period as may be specified by the Plan Committee.

  (b) For purposes of subsection 18.6, Hours of Service shall also include hours, not otherwise treated as Hours of Service, for which participant is directly or indirectly compensated by the Employers or the Subsidiaries, or entitled to compensation from the Employers or Subsidiaries, for absence due to sickness, disability or other similar reason.

  (c) For purposes of subsection 18.1, Hours of Service shall also include hours, not otherwise treated as Hours of Service, for which a Part-Time Employe (*sic*) participant is credited and deemed to have accrued during a calendar month subsequent to December 1975, as provided by subparagraph 18.1(1).

  (d) Hours of Service shall include Hours of Service accrued by a Qualified Disabled Terminated Employe (*sic*) for purposes of Vesting Service and Post-1975 Benefit Service, pursuant to subparagraphs 18.1(a)(iii) and 18.4(b) of this Plan

  <u>Hours of Service may be computed and recorded under the "elapsed time" regulations if the Employer so selects.</u>

(emphasis added).

  [6] The provisions of § 18.5 in the 1976 Plan remained nearly unchanged in the Amended 1976 Plan.  However, the Amended 1976 Plan added a number of additional subsections to § 18.5, including subsection (f) which states:

    In determining the Hours of Service of any employee who is compensated by the

5

for each bi-weekly period during which they work any amount of time.  (*Id.*)[7]

Plaintiff points to a memo dated September 24, 1979 from Cary E. Ashley, the Secretary of Monsanto's Employee Benefits Plans Committee ("Ashley Memo").  The memo discusses the adoption of the 95 Hour Rule and states in part:

> The Employee Benefits Plans Committee at its meeting this date, approved [the] request that the counting of overtime be excluded for purposes of determining hours of service under the Salaried Pension Plan.

According to plaintiff, under the 95 Hour Rule, the defendants no longer credited overtime hours towards Vesting Service as demanded by the terms of the 1976 Plan.  ("Ashley Memo").  Instead technical and clerical employees received a flat rate of 95 Hours of Service for each semimonthly payroll period regardless of the *actual* number of Hours of Service performed.  (*Id.*)  Contrary to defendants' assertions that the 95 Hour Rule was put into effect in 1979, plaintiff argues that it did not take effect until April 1981.  In support of this argument, plaintiff points to IRS forms (Form 5500-Annual Return/Report of Employee Benefit Plan) submitted by the defendants on behalf of the Plan.  Plaintiff notes that Form 5500 section 8(b)(ii) required defendants to indicate

---

> Employers or the Subsidiaries on a basis not dependent on the number of hours worked by such employee, the Plan Committee may credit for such employee with 95 Hours of Service for each semi-monthly payroll period in which such employee is directly or indirectly compensated by the Employers or Subsidiaries for the performance of duties for the Employers and the Subsidiaries, or may utilize such other method of estimating the period as may be authorized under the applicable regulations.

[7] According to defendants, the 95 Hour Rule liberalized the counting of service and allowed employees with less than 21 weeks (that is, less than .41 years) of work to receive a full year's credit.  Defendants assert that federal regulations authorized pension plans to use equivalencies such as the 95 Hour Rule or the elapsed time method to enable plans to avoid record-keeping difficulties associated with the crediting of Hours of Service.  29 C.F.R. § 2530.200b-3(c).

whether any amendment to the Plan resulted in a reduction of the accrued benefit of any participant under the Plan.  Plaintiff observes that defendants checked "No" in regards to section 8(b)(ii) in 1979, 1980, 1981, and 1982.  Given this evidence, plaintiff concludes that the Plan was not amended to include the 95 Hour Rule until it was officially amended in April 1981.

According to plaintiff, in 1981, Monsanto amended, restated and continued the 1976 Plan as the 1981 Monsanto Company Salaried Employees' Pension Plan ("1981 Plan").  Plaintiff points to the minutes of the January 23, 1981 meeting of the Board of Directors of defendant Pharmacia ("1981 Bd. Minutes").  Plaintiff observes that, during the same meeting, defendants ratified the decision to close the Sand Mountain facility and approved amendments to the Plan. ("1981 Bd. Minutes").  Plaintiff contends that those amendments included the 95 Hour Rule.

In addition to the provisions concerning vesting, the Plan also provides a method for determining "Benefits Service," which determines the amount of a participant's pension benefit.  Since 1976, the Plan has provided that Benefits Service is to be calculated differently for service rendered before 1976 than for later years.  (1976 Plan, §§ 18.3-18.4; Amd. 1976 Plan, §§ 18.3-18.4).  Under the Plan, according to defendants, pre-1976 Benefit Service is defined as the period of an employee's continuous employment (that is, the elapsed time between the first and final days of employment, assuming no breaks in service).  (1976 Plan, § 18.3; Amd. 1976 Plan, § 18.3).  Defendants maintain that pre-1976 Benefits Service is not based on hours worked (whether they be actual hours or an equivalency like the 95 Hour Rule).  (*Id.*) Defendants assert that only post-1975 Benefits Service is based on "Hours of Service" using the elapsed time method until 1979 and the 95 Hour Rule thereafter.  (1976 Plan, § 18.4; Amd. 1976 Plan, § 18.4).

IV.   **The Closing of the Sand Mountain Facility.**

7

According to plaintiff, in response to the announcement that the Sand Mountain facility was closing, employees at the plant openly complained to management that Monsanto was shutting down the plant in order to keep the employees from receiving their pension benefits.[8]  In an effort to assuage the employees' concerns, plaintiff asserts, members of Monsanto's management held open meetings with employees.  In these meetings, plaintiff states, members of management assured employees that anyone hired before September 1, 1972 was fully vested under the Plan and eligible for benefits.[9]

Defendants deny that Monsanto management ever told Sand Mountain employees that those hired before September 1, 1972 would be vested.  Defendants also assert that there is no memorandum or document which makes reference to a special promise of pension benefits for Sand Mountain employees.

C.B. Kitchens ("Kitchens"), a former employee at the Sand Mountain facility, testified that he remembered hearing a rumor that Monsanto would give employees a "grace period" so

---

[8] Defendants deny that the Sand Mountain facility was closed to prevent employees from vesting in their pensions.  Defendants point out that Monsanto's 1980 Annual Report explains that the company was experiencing difficult market conditions relating to the polyester produced at the facility.  James B. Hutcheson ("Hutcheson"), a former Sand Mountain employee, testified that, at the time the facility was closed and for a number of years thereafter, the market for polyester yarn was poor.  (Hutcheson Depo., p. 48).  Defendants also note that several of the Sand Mountain employees were offered new positions in different locations.  Hutcheson testified that some employees in leadership positions were transferred to different locations.  (*Id.* at 28).  Additionally, Johnny M. Boozer ("Boozer") stated that a number of management personnel were given the opportunity to transfer.  (Boozer Depo., p. 49).  Defendants point out that Gilley testified that he was offered another position with Monsanto in Pensacola, but he declined it for personal reasons.  (Gilley Depo., p. 74).  Don E. Carver ("Carver") stated that, after the Sand Mountain facility closed, he transferred to a different Monsanto plant in South Carolina and, ultimately, retired with a pension.  (Carver Depo., pp. 20-21, 39-40).

[9] According to plaintiff, a memorandum memorializing this promise was sent to employees.

8

that they could reach the vesting threshold.  (Kitchens Depo., pp. 22-25).  Kitchens could not

remember the specifics of the rumor.  (*Id.*)  Kitchens also testified that he heard the rumor from a

co-worker rather than a superior, and that he believed the "grace period" was to be between 16

and 18 months.  (*Id.* at 22-23).   Hutcheson testified that all employees were given 12 additional

months of service under the Plan when the plant closed.  (Hutcheson Depo., p. 32).  According to

Hutcheson, this information was communicated to the employees during meetings with

management.  (*Id.*)  Ralph Keel ("Keel"), another former Sand Mountain employee, testified that

he remembers someone telling him that employees hired before August 1972 would be vested.

(Keel Depo., p. 15).  Boozer testified that the employees from the "original crew" hired in

November 1971 were  promised that they would be considered vested in the Plan.  (Boozer

Depo., p. 46).  Another former employee, Carver testified as follows:

> Q:    Okay.  I want you to tell me everything that you can recall about the
>        contents of the memo or memos that talked about pension service.
> A:    The only thing that I can remember was them stating that no one had been
>        there long enough to be vested and as a result that they would take the
>        people that had been there nine plus months and they would give them the
>        additional time to total ten years to where they would be vested with the
>        company in order that they could draw a retirement pay from Monsanto
>        upon their retirement.
> Q:    And I think you said nine plus months.  Did you mean nine plus years?
> A:    No, because I think the longest that we had anybody was about – that hired
>        in from that area in that time was maybe nine years and five months.

(Carver Depo., p. 69).

According to Paul Edward Johnson ("Johnson") meetings were held at the facility

regarding the pension benefits issue prior to the plant closing.  He testified:

> Q:    Do you remember what was said at the group meetings about pension
>        benefits?
> A:    Not really.  I just remember that the point was brought out – the point,

9

sticking point to me, that I remember was, that I lacked a month and eleven days having eligibility for retirement. I worked eight full years, two partial years, and my understanding was I lacked a month and eleven days being vested for retirement, which would have meant the cut-off date for retirement was September the 1st.

. . .

A:   They told me that the cut-off date --

Q:   Okay.

A:   Cut-off date being September the 1st, they gave us time, added time to our current time that we had.

Q:   So, when you said they gave you a cut-off date, do you mean they told you anyone who was hired before September 1st --

A:   Correct.

Q:   – of 1972 would be vested?

A:   Correct.

Q:   Do you remember who said that?

A:   Some of the personnel people, I don't really – like I said, we had a number of them, but, you know, I made the statement, I guess, hundreds of times – people have asked me, will I draw Monsanto retirement and I said, no, I missed it a month and eleven days. I hired in on October 11th, that's the reason – that's my birthday. They hired me on my 18th birthday, so eleven days back would be September and you go back a full month, so that would be one month and eleven days.

(Johnson Depo., pp. 15-17).

Larry G. Segers ("Segers") also testified regarding the alleged promise that Sand

Mountain employees' benefits would vest despite their not attaining 10 years of Vesting Service:

Q:   Besides the severance package, do you remember receiving any other benefits when the plant closed?

A:   Well, of course – this of course brings up the retirement thing. Of course that was, you know, Ray Douglas like I said, there wasn't any memos that showed – that I remember seeing but Ray told us, said, well, they're going to – they're going to give you, you know – let me back up. They wanted – you know, everybody was asking or a lot of folks were asking, you know, will we get any retirement benefits. Well, they're going to – they said Monsanto is going to give you, you know, some extra time depending on when you're hired in and get – you may get vested, you know, and best I can remember what he said, you know, the cutoff time was sometime around September of '72, they were going to give you that extra time. Anybody hired back before then would, you know, get some kind of

> vestation or retirement and – but I don't remember getting any memo stating that or you know, I can't pull anything out that I can find, you know.  I just remember at the time I said, well, maybe that will be enough to pay the phone bill about 50 – in 30 years or whatever it is.
>
> Q:   Do you remember anyone else in management telling you that besides Ray?
>
> A:   I can't remember talking – you know, he was the meeting supervisor and I can't remember talking to anybody else that I can remember that told me that.

(Segers Depo., pp. 98-99).

## V.   Gilley's Employment History and Claim for Pension Benefits.

According to Gilley, he began his employment with Monsanto in August 1972, shortly after the Sand Mountain plant opened, and worked continuously until March 31, 1981, some four weeks after the Sand Mountain facility shut down.[10]  Gilley alleges that from August 1972 through December 31, 1972, he worked 80 hours of regular time plus at least 40 (but possibly 60 to 70) actual hours of overtime per semi-monthly payroll period.  (Amd. Cmpt. ¶ 18).

In late 1980 or early 1981, Monsanto made public its intention of closing the Sand Mountain plant.  Although Gilley was laid off shortly after production ended, he testified that he was offered another position with Monsanto at another plant.  (Gilley Depo., pp. 73-74).  However, he declined the position because his wife did not want to move.  (*Id.* at 74).  Gilley remained on lay-off status and continued to earn pension credits until his final termination on February 16, 1982.  (Buettner Decl. ¶ 8).

According to Gilley, on or about January 31, 2001, he applied for early retirement benefits over the telephone with a representative of defendant Pharmacia.  During that telephone

---

[10] Brian Buettner ("Buettner"), an employee in Monsanto's Compensation and Rewards Group, testified that Gilley's personnel records indicate that he worked for the company from August 30, 1972 to March 31, 1981.  (Buettner Decl. ¶ 7).

conversation, plaintiff asserts, the representative verified Gilley's eligibility under the Plan, and assigned him a personal identification number (PIN).  In a letter dated April 6, 2001 from the Pharmacia Benefits Center, Gilley was informed that the company's research had shown that he was not due any benefits under the Plan as he had not worked with the company the required ten years.  The letter stated "[t]here are no benefits due to you from the Monsanto Company Pension Plan *at this time*."  (emphasis added).  According to Gilley, despite continued communication with Pharmacia/Monsanto regarding his pension benefits, the defendants never informed him of his right to appeal the denial or his right to file an action under ERISA.

Gilley asserts that in late October 2003, after receiving another letter informing him that he had only nine and half years of Vesting Service with Monsanto and that he was not entitled to a pension benefit, he retained counsel.  According to Gilley, on or about November 4, 2003, he filed his administrative appeal.  In a letter dated February 25, 2004, Charles L. Belloli, the Secretary of Monsanto's Employee Benefits Plans Committee, informed Gilley's counsel that his appeal had been denied.  This letter explained that Gilley was not vested under the Plan because he had only 9.594 years of "Vesting Service" calculated as follows: 0.411 years of Vesting Service for 1972 (95 times nine (9) (the number of semi-monthly pay periods Gilley worked in 1972) divided by 2080 hours (the number of hours in a standard work year)); nine years for the period 1973 through 1981; and 0.182 years of Vesting Service for the period January 1, 1982 to February 16, 1982 (four times 95 divided by 2080 hours).[11]  According to Gilley, attached to this

---

[11] According to defendants, Gilley would have still failed to meet the 10-year vesting requirement even if the continuous service or elapsed time method of calculation had been used. Defendants contend that, under such a method, Gilley would have received .337 years for 1972, 9 years for 1973 through 1981, and .129 years for 1982.

letter was a memorandum, dated September 24, 1979, regarding the Committee's adoption of the 95 Hour Rule as a proposed amendment to the 1976 Plan.

## VI.   Procedural History/Gilley's Allegations in this Action.

Gilley contends that he has ten full years of Vesting Service under the Plan if defendants are enjoined from using the 95 Hour Rule to retroactively reduce *accrued* credited service under the Plan in violation of ERISA § 204(g).  Gilley alleges that, during its first few years of operation, the general policy at the Sand Mountain plant was to give every employee the opportunity to work as much overtime as possible.  In fact, according to Gilley, Monsanto's management strongly encouraged employees to work overtime during this period.  Gilley asserts that, in 1972, he and all the other employees at the Guntersville facility worked as much overtime as physically possible to get the plant up and running.  In fact, from August 1972 through December 31, 1972, Gilley recalls working at least 40 (and possibly as much as 60 to 70) actual hours of overtime (not time and a half) each semi-monthly payroll period in addition to the 80 hours of regular time.[12]  As a result of working substantial amounts of overtime, Gilley asserts that he had over 1000 Hours of Service in 1972.  Under the version of the Plan in force at that time, Gilley contends, an employee with a minimum of 1000 Hours of Service in any year was credited with one full year of Vesting Service.  Gilley alleges that he is entitled to one year of Vesting Service for the calendar year 1972.  According to Gilley, he is entitled to eight years of Vesting Service from January 1, 1973 through December 31, 1980.  Under the 1976 Plan, Gilley asserts, an employee is entitled to receive credited service for an absence for 12 months as a

---

[12] Plaintiff cites to the sworn affidavit of Wendell F. Gilley dated December 3, 2003 but does not provide a copy of this affidavit.

result of a layoff.  Because Gilley's termination was the result of a layoff, he asserts he is entitled to credit for Vesting Service between March 31, 1981 and March 31, 1982.[13]  Accordingly, Gilley claims he is entitled to a full year of Vesting Service for the period January 1, 1981 through December 31, 1981.  Further, Gilley states that he is entitled to six (6) semi-monthly payroll periods of credited Vesting Service for January 1, 1982 through March 31, 1982, giving him a total of ten plus years of service and entitling him to a pension benefit.

Gilley filed this action on March 17, 2004.  Gilley filed a First Amended Complaint on December 3, 2004.  The Amended Complaint contains five counts alleging various ERISA violations.[14]  Plaintiff asserts that the putative class is defined in Counts Two and Five, but the

---

[13] Plaintiff notes that, under Section 18.5(a) of the 1976 and Amended 1976 Plans, Hours of Service includes "(v) Hours of absence from active work during the first 12 months of an absence due to non-occupational illness or disability not yet determined to constitute total and permanent disability or due to layoff."  Although defendants assert that Gilley has credited service up to February 26, 1982, plaintiff maintains that he should be credited with service up to March 31, 1982 as his last day of work at the Guntersville plant was March 31, 1981.

[14] Count One is brought under ERISA § 502(a)(3) and alleges in part:

> Plaintiff, Mr. Gilley, is a participant in the Monsanto Pension Plan.  Mr. Gilley has over ten years of Vesting Service under the terms of the 1976 Plan, and over ten years under the terms of the 1981 Plan if defendants' are enjoined from improperly applying the 95 Hour Rule retroactively in violation of ERISA. . . .

> In April 2001, Mr. Gilley received a letter denying him pension benefits on the basis that he was not vested under the Monsanto Pension Plan.  The letter failed to provide proper notice of the reason for the decision and failed to give notice to Mr. Gilley of the opportunity for a full and fair review as required by ERISA § 503(1) & (2).

> Mr. Gilley continued to communicate with Pharmacia/Monsanto regarding his pension benefits.  During this time Pharmacia/Monsanto never informed Mr. Gilley of his rights including his right to appeal the denial of the Committee's decision to deny him his pension benefits in continued violation of ERISA § 503(2). . . .

same class pertains to Counts Three and Four as well.  Count Two, the first class count, is a claim under ERISA § 502(a)(3) on behalf of plaintiff and other similarly situated participants for violations of ERISA § 510 and under a theory of equitable estoppel.  Count Two also asserts a claim on behalf of the Plan under ERISA § 502(a)(2) and § 409.[15]  Gilley asserts that his class

───────────────

> On or about February 23, 2004, the Committee considered and denied Mr. Gilley's appeal. . . . the Committee took the position that Mr. Gilley was not vested under the 1981 Plan because he was only entitled to 95 Hours of Service for each semi-monthly pay period during 1972. . . .
>
> Defendants arbitrarily and capriciously denied plaintiff credit for his accrued Vesting Service for 1972.
>
> Defendants arbitrarily and capriciously denied plaintiff credit for a full year of Vesting Service from his last day of employment at Monsanto until twelve months thereafter on or about March 31, 1982. . . .

(Amd. Cmpt. ¶¶ 37-44).

   Defendants assert that Count One is pleaded as an individual claim for benefits and has no place in a purported class action.

   [15] Count Two states in part:

> Defendants' are estopped from denying Mr. Gilley and other similarly situated participants their rightful pension benefits because the terms of the 1981 Plan are ambiguous in that Section 17.5 (*sic*) includes overtime within the definition of Hours of Service and simultaneously excludes overtime pursuant to the 95 Hour Rule, an amendment added to the 1976 Plan by the Committee and the Monsanto Company Employee Benefits Executive Committee . . . in late 1979 or early 1980. . . .
>
> [After announcing the closing of the Alabama plant, in] an effort to assuage the employees' concerns, a memorandum was sent to all employees stating that anyone hired before September 1972 had enough credited service time to be fully vested under Monsanto's Pension Plan.
>
> Open meetings were held with employees regarding the plant closing.  During these meetings management repeatedly reassured employees that anyone hired before September 1972 was fully vested under Monsanto's Pension Plan entitling

claim under Count Two is not mutually exclusive of his claim in Count Five.[16]  In Count Three,
plaintiff brings a claim on behalf of himself and the class  for statutory sanctions under ERISA §
502(c), or in the alternative under ERISA § 510, for defendants' failure to provide Gilley with the
1976 Plan documents after repeated requests.[17]  Because Gilley's failure or success in the instant

---

them to full benefits upon retirement. . . .

Defendants are estopped from denying participants at the Alabama facility hired
prior to September 1972 their accrued credited service under the 1976 Plan and
their pension benefits because they are fully vested under the terms of the
Monsanto Pension Plan.

Furthermore, the Committee, and/or the Executive Committee, and/or
Pharmacia/Monsanto as administrator(s) and/or fiduciary(ies) failed to discharge
their duties with respect to the Monsanto Company Salaried Employees' Pension
Plan . . . and its participants as required by ERISA by applying the 95 Hour Rule
in a retroactive fashion to deny plaintiff his credited service under the 1976 Plan
and therein his pension benefits for the sole purpose of benefitting
Pharmacia/Monsanto because if successful defendants could deny other similarly
situated plan participant's *accrued* credited service and benefits in the future at a
savings to the company. . . .

(Amd. Cmpt. ¶¶ 48-54).

[16] Plaintiff asserts that certification should not be defeated simply because some plaintiffs
have different claims or claims that require some individualized analysis if there is a sufficient
nexus between the legal claims of the various class members and the class as a whole.

[17] Count Three asserts in part:

Plaintiff's counsel first requested a copy of the 1976 Plan in a letter dated
November 20, 2003.  Defendants failed to provide plaintiff's counsel with a copy
of the 1976 Plan instead providing a 1980 *conformed copy* of the 1976 Plan in
their Appendix to their Motion to Dismiss.  On or about June 3, 2004, defendants
finally provided counsel with a copy of the 1976 Plan after counsel complained in
her filings with the court of defendants' attempts at misdirection.

Plaintiff, Mr. Gilley as an individual and as class representative for all similarly
situated participants, is entitled to statutory sanctions under ERISA § 502(c), or
alternatively under ERISA § 510 should the court find relief under that section

case inures to the benefit of the class as a whole, plaintiff asserts, this is appropriately a class claim.  Count Four asserts a claim for equitable relief.[18]

According to Gilley, his primary claim is under Count Five.  In Count Five, Gilley alleges that defendants have violated ERISA  § 204(g) by retroactively applying the 95 Hour Rule and causing a reduction in benefits for all class members.[19]  Plaintiff defines the putative class as:

_____

> more appropriate, to redress defendants' interference with participants' attainment of benefits.

(Amd. Cmplt. ¶¶ 57-58).

[18] Count Four states:

> Plaintiff, Mr. Gilley, as an individual and as a representative participant on behalf of the plan was prevented from attaining rights under the Monsanto Pension Plan by defendants' closing of the Alabama plant at a time that prevented participants from becoming vested.

> Plaintiff, Mr. Gilley, on behalf of himself and the Monsanto Pension Plan and its participants, is entitled to appropriate equitable relief.

(Amd. Cmplt. ¶¶ 59-60).

[19] Count Five alleges in part:

> . . . Defendants by applying the 95 Hour Rule retroactively to accrued credited service under the 1976 Plan reduced the amount of *accrued* Hours of Service and Vesting Service under the plan.

> As a result of defendants' retroactive application of the 95 Hour Rule plaintiff and/or other similarly situated plan participants suffered a reduction or loss in their right to accrued benefit and/or their pension benefit.

> Furthermore, the Committee, the Executive Committee, and/or Pharmacia/Monsanto as Monsanto Pension Plan administrator(s) and/or fiduciary(ies) failed to discharge their duties with respect to the plan and its participants as required by ERISA in that the defendants amended the method of calculating Hours of Service under the 1976 Plan for the sole purpose of benefitting the defendants rather than the plan participants, by amending the plan

17

> All participants of the 1976 Monsanto Company Salaried Employees' Pension
> Plan, excluding the defendants, both active or retired, or their beneficiaries or
> estates that had, have, or will have their credited service, based on "Hours of
> Service" as that phrase is defined by the terms of the 1976 Plan, reduced by the
> retroactive application of the 95 Hour Rule causing a concomitant reduction in
> their accrued benefit.[20]

(Amd. Cmpt. ¶ 70).

## STANDARD OF REVIEW

The Eleventh Circuit recently discussed the standard of review for class certification

decisions in *Cooper v. Southern Co.*, 390 F.3d 695 (11th Cir. 2004).  In *Cooper* the court stated:

> Questions concerning class certification are left to the sound discretion of the
> district court. *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1386 (11th
> Cir.1998) (en banc); *Freeman v. Motor Convoy, Inc.*, 700 F.2d 1339, 1347 (11th

---

> in a manner that discriminated against certain plan participants, and by applying
> the amendment in a retroactive fashion thereby denying plan participant's accrued
> credited service under the Monsanto Pension Plan.
>
> Plaintiff, Mr. Gilley, is a suitable class representative to sue on behalf of all
> similarly situated plan participants under ERISA § 502(a)(3) for injuries suffered
> as a result of the defendants' violation of ERISA § 204(g) and on behalf of the
> Monsanto Pension Plan for defendants' breach of their fiduciary duty to the plan
> and its participants. . . .

(Amd. Cmpt. ¶¶ 66-69).

[20] Plaintiff states that, because Count Five is his primary claim, his discussion of class
certification will center on this count.

Defendants take issue with plaintiff's proposed class definition.  Defendants assert that
this defined class would not be limited to Sand Mountain employees but would include Plan
participants worldwide.  Further, defendants point to Gilley's deposition testimony indicating
that he knew of only two other persons who might have similar claims to himself.  (Gilley Depo.,
pp. 99-103).  Gilley identified one of these persons as "Sandusky," but could not remember his
first name.  (*Id.* at 99).  Gilley did not know the name of the other person, but only that he lived
in Decatur and shared a mutual friend with Gilley.  (*Id.* at 99-103).  According to defendants,
plaintiff has offered no evidence that these persons are within the class definition or that they
have been or would be denied a pension.

Cir.1983). "A district court's decision whether or not to certify a class under Rule 23 of the FRCP is reviewed for abuse of discretion. As long as the district court's reasoning stays within the parameters of Rule 23's requirements for the certification of a class, the district court decision will not be disturbed." *Hines v. Widnall*, 334 F.3d 1253, 1255 (11th Cir.2003) (citations omitted).

Even if we would have certified a class, that does not mean the district court abused its discretion in declining to do so. *Id.*; *see also Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1374 (11th Cir.1984). Indeed, the distinguishing hallmark of abuse-of-discretion review is that it "presupposes a zone of choice within which the trial courts may go either way." *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 971 (8th Cir.1984).

By definition ... under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call. That is how an abuse of discretion standard differs from a de novo standard of review. As we have stated previously, the abuse of discretion standard allows "a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." *Rasbury v. I.R.S.*, 24 F.3d 159, 168 (11th Cir.1994) (quoting *United States v. Kelly*, 888 F.2d 732, 745 (11th Cir.1989) (citation omitted)).

390 F.3d at 711-12.

## ARGUMENTS[21]

### I.   **Plaintiff's Motion.**

#### A.     **The Class Certification Requirements.**

Class certification is governed by Federal Rule of Civil Procedure 23(a), which provides:

Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Plaintiff notes that the four requirements of Rule 23(a) are commonly referred to as "the

---

[21] This section summarizes the arguments made by the parties and does not necessarily reflect the conclusions reached by the court.

prerequisites of numerosity, commonality, typicality, and adequacy of representation." *General Tel. Co. of the Northwest, Inc. v. E.E.O.C.,* 446 U.S. 318, 330 (1980).  Plaintiff acknowledges that, as the party seeking class certification, he has the burden of proving the prerequisites. *Hudson v. Delta Air Lines, Inc.,* 90 F.3d 451, 456 (11th Cir. 1996); *Gilchrist v. Bolger*, 733 F.2d 1551, 1556 (11th Cir. 1984).  In addition to the prerequisites under Federal Rule of Civil Procedure 23(a), Rule 23(b) provides that a class must fall into one of the three following categories:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>
>> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
>>
>> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Plaintiff argues that the first prerequisite under Rule 23(a), "numerosity," has been

satisfied because the putative class is too large to make joinder practical.  Presumptively, plaintiff

asserts, the benchmark in regards to whether the class members are too numerous for joinder to

be practicable is forty (40) persons.  *See Korn v. Franchard Corp.,* 456 F.2d 1206, 1209 (2nd

Cir. 1972) (stating, "[f]orty investors have been said to represent a sufficiently large group where

the individual members of the class are widely scattered and their holdings are generally too

small to warrant undertaking individual actions") (internal quotation marks and citations

omitted).  Furthermore, plaintiff argues, he need not set forth the exact number of class members

to satisfy the numerosity requirement.  *See Stewart v. Abraham*, 275 F.3d 220, 226-27 (3rd Cir.

2001) (explaining that "generally if the named plaintiff demonstrates that the potential number of

plaintiffs exceeds 40, the first prong of Rule 23(a) has been met").  Plaintiff points to *Groover v.*

*Michelin North America, Inc.*, 187 F.R.D. 662 (M.D. Ala. 1999), where the court stated, "a

plaintiff need not show the precise number of members in the class. . . . [and if] the numerosity

question is a close one, a balance should be struck in favor of a finding of numerosity, since the

court has the option to decertify pursuant to Rule 23(c)(1)."  187 F.R.D. at 666 (citing *Evans v.*

*U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir.1983)).  Plaintiff asserts that "Monsanto

provides pension benefits for substantially all of its employees."[22]  According to plaintiff,

Monsanto employed an average of 59,769 employees in any given year between 1970 and 1982.[23]

---

[22] Plaintiff attributes this quote to Monsanto's 1981 Annual Report to Shareholders. However, plaintiff has failed to provide the court with a copy of this document.

[23] Plaintiff asserts that this figure is the approximate number of employees according to Monsanto's 1980 Annual Report to the Shareholders, pp. 66-67.  Plaintiff maintains that this document shows the following number of employees: 52,199 in 1982; 57, 391 in 1981; 61,836 in 1980; 63,926 in 1979; 62,851 in 1978; 61,519 in 1977; 61,903 in 1976; 59,242 in 1975; 60,926 in 1974; 58,277 in 1973; 57,891 in 1972; and 59,271 in 1971.  Plaintiff has not provided the court with a copy of these pages.

In 1980, just prior to the plant's closure, plaintiff asserts, there were approximately 880 employees working at the Guntersville, Alabama (Sand Mountain) facility.[24]  Plaintiff further maintains that, at its peak, the Guntersville plant had around 1200 employees.  Given these figures, plaintiff concludes that the numerosity prerequisite has been met.

Plaintiff argues that the prerequisites of "commonality" and "typicality" tend to merge. The Supreme Court stated in *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147 (1982):

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

457 U.S. at 157 n.13.  *See also Washington v. Brown & Williamson Tobacco Corp.,* 959 F.2d 1566, 1569 n.8 (1992).  According to plaintiff, "commonality" looks to the issue of whether there are questions of law or fact common to the class.  Commonality, plaintiff asserts, is not a difficult requirement to meet and is generally satisfied if at least one issue's resolution will affect all or a significant number of class members.  Plaintiff declares that this prerequisite to certification will not be defeated simply because some plaintiffs have different claims or claims that require some individualized analysis if there is a sufficient nexus between the legal claims of the various class members and the class as a whole. *Prado-Steiman ex rel. Prado v. Bush,* 221 F.3d 1266, 1278-79 (11th Cir. 2000).  Plaintiff maintains that the single legal issue common to Gilley's claim and the

---

[24] Plaintiff cites Monsanto's 1980 Annual Report to Shareholders p. 7 for this figure.

claims of all class members is whether ERISA's mandates permit the defendants' retroactive application of the 95 Hour Rule to *accrued* credited service under the 1976 Plan. The resolution of this single legal issue, plaintiff concludes, will affect the outcome of plaintiff's claim and the claims of all class members.

Similarly, plaintiff notes, the Eleventh Circuit has recognized that to establish typicality there must be a nexus between the class representatives' claims or defenses and the common questions of fact or law which unite the class. *Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir. 1984). In the present case, plaintiff argues, all members of the putative class are participants with accrued credited service under the 1976 Plan. All, according to plaintiff, have, had or will have their accrued credited service under the terms of that Plan reduced as a result of the defendants retroactive application of the 95 Hour Rule amendment in violation of ERISA § 204(g). Plaintiff acknowledges that the loss of benefits that each class member has or will suffer requires individualized calculations. However, plaintiff contends that the method of recalculation used will be substantially the same for the entire class if the defendants are enjoined from employing the 95 Hour Rule. Therefore, plaintiff argues, the prerequisites of "commonality" and "typicality" have been met in the present case.

Plaintiff further asserts that the last Rule 23(a) requirement, adequacy of representation, is also satisfied here. To meet the requirement of adequacy, plaintiff states, a class representative must show that there is not a conflict of interest between himself and the other class members, and that he has retained competent counsel. Plaintiff asserts that he is an adequate representative because his interest are not antagonistic to those of the class. Plaintiff also asserts that he has obtained competent, qualified counsel, who is generally capable of conducting this litigation.

23

In addition to satisfying the threshold requirements of Rule 23(a), a class action may be maintained only if it qualifies under at least one of the categories provided in Federal Rule of Civil Procedure 23(b).  *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 614 (1997); *Rutstein v. Avis Rent-A-Car Systems, Inc.,* 211 F.3d 1228, 1233 (11th Cir. 2000), *cert. denied sub nom. Zeirei Agudath Israel Bookstore v. Avis Rent-A-Car System, Inc.*, 532 U.S. 919 (2001).  A class action under Rule 23(b)(1)(A) is appropriate where there is a risk of "inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class."  Under Rule 23(b)(1)(B) a class action is appropriate where there is a risk of adjudications with respect to individual members of the class being, as a practical matter, dispositive of the interests of the other members not parties to the adjudications or of such adjudications substantially impairing or impeding non-parties' ability to protect their interests.

In the present action, plaintiff asserts, if this court denies class certification and rules on whether the 95 Hour Rule violates ERISA § 204(g), the issue could be raised in a second action, conceivably placing defendants in a quandary as to how to treat the remaining potential class members and the Plan.  Plaintiff asserts that if the court denies certification and rules that the 95 Hour Rule did not violate ERISA § 204(g), the decision would, as a practical matter, be determinative on the issue as defendants would be inclined to treat all members of the putative class the same through its treatment of the Plan.  Additionally, plaintiff argues, courts have found that class certification is particularly appropriate under Rule 23(b)(1) when a plaintiff brings claims on behalf of the Plan under ERISA §§ 502(a)(2) and 502(a)(3).  Plaintiff asserts this is because, regardless of whether or not the court certifies the action as a class action, the court's

24

ruling will be determinative on the issues raised.  *Piazza v. Ebsco Industries, Inc.,* 273 F.3d 1341, 1352 (11th Cir. 2001) (finding that claims brought under ERISA § 502(a)(2) have been certified under Rule 23(b)(1) or (2)).

Plaintiff argues that there are other factors that weigh in favor of certification under Rule 23(b)(1)(B).  First, plaintiff asserts, because the events at issue here occurred between twenty and thirty years ago, the likelihood of other class members filing individual actions is diminished, making this court's decision the final determination of the issues raised.  Second, plaintiff contends, if the ruling in the present case is adverse to the class members' interest, they may be unable to bring a separate suit.  This is because, plaintiff argues, the expense involved in prosecuting such an action is high in relation to the value of each individualized claim and such prosecution requires specialized knowledge of ERISA.  Third, plaintiff argues, the present action is ideally suited for class certification because it is an ERISA action involving equitable remedies that inure to the benefit of the class as a whole and because the legal issues are a matter of federal statutory and common law.

Under Rule 23(b)(2), a class is certifiable if the defendant has acted or refused to act on grounds generally applicable to the class, "thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Plaintiff maintains that courts in the Eleventh Circuit have interpreted the term "generally applicable" to mean that the party opposing the class "has acted in a consistent manner towards members of the class so that his actions may be viewed as part of a pattern of activity, or to establish a regulatory scheme, to all members."  *Leszczynski v. Allianz Ins.,* 176 F.R.D. 659, 673 (S.D. Fla. 1997) (internal quotation marks and citations omitted).  Plaintiff argues that certification under Rule 23(b)(2) is

appropriate if class treatment is "clearly called for, for example, in situations where a court, through a single injunction or declaration, can redress group, as opposed to individual, injuries. . . . A Rule 23(b)(2) action cannot resolve individualized issues of fact, nor provide different types of relief required to redress individual injuries." *In re Managed Care Litigation,* 209 F.R.D. 678, 686 (S.D. Fla. 2002) (quoting *Holmes v. Cont'l Can Co.,* 706 F.2d 1144, 1155 (11th Cir.1983) and 5 James Wm. Moore, et al., Moore's Fed. Prac. § 23.43(2)(b) at 23-195 (3d ed. 2000)) (internal quotation marks omitted).  In this action, plaintiff contends, he represents all participants of the 1976 Plan whose *accrued* credited service under the Plan was reduced in violation of ERISA's anti-cutback rule.  Further, plaintiff argues, all injuries suffered by the class as a whole could be redressed by declarations that defendants' retroactive application of the 95 Hour Rule is a violation of ERISA § 204(g) and that defendant has violated ERISA §§ 404 and §510, along with corresponding injunctions.  Any incidental monetary relief that would inure to individual class members, plaintiff asserts, would be merely a consequence of the equitable relief sought.  Accordingly, plaintiff concludes that the requirements for class certification under Rule 23(b)(2) have been met.

Plaintiff asserts that class certification under Rule 23(b)(3) is appropriate if common questions of law or fact predominate over questions affecting individual class members and if a class action would be superior in fairness and efficiency in relation to other methods of adjudication.  The matters a court is to consider under the rule include: (A) the class members' interest in individually controlling their separate actions; (B) the extent and nature of existing litigation by class members concerning the same claims; (C) the desirability of concentrating the litigation in the particular forum; and (D) the likely difficulties of managing a class action.  Fed.

26

R. Civ. P. Rule 23(b)(3).  Classes certified under Rule 23(b)(3) require notice to the potential

class members and the opportunity to opt out of the class.  Fed. R. Civ. P. Rule 23(c)(2)(B).

According to plaintiff, certain types of claims are inappropriate for class certification under Rule

23(b)(3).  For example, plaintiff notes that the Eleventh Circuit has held that it is an abuse of

discretion to certify a claim for breach of fiduciary duty under Rule 23(b)(3) because individuals

can only bring these claims on behalf of a plan, making opting out inappropriate.  *Piazza v.

Ebsco Industries, Inc.*, 273 F.3d 1341, 1351-52 (11th Cir. 2001).  Plaintiff further points out that

a district court in the Fifth Circuit stated regarding Rule 23(b)(3) certification: "This class action

mechanism is intended for use when class certification is convenient and desirable but the classes

cannot qualify for (b)(1) or (b)(2) certification. . . . Such cases include large-scale, complex

litigation for money damages."  *In re Electronic Data Systems Corp.*, 2004 WL 2616225, *13

(E.D. Tex. 2004) (citing *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 412 (5th Cir. 1998)).

Plaintiff asserts that, in addition to certification under both Rule 23(b)(1) and (b)(2),

plaintiff's claims under § 502(a)(3) for individual relief are appropriate for certification under

Rule 23(b)(3).  First, plaintiff contends, all members of the putative class have been or will be

affected in the same manner by the defendants' retroactive application of the 95 Hour Rule.

Further, plaintiff argues, individual relief under § 502(a)(3) would be easily achieved by

awarding a flat amount of credited service and then recalculating vesting and benefit service

according to the terms of the 1976 Plan.[25]  Secondly, plaintiff asserts, common issues of law

predominate because the only issues involved here concern whether defendants actions violated

---

[25] Plaintiff also asks for sanctions under § 502(c) or remedial relief under § 510 for
defendants' failure to provide him with plan documents, which plaintiff asserts are essential to
his case.

various ERISA provisions.  Plaintiff concludes that a class action is the only type of action that will fairly adjudicate plaintiff's claims and those of the class.

### B.  Individual Aspects of Class Certification for Remaining Counts.

#### 1.  Count Two.

Plaintiff asserts that the requirements for class certification have been met in regard to Count Two, in which plaintiff claims, under a theory of equitable estoppel, that defendants intentionally interfered with his rights and those of the class members in violation of ERISA § 510.  In Count Two, plaintiff also asserts a claim on behalf of the Plan, under ERISA § 502(a)(2), that defendants breached their fiduciary duties to the Plan.

Plaintiff anticipates that defendants will object to certification of Count Two by arguing that plaintiff failed to file the present action within the applicable statute of limitations and, therefore, has not satisfied the prerequisites of commonality, typicality or adequacy of representation.  Plaintiff also anticipates that defendants might object to certification of Count Two because the count will require individualized proof on the statute of limitations issue.  However, plaintiff asserts, the statute of limitations issue is not a problem here because defendants failed to give proper notice to him of his rights as required by ERISA § 503(2).  Plaintiff argues that his position is further supported by the fact that he seeks a determination that he and other class members are entitled to equitable enforcement of their rights under ERISA.

According to plaintiff, defendants previously argued that *Musick v. Goodyear Tire & Rubber Co., Inc.,* 81 F.3d 136 (11th Cir. 1996), established that plaintiffs' claims under ERISA § 510 are subject to a two-year limitations period.  *See Musick*, 81 F.3d at 137 (stating, "a two-year statute of limitations is applicable to section 510 actions brought in Alabama, at least insofar as

back pay, back benefits, and retirement eligibility credit are the remedies sought"). Plaintiff

argues that defendants reliance on *Musick* is misplaced. According to plaintiff, "[a]n ERISA

cause of action accrues when a request for benefits is denied." *Hogan v. Kraft Foods,* 969 F.2d

142, 145 (5th Cir. 1992). Plaintiff admits that this suit was filed nearly three years after

defendants first notified him that he was not entitled to an early retirement benefit. However,

plaintiff argues, there are certain extenuating circumstances that make *Musick* inapplicable here.

Plaintiff asserts that he first applied for his early retirement benefit in January 2001 and was

denied benefits by Pharmacia/Monsanto without explanation in a letter dated April 6, 2001.[26]

The letter, according to plaintiff, stated, without further explanation, "[t]here are no benefits due

to you from the Monsanto Company Pension Plan *at this time*." (emphasis added). Plaintiff

states that, over the next two years, he continued to speak with Pharmacia/Monsanto regarding

his benefits. However, plaintiff contends, defendants never informed him of the specifics as to

why he was denied. Neither, plaintiff argues, did defendants inform him of his right to an

administrative appeal or to bring an action under ERISA. Plaintiff maintains that this suit was

timely filed because defendants' April 6, 2001 letter was not a final determination, as it failed to

inform him of his rights.[27] Plaintiff argues that, as they failed to notify him of his rights,

defendants cannot claim that this suit was untimely. Plaintiff explains that defendants misled

him by using language that suggested that they might possibly change their minds in the future.

     Plaintiff further notes that the *Musick* court established the applicable two-year

---

[26] Plaintiff asserts that he received the letter some time after April 10, 2001.

[27] Plaintiff asserts that he retained counsel after receiving a final determination letter on or about June 27, 2003.

29

limitations period by applying state law standards to the plaintiff's claims based on the nature of the claim.  81 F.3d at 138.  The claims in *Musick*, plaintiff argues, are distinguishable from his claims here.  In *Musick*, the court characterized the plaintiffs' claims under ERISA § 510 as being most analogous to a claim for wages and retaliatory discharge under Alabama law.  *Id.* at 139.  Plaintiff asserts that, in the present action, he seeks a determination that he and the class members are entitled to an equitable enforcement of their statutory rights under ERISA. Therefore, plaintiff concludes, his claims differ in their essential character from the *Musick* plaintiff's claims for backpay, reinstatement, and benefits.

### 2.    ERISA § 510 and/or ERISA § 404.

In Count Two, plaintiff alleges that defendants are knowingly and intentionally violating ERISA by applying the 95 Hour Rule uniformly despite the fact that doing so divests plaintiff and the class members of *accrued* credited service under the 1976 Plan.  Plaintiff maintains that the Plan is ambiguous in that Section 18.5 includes overtime within the definition of Hours of Service and simultaneously excludes overtime pursuant to the 95 Hour Rule.  Plaintiff reiterates that, during the time the Sand Mountain facility was preparing to close, defendants' management held open meetings and sent a memorandum assuring employees that anyone hired before September 1972 had enough credited service to be fully vested under the Plan.

Plaintiff maintains that at the time of these meetings and the memo, defendants' management, correctly, did not apply the 95 Hour Rule retroactively.  However, plaintiff contends, defendants are now making such a retroactive application in violation of ERISA §

204(g).[28] Plaintiff asserts that defendants committed this violation knowingly and intentionally in an effort to save money. Plaintiff notes that the class members accrued their credited service under the 1976 Plan nearly 30 years ago. With every year that passes, plaintiff argues, the probability that any one class member will pursue an individual claim decreases. Plaintiff also asserts that the cost of litigation to recover the benefits is high when compared to the size of the retirement benefit an individual would receive under the Plan. Additionally, plaintiff argues, it would be difficult for individual members of the class to find counsel competent to bring an ERISA action. Furthermore, plaintiff contends, individual class members will be even more unlikely to bring separate actions if defendants failed to notify them of their rights to appeal or file suit, as they allegedly did in plaintiff's situation. Plaintiff also notes that defendants are likely to be in possession of the documentation necessary to prove a plaintiff's claims, which could make it difficult for individual class members to successfully prosecute an action. Plaintiff argues that, given the large number of employees working at the Sand Mountain facility between 1971 and 1982, defendants stand to save millions by retroactively applying the 95 Hour Rule. Given all this, plaintiff maintains that it is imperative that certification under Rule 23(a) be granted in this action.

Plaintiff points to *Bodine v. Employers Casualty Co.,* 352 F.3d 245 (5th Cir. 2003), where the court stated:

> To sustain a valid § 510 claim, an employee must show: (1) prohibited (adverse) employer action (2) taken for the purpose of interfering with the attainment of (3) any right to which the employee is entitled.

---

[28] Plaintiff asserts that he requested his pay records during his administrative appeal and, again, during discovery. However, according to plaintiff, defendants have consistently stated that they do not have any pay records.

352 F.3d at 250 (citing *Van Zant v. Todd Shipyards Corp.*, 847 F.Supp. 69, 72 (S.D. Tex. 1994)).

Normally, plaintiff asserts, claims for equitable estoppel are not suitable for class certification because they require proof of reliance on promises that defendants subsequently failed to keep.  However, plaintiff contends, the present case is an exception because, here, the element of reliance can be viewed objectively.  Plaintiff points out that defendants promised employees at the Sand Mountain facility that, if they were hired prior to September 1972, they were fully vested in the Plan.  It is plaintiff's position that reliance would naturally flow from such a promise.

### 3.    Count Three.

Plaintiff's claims in Count Three are based on defendants' failure to provide requested plan documents.  According to plaintiff, his counsel first requested a copy of the 1976 Plan in a letter dated November 20, 2003.  However, plaintiff asserts, defendants provided only a copy of the 1980 conformed copy of the 1976 Plan.  This version contained the 95 Hour Rule.  On or about June 3, 2004, defendants finally provided plaintiff's counsel with a copy of the 1976 Plan.  Plaintiff asserts that he is, individually and as class representative, entitled to sanctions under ERISA § 502(c), or alternatively under ERISA § 510.  Plaintiff argues that, because defendants' failure to provide requested documents affects the class as a whole, this claim is appropriately brought as a class claim and the prerequisites of numerosity, commonality, typicality, and adequacy of representation have been met under Rule 23(a).

### 4.    Count Four.

Plaintiff maintains that he, individually and as a representative participant on behalf of the Plan, was prevented from attaining rights under the Plan by defendants closing of the Sand

32

Mountain plant at a time that prevented participants from becoming vested.  According to

plaintiff, the prerequisites of numerosity, commonality, and typicality have been met.  Further,

plaintiff asserts that he is an adequate representative of the class.  Plaintiff concludes that the

class is appropriately certifiable under Rule 23(b)(1), 23(b)(2) or 23(b)(3).

## II.   Defendants' Response.

### A.   Plaintiff's Class Definition is Fatally Flawed.

Defendants note that, as a threshold matter, a proposed class cannot be certified unless it

is adequately defined and clearly ascertainable.  *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th

Cir. 1970).  Where individualized fact-finding is required to determine class membership,

defendants contend, class treatment is inappropriate.  *Crosby v. Soc. Sec. Admin. of United*

*States,* 796 F.2d 576, 580 (1st Cir. 1986); *Simer v. Rios*, 661 F.2d 655, 670-71 (7th Cir. 1981).

Defendants argue that "[a]n identifiable class is essential so that the Court can determine whether

a particular claimant is a class member."  *Perez v. Metabolife Intern., Inc.*, 218 F.R.D. 262, 266

(S.D. Fla. 2003) (quoting *McGuire v. International Paper Co.*, 1994 WL 261360, at *3 (S.D.

Miss. 1994)).  Further, defendants maintain, "[a] vague class definition portends significant

manageability problems for the court."  *Perez*, 218 F.R.D. at 266 (quoting *Rink v. Cheminova*,

*Inc.*, 203 F.R.D. 648, 660 (M.D. Fla. 2001)).  According to defendants, plaintiff bears the burden

of presenting the court with an objective and feasible way of identifying class members, and

certification should be denied when the proposed class cannot be determined readily without

additional fact finding.  *See Crosby* 796 F.2d at 580 (finding use of "within a reasonable time" in

class definition made it impossible to identify class members without individualized fact-

finding).

33

Defendants argue that plaintiff's class definition cannot support class certification for three reasons.  First, defendants assert, membership in the purported class is not clearly ascertainable as required by Rule 23 and controlling case law.  Second, defendants contend, the class definition confuses "accrual" and "vesting" in a manner that renders the definition unworkable and inconsistent with the claims of plaintiff's complaint.  Finally, defendants argue, the definition bears no relationship to the claims alleging estoppel, failure to provide ERISA-required documents, and closing of the plant to interfere with pension rights.

### 1.    Plaintiff's Proposed Class is Not Clearly Ascertainable.

According to defendants, plaintiff's proposed class comprises an unidentifiable and illegitimate group because membership in the class cannot be determined without a case-by-case examination of: (1) each participant's dates of service; (2) whether each participant was or should be credited with a fractional year of service prior to September 1979 under the 95 Hour Rule; (3) the hours of overtime worked; and (4) whether crediting actual hours worked (including overtime) would yield greater amounts of Vesting Service than the 95 Hour Rule.  Defendants argue that these determinations would require mini-trials for each potential member and consume multiple hours of court time.

Defendants assert that Gilley's personal circumstances illustrate the problem with the proposed class.  According to defendants, the Plan Administrator never calculated pensions using the actual hours worked, as advocated by plaintiff, and doing so would require individualized fact-finding.  In support of this assertion, defendants point to the testimony of Monsanto Compensation and Rewards Group employee Buettner.  Buettner testified that Monsanto's benefits department has never maintained records that reflect actual hours worked by salaried

34

employees, and Vesting Service was never calculated based upon the number of actual hours worked by such employees.  (Buettner Decl. ¶ 10).  Additionally, Buettner stated that Monsanto possesses no documents that reflect the actual number of hours worked by Gilley in 1972.  (*Id.* at ¶ 11).  Indeed, defendants maintain, records showing overtime hours prior to 1973 do not exist. Further, defendants argue, Gilley does not have records showing his overtime hours, and he testified that he did not know the precise number of hours he worked.  (Gilley Depo., pp. 130-31).  Given this situation, defendants conclude, plaintiff's advocated method of determining Vesting Service would require mini-trials on the issue of class membership.  These trials would be based largely on the testimony of employees, managers and others as to their vague memories of precise hours worked during particular weeks decades earlier.  Under plaintiff's class definition, defendants argue, such tedious fact-finding would be required, not only for Gilley and other Sand Mountain employees, but for all former Monsanto employees worldwide.[29]

Defendants assert that these real and practical definition problems violate Rule 23 and require denial of class certification.  Defendants contend that "[a] court should deny class certification where the class definitions are overly broad, amorphous, and vague, or where the number of individualized determinations required to determine class membership becomes too

_____

[29] Defendants argue that plaintiff's discovery record underscores the problems in ascertaining class membership.  According to defendants, plaintiff made broad demands for personnel information, including Hours of Service, accrued benefits and Vesting Service. Defendants advised plaintiff that information could not be provided in the forms requested because the Plan had used equivalency methods permitted by ERISA regulations and had not maintained pension records based on actual hours worked.  Defendants maintain that they offered to gather some information but, because it could not be generated automatically and required laborious hand review of records, asked plaintiff to define the group of employees for which data was sought.  Defendants assert that plaintiff failed to define such a group.  Defendants conclude that this failure to describe pertinent categories of employees for discovery purposes portends the similar failure in defining a class.

35

administratively difficult." *Perez*, 218 F.R.D. at 268-69 (denying certification of a class that would have required the court to determine dosage and number of pills taken by individuals in order to determine whether they were class members); *accord Adair v. Johnston,* 221 F.R.D. 573, 577 (M.D. Ala. 2004) (denying certification of class of all holders of certain life insurance policies that were covered by ERISA on the ground that the court could not determine whether any particular life insurance was covered by ERISA without individualized fact-finding). According to defendants, this court has, in the past, recognized the necessity of clear, definite class membership. *See Ray v. Phelps Dodge Brass Co.,* 1983 WL 665 at *1 (N.D. Ala. 1983) (stating, "where a case requires detailed investigations of the circumstances surrounding the claims of individual class members, that case does not lend itself to treatment as a class action") (citing *Reddix v. Lucky*, 252 F. 2d 930 (5th Cir. 1958)).

### 2. Plaintiff's Proposed Class Definition is Unworkable and Inconsistent with the Factual Allegations of the Amended Complaint.

Defendants note that plaintiff's factual allegations arise out of the denial of his pension claim and the determination that he had not worked sufficient time to attain vesting. (Amd. Cmpt. ¶¶ 19-25, 33-34, 39-41-45, 50-53). However, defendants argue, the proposed class definition does not mention vesting and speaks in terms of benefit accrual. According to defendants, these are distinct and different concepts. Defendants assert that "vesting" refers to eligibility for pension benefits, while "accrual" refers to the amount of the pension benefit to which a participant is entitled once vested. *See Ashenbaugh v. Crucible Inc., 1975 Salaried Retirement Plan*, 854 F.2d 1516, 1523-24 (3rd Cir. 1988) (distinguishing vesting from accrual).

It is defendants' position that the fundamental difference between vesting and accrual

renders the proposed class definition unworkable and meaningless.  Defendants maintain that,

under the 1976 Plan, "Vesting Service" – whether the service took place before or after 1976 – is

defined as a function of "Hours of Service."  (1976 Plan § 18.1).  Defendants argue that accrual

of benefits before 1976, by contrast, is defined as the employee's period of "continuous service."

(1976 Plan § 18.3).[30]  According to defendants, "Hours of Service" (whether actual hours worked

or an equivalency such as the 95 Hour Rule) are not used to calculate accrued service prior to

1976.  Defendants assert that the Plan directs that service completed prior to 1976 be calculated

under the continuous service method while service after 1975 is to be calculated using "Hours of

Service."

Defendants maintain that the class definition ignores these provisions in the Plan.  By

proposing to define the class as participants whose accrued benefits have been reduced by

retroactive application of the 95 Hour Rule, the definition, according to defendants, creates a

class which does not include anyone.  Defendants argue that the 95 Hour Rule has never been

used to calculate the accrual of benefits for services completed prior to 1976.

---

[30] Section 18.3 of the 1976 Plan states:

> Pre-1976 Benefit Service.  The number of years of Benefit Service, and any
> fraction thereof, to which a participant shall be entitled on the Effective Date of
> this Plan for service rendered prior to January 1, 1976 to any Employer,
> Subsidiary, or former subsidiary during the period it was a Participating Company
> in a Predecessor Plan ("Pre-1976 Benefit Service") shall be equal to the years of
> Credited Service said participant accrued under the 1971 Plan. . . .

The 1971 Plan states:

> Except as hereinafter provided, Credited Service shall mean the period of active
> work during a period of Continuous Service . . .

(1971 Plan Art. III § 2(a)).

37

### 3.    The Proposed Class Bears No Relationship to Counts Two, Three, and Four.

Defendants assert that the proposed class definition is improper for other reasons. Defendants argue that three of the four purported class claims have nothing to do with the 95 Hour Rule. Defendants note that Count Two concerns promises purportedly made to Sand Mountain employees. Count Three concerns Gilley's alleged request for a specific plan document and Monsanto's alleged failure to provide it. Count Four concerns the alleged closure of the Sand Mountain plant to prevent employees from vesting in their pensions. Defendants conclude that the proposed class definition simply bears no relationship to these allegations and cannot serve as the basis for class certification of these claims.

### B.    Plaintiff Has Failed to Carry His Burden of Showing Specific Facts to Satisfy Requirements of Rule 23(a) and (b).

It is defendants position that none of the Rule 23(a) or (b) requirements have been met by plaintiff.

### 1.    Plaintiff Offers No Evidence Regarding the Number of Class Members and, Therefore, Cannot Show Numerosity.

Defendants highlight plaintiff's assertions that between 1971 and 1972 defendants employed an average of 59,769 persons worldwide and that there were approximately 880 employees at the Sand Mountain facility in 1980. According to defendants, these figures do nothing to show numerosity because they tell the court nothing about the number of employees in the proposed class. Defendants assert that the fact that they may have employed 59,769 people worldwide does not show the number of participants in the Salaried Employees Pension Plan, much less the number of participants affected by the 95 Hour Rule. Nor, according to

defendants, does it show how many were or will be denied a pension under plaintiff's theory about the 95 Hour Rule.  Defendants point to plaintiff's deposition testimony, in which he asserted knowledge of only possibly two or three persons who were in a similar situation as himself.  (Gilley Depo., pp. 103-04).

Defendants maintain that a court may make "common sense assumptions" regarding numerosity but may not conclude that numerosity exists where the plaintiff has adduced no specific facts that allow such an assumption.  *See Dalton v. FMA Enterprises, Inc.,* 1996 WL 379105 at *3-4 (M.D. Fla. 1996) (holding numerosity not met where plaintiff relied on the use of a form letter to show numerosity without producing evidence of actual size of proposed class).

Defendants point to *Siles v. ILGWU National Retirement Fund,* 783 F.2d 923 (9th Cir. 1986).  In *Siles,* a case involving ERISA, the Ninth Circuit held that the plaintiff had failed to show numerosity.  783 F.2d at 930.  The *Siles* court noted that the plaintiff had produced evidence of the number of employees who lost their jobs in the relevant time period, but had failed to introduce evidence of the number of employees who received a pension or who worked the required time for vesting.  *Id.*  Defendants assert that here, similarly to the plaintiff in *Siles,* Gilley has failed to show how many persons share his service record.  Further, defendants conclude, a review of the Plan's terms shows that no person is within a class defined as those adversely affected by the 95 Hour Rule.

> **2.     Plaintiff Cannot Show Commonality or Typicality Because His Claims are Based on Individualized Facts.**

Defendants note that Rule 23(a)(2) requires plaintiffs to establish that there are "questions of law or fact common to the class."  Like the typicality requirement of Rule 23(a)(3), defendants

assert, commonality serves as a guidepost for determining whether "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 158 n.13 (1982).

According to defendants, the bedrock principle of Rule 23(a) is that "a class action must involve issues that are susceptible to class-wide proof." *Cooper v. Southern Co.,* 390 F.3d 695, 714 (11th Cir. 2004). "It is not every common question that will suffice . . . What we are looking for is a common issue the resolution of which will advance the litigation." *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). Defendants contend that problems of commonality merge into problems of management and thus into the predominance requirement of Rule 23(b)(3). *Simer v. Rios,* 661 F.2d 655, 677 (7th Cir. 1981). Defendants argue that the court must "inquire into the proof necessary for the various elements" of the causes of action and "after examining the proof necessary . . . must inquire into the form that trial on these issues would take." *Id.* at 672. This court has observed, defendants note, "[i]f the individual and class claims might as well be tried separately, the maintenance of the action as a class action does not advance 'the efficiency and economy of litigation which is the principal purpose of the procedure.'" *Ray v. Phelps Dodge Brass Co.*, 1983 WL 665 at *2 (1983) (quoting *Falcon*, 457 U.S. at 148).

According to defendants, "examining the proof" in this case shows that class certification would invite disaster. Defendants argue that plaintiff's vesting claim turns on the facts that: (1) his employment lasted just short of ten years, with partial years of service in 1972 and 1982; (2) he allegedly worked extraordinary numbers of overtime hours in the first few months of his

employment; and (3) during his particular nine and a half years of employment certain changes were made to the Plan that allegedly reduced his Vesting Service.  Defendants assert that there is no evidence that this combination of factors comes into play for any other employee.  Indeed, defendants contend, the fact that, in his deposition, plaintiff could only identify two other individuals who he claims might be in the same position as he shows the atypical nature of his grievance.  Among other problems, defendants note, plaintiff's claims depend upon the number of overtime hours he worked in 1972 – a fact unique to him and not readily susceptible of proof.[31]  According to defendants, resolution of the other purported class members' claims would depend on the actual number of hours each of them worked during any partial years of service.[32]  Further, defendants assert, their claims also depend upon whether each would-be class member exhausted administrative remedies as required under ERISA.  *See Perrino v. Southern Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1315 (11th Cir. 2000) (stating "plaintiffs in ERISA actions must exhaust available administrative remedies before suing in federal court").  Thus, defendants conclude, trial of Gilley's case would not resolve the claims of anyone else, and individual issues

---

[31] According to defendants, plaintiff contends that pre-1979 service must be based on actual hours worked, including overtime hours, despite the fact that neither the Plan nor applicable law ever required it.  Indeed, defendants argue, the Plan did not maintain records to credit participants based on actual hours worked.  Prior to 1979, defendants assert, the Plan used continuous service and elapsed time methods which require only the start date and termination date; after 1979, the Plan used the 95 Hour rule equivalency and not actual hours worked.

[32] Defendants assert that plaintiff claims without proof that "all the other employees [at the] Guntersville facility worked as much overtime as physically possible."  Defendants maintain that the record shows that overtime varied by individual employee, department and time period.  Hutcheson testified that some departments required more overtime than others when the Sand Mountain facility was first opened.  (Hutcheson Depo., p. 26).  Such variations, defendants conclude, are the antithesis of class action procedure.

would overwhelm any common claims.[33]

Defendants argue that additional individualized issues surround plaintiff's estoppel claim and the claim that the plant was closed to thwart vesting.  According to defendants, plaintiff's estoppel claims requires him to show that: (1) defendants represented a material fact; (2) defendants were aware of the true facts; (3) defendants intended that the representation be acted on, or plaintiff reasonably believed that defendants so intended; (4) plaintiff was unaware of the true facts; and (5) plaintiff reasonably or justifiably relied on the representation to his detriment. *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998).  *Accord Glass v. United of Omaha Life Ins. Co.,* 33 F.3d 1341, 1347 (11th Cir. 1994).  Defendants note that, "[b]ecause of their focus on individualized proof, estoppel claims are typically inappropriate for class treatment."  *United Steelworkers of America, AFL-CIO-CLC v. Ivaco, Inc.,* 216 F.R.D. 693, 697 (N.D. Ga. 2002) (denying class certification of ERISA promissory estoppel claims because plaintiffs' evidence as to misrepresentation and detrimental reliance is "necessarily grounded on evidence that is specific to each individual").  Defendants conclude that individualized evidence would be needed in this case because what each class member read or heard and whether each class member reasonably relied on such representations are individual, not common, issues.

Defendants argue that the record of conflicting "promises" highlights the individualized

---

[33] According to defendants, plaintiff wrongly asserts that there is a "single legal issue" concerning whether ERISA permits retroactive application of the 95 Hour Rule to accrued credited service.  The 95 Hour Rule, defendants assert, has never been applied retroactively to accrual of service as explained in the class definition section above.  Second, defendants argue, this framing of the issue also ignores that the 95 Hour Rule is more generous in crediting Vesting Service than the elapsed time method.  There can be, according to defendants, no class unless one can identify a substantial number of persons whose Vesting Service was reduced by application of the 95 Hour Rule.  Finally, defendants conclude, this purported legal issue has no significance apart from the counting of overtime hours, which requires individual fact-finding.

nature of the facts.  According to defendants, before filing suit, plaintiff claimed that he and six

other employees were entitled to a "special package" in exchange for staying on after the plant

ceased manufacturing operations.[34]  Defendants assert that this claim is quite different from the

Complaint's allegation that plaintiff relied on a promise that all employees at Sand Mountain

who began work before September 1972 would receive a pension.  Defendants contend that the

versions of such a "promise" are multiplied by the testimony of other witnesses.  Hutcheson

testified that he remembered defendants promising to give every Sand Mountain employee a year

of extra service in connection with the closing.  (Hutcheson Depo., p. 32).  Kitchens stated that

he heard a rumor that defendants were giving Sand Mountain employees a grace period of 16 to

18 months of Vesting Service.  (Kitchens Depo., p. 22-25).  Boozer testified that the "original

crew" of employees hired in November 1971 were promised vesting.  (Boozer Depo., p. 46).

According to defendants only two of plaintiff's witnesses attach any significance to the

September 1972 "cutoff" date alleged in the First Amended Complaint, and these recollections

are vague and inconsistent.  Keel testified that he remembers someone telling him that Sand

Mountain employees hired before August 1972 would be vested.  (Keel Depo., p. 15).  Johnson

stated that only those employees who began at the Sand Mountain facility before September 1,

1972 would be vested.  (Johnson Depo., p. 16).  Defendants conclude that there is no

commonality among the supposed "promises" and no basis to conclude that plaintiff's assertions

---

[34] To support this assertion, defendants point to the deposition testimony of Melanie
Moses ("Moses").  Moses testified that Gilley told her that he and the six other former employees
of the Sand Mountain facility had stayed on after the plant ceased operations to close it.  (Moses
Depo., pp. 17-18).  According to Moses, Gilley stated that in exchange for staying on to close the
plant, he and the other employees were to receive a special package entitling them to benefits
despite their having slightly less than the 10 years of Vesting Service required.  (*Id.*)

are typical of any other purported class member.

Defendants argue that the plant-closing claim in Count Four invites the same individualized fact-finding.  According to defendants, to assess the claim that they closed the plant to prevent pensions from vesting would require detailed inquiry into each class member's dates of service as well as a determination of whether each was offered other employment when the Sand Mountain facility closed.  Defendants point to the evidence that plaintiff and other employees were offered continued employment, and that some such employees accepted.  Likewise, defendants maintain, Count Three's claim regarding Gilley's request for a plan document is personal to him.  According to defendants, this claim depends on a specific demand for a specific document and defendants' specific response to the demand.  Defendants conclude that Counts Three and Four cannot meet the requirements of commonality and typicality.

Defendants further argue that Counts Two and Four involve the additional individualized issue of whether they are time-barred.  Defendants note that the Eleventh Circuit has held that claims under ERISA § 510 borrow Alabama's two-year statute of limitations and that the claim accrues at the time of the adverse employment action.  *Musick v. Goodyear Tire & Rubber Co., Inc.*, 81 F.3d 136, 137 (11th Cir. 1996) (stating "a two-year statute of limitations is applicable to section 510 actions brought in Alabama, at least insofar as back pay, back benefits, and retirement eligibility credit are the remedies sought").  Defendants point out that, here, the Sand Mountain plant was closed in 1981, plaintiff was terminated in 1982, and the Plan was amended to include the 95 Hour Rule in 1979.  According to defendants, questions regarding knowledge of the pertinent facts and the ability to assert tolling of the limitations period introduce a host of individual issues and preclude class certification.  *See Piazza v. Ebsco Industries, Inc.,* 273 F.3d

44

1341, 1347 (11th Cir. 2001) (stating "[i]t is by now clear that a class representative whose claim is time-barred cannot assert the claim on behalf of the class").  Indeed, defendants argue, plaintiff's argument for tolling of the statue of limitations confirms the individual nature of this issue.

### 3.    Plaintiff has Conflicting Interests and is Not an Adequate Class Representative.

Defendants argue that the "adequacy" element of Rule 23(a) requires two inquiries.  First, defendants assert, the plaintiff must not have a position that conflicts with that of the other purported class members.  *Griffin v. Carlin,* 755 F.2d 1516, 1533 (11th Cir. 1985).  Second, defendants maintain, the plaintiff's counsel must have a demonstrated ability to protect and prosecute the claims of the entire class.  *Id.*  According to defendants, neither requirement has been met in this case.

Defendants note that a party cannot adequately represent the interest of two competing groups.  *See Valley Drug Co. v. Geneva Pharm., Inc.,* 350 F.3d 1181, 1189 (11th Cir. 2003) (stating, "[i]f substantial conflicts of interest are determined to exist among a class, class certification is inappropriate").  Here, defendants argue, plaintiff purports to represent both the proposed class and the Plan in Count Five.  As a purported representative of the Plan, defendants contend, plaintiff must seek enforcement of the Plan's rules, including its requirement of ten years Vesting Service for benefits.  However, defendants argue, plaintiffs claims attack the Plan's terms and pit the interests of those who benefit from the 95 Hour Rule against other participants.  According to defendants, plaintiff cannot avoid this problem by confining the class membership to anyone whose service was reduced because: (1) he seeks to represent the Plan itself; and (2) he

has failed to identify any such person or to detail a method for determining who they might be. *See Wynn v. Dixieland Food Stores, Inc.,* 125 F.R.D. 696, 700 (M.D. Ala. 1989) (recognizing the interplay between the adequacy requirement and commonality and typicality requirements). Furthermore, defendants assert, as a person who is not vested, plaintiff's interests conflict with purported class members who are vested but allege a reduction in their accrued benefits. Defendants point out that plaintiff's brief in support of this Motion acknowledged that a Rule 23(b)(2) class cannot be used to resolve individual fact issues or provide different types of relief.[35]

As for the second inquiry regarding class counsel, defendants argue that the record contains no evidence that plaintiff's counsel has experience in pursuing ERISA claims or class actions.  Defendants state that Rule 23 and due process require such proof before counsel can be deemed to represent unnamed class members who have no choice in the selection of counsel. *See Piazza*, 273 F.3d at 1355 n.11 (indicating that qualifications of class counsel should be expressly considered in the adequacy requirement).

### 4. Plaintiff Has Not Demonstrated "Predominance" or "Superiority" as Required by Rule 23(b)(3).

Defendants note that, in addition to the four requirements of Rule 23(a), at least one prong of 23(b) must also be satisfied.  Defendants assert that, because plaintiff has failed to meet

---

[35] Defendants note that plaintiff contends that relief would require "only a simple mechanical calculation."  Defendants argue that this assertion ignores the difference between vesting and accrual as well as the myriad of factual variations that bear on the availability and form of any relief, including amounts of overtime, the plan terms applicable to any given year of service, whether a participant had any partial years of service and how partial years were credited.  According to defendants, painstaking review of each individual's circumstances is unavoidable.

even one of Rule 23(a)'s requirements, the court need not look to Rule 23(b).  Nonetheless, defendants argue, it is clear that none of the requirements of Rule 23(b) is satisfied.

Defendants point out that Rule 23(b)(3) requires a factual showing that: (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members;" and (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. Proc. 23(b)(3).  Defendants assert that Rule 23(b)(3) "invites a close look at the case before it is accepted as a class action." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rule of Civil Procedure (I)*, 81 Harv. L. Rev. 356, 390 (1967)).  Defendants argue that a determination of whether a class-wide trial would be feasible is essential to any Rule 23(b)(3) inquiry.  Defendants point to *Rutstein v. Avis Rent-A-Car Systems, Inc.,* 211 F.3d 1228 (11th Cir. 2000) where the Eleventh Circuit stated:

> In order to determine whether common questions predominate, we are called upon to examine the cause of action asserted in the complaint on behalf of the putative class.  Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action.

211 F.3d at 1234 (internal punctuation and citations omitted).  Defendants contend that this inquiry often requires a look at the nature of the claim and the means of proof.  *Id.* (citing *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) for the proposition that "class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action'").  According to defendants, "predominance" and "superiority" are related to the commonality and typicality requirements but are more demanding. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623-24 (1997) (stating, "[e]ven if Rule 23(a)'s

47

commonality requirement may be satisfied by [a] shared experience, the predominance criterion is far more demanding"). Defendants argue that these requirements ask the fundamental question of whether it is fair to absent class members, defendants, and the court to consolidate hundreds or thousands of claims in a single trial.

Defendants point out that the Eleventh Circuit has denied class certification when proof of uniformity among the purported class members is lacking. *E.g., Rutstein v. Avis Rent-A-Car Systems, Inc.,* 211 F.3d 1228 (11th Cir. 2000) (denying class certification where individual issues were more significant than alleged corporate policy of discrimination); *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451 (11th Cir. 1996) (upholding denial of class certification on claims that defendant violated ERISA by making false statements with regard to retirement benefits due to "highly individualized" nature of claims). Defendants note that this court has stated that "[t]he purpose of a class action is to focus on an issue potentially affecting every class member." *Ray v. Phelps Dodge Brass Co.*, 1983 WL 665 at *2 (N.D. Ala. 1983).

Defendants argue that, given this case law, the present action cannot be certified. According to defendants, plaintiff's claims and those of other purported class members require examination of specific circumstances, including the dates and length of service, the amount of overtime during any partial year of service, and the Plan terms applicable to any given year. Defendants further argue that the claims require examination of individualized facts such as service at the Sand Mountain facility, receipt and reliance upon a promise of benefits, an offer of continued employment after the closing of the plant and the reasons for accepting or rejecting such an offer, the untimeliness of bringing suit, and the exhaustion of administrative remedies under ERISA. Defendants contend that these individualized issues predominate over the

48

common issues.

Moreover, defendants assert, there has been no showing that the proposed class action would be the "superior" method of adjudicating these matters.  Defendants maintain that, if there are any other persons who have been wrongfully denied a pension based on the grounds alleged by plaintiff, these persons are just as capable as plaintiff of submitting a claim to the plan administrator.  While plaintiff suggests that injured participants would be unable to pursue their rights, defendants observe that plaintiff and his counsel, without any extraordinary resources, were able to submit and prosecute an administrative claim for benefits and, thereafter, to file this suit.  Given that the pension claims at issue involve substantial sums of money, defendants argue that there is ample incentive for persons to pursue individual lawsuits.  Further, defendants contend, ERISA's attorneys' fee provision, 29 U.S.C. § 1132(g)(1), provides added economic means to pursue meritorious pension claims.  *See Partain v. First Nat. Bank of Montgomery,* 59 F.R.D. 56, 60-61 (M.D. Ala. 1973) (indicating a reduced need for class actions where statute provides for attorney's fees).

Defendants conclude that, having failed the requirements of predominance and superiority, this case cannot be certified under Rule 23(b)(3).

**C.    The Proposed Class Cannot be Certified Under Rule 23(b)(1) or 23(b)(2).**

Defendants argue that certification under Rule 23(b)(1) or (b)(2) is also inappropriate. Even if Rule 23(a) were satisfied, defendants assert, subsections (b)(1) and (b)(2) are not devices to circumvent the mandate for cohesiveness in any class action.  Defendants maintain that, whether certification is sought pursuant to (b)(1), (b)(2), or (b)(3), "the chief purpose behind the class action device is to achieve a significant measure of judicial economy . . ." *Allison v. Citgo*

*Petroleum Corp.*, 151 F.3d 402, 414 (5th Cir. 1998). A Rule 23(b)(1) or Rule 23(b)(2) action, defendants assert, cannot resolve individualized issues of fact. *See* 5 James Wm. Moore et al., Moore's Federal Practice § 23.43(2)(b) (3d ed. 2004) (stating that certification under rule 23(b)(2) is not appropriate for claims requiring individualized relief).

According to defendants, Rule 23(b)(1) is generally "satisfied only in the event that inconsistent judgments in separate suits would trap the party opposing the class in the inescapable legal quagmire of not being able to comply with one such judgment without violating the terms of another." *Jones v. American General Life and Acc. Ins. Co.,* 213 F.R.D. 689, 697 (S.D. Ga. 2002) (citations and internal quotation marks omitted). Defendants note that the *Jones* court explained that it is not sufficient that separate actions will raise the same issues of law, even if there is a risk of inconsistent verdicts. *Id.* Defendants maintain that, because each potential class member's eligibility for benefits is dependent upon his or her individual service record and any purported representations relied upon, a judgment as to a given individual's eligibility for benefits will not obligate defendants to grant or deny benefits to any other class member.

Defendants likewise contend that this action is not appropriate for certification under Rule 23(b)(2). Rule 23(b)(2), defendants assert, requires a demonstration that defendants acted on grounds "generally applicable to the class as a whole," and that declaratory or final injunctive relief is the appropriate final remedy. *Jones,* 213 F.R.D. at 698. Defendants argue that, although plaintiff here characterizes his claims as seeking a declaratory judgment and other equitable relief in order to fit within Rule 23(b)(2), he is not actually seeking equitable relief. According to defendants, plaintiff is actually seeking only payment of pension benefits. Indeed, defendants

argue, ERISA does not permit the granting of equitable relief when, as here, a plaintiff can be made whole by payment of benefits. *See Thomas v. SmithKline Beecham Corp.,* 297 F.Supp.2d 773, 795-96 (E.D. Pa. 2003) (granting summary judgment on claims for equitable relief where plaintiff could be made whole through award of benefits).

Defendants argue that Rule 23(b)(2) certification should also be denied because they did not act on grounds generally applicable to the class. According to defendants, "Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive and homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 580 (7th Cir. 2000). Defendants contend that the denial of plaintiff's pension claim here was based on his service record and does not create a Rule 23(b)(2)-type claim.

Finally, defendants argue, because plaintiff seeks payment of benefits, it may be a denial of due process to certify the no-notice, no-opt-out class provided by Rule 23(b)(2). Defendants note that the Supreme Court has expressed concern over the constitutionality of certifying a mandatory class that includes claims for money damages. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999) (indicating that certification of mandatory class that includes money damages potentially compromises the due process rights of individual claimants); *Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121 (1994) (indicating that there is "at least a substantial possibility" that class actions seeking money damages can only be certified under Rule 23(b)(3) in light of the constitutional considerations implicated). Defendants conclude that certification under Rule 23(b)(2) is improper where, as here, the claim for declaratory or equitable relief operates as a

prelude to damage claims.  5 James Wm. Moore et al., Moore's Federal Practice § 23.43(2)(b) (3d ed. 2004) (stating that class certification under Rule 23(b)(2) is generally improper if the primary relief sought by the action is money damages).

**IV.**     **Plaintiff's Reply.**

    **A.**     **The Proposed Class Definition.**

Plaintiff disputes defendants' argument that the proposed class definition is unworkable because of its use of the term "accrued benefit."  According to plaintiff, Hours of Service are used to determine "vesting" and "benefit" service under the 1976 Plan and the 1981 Plan. Plaintiff asserts that "vesting" and "benefit" service are in turn used to calculate "accrued benefit."  Plaintiff argues that the 95 Hour Rule was not incorporated into the Plan until 1981.  If defendants retroactively apply the 95 Hour Rule to determine Hours of Service for service prior to 1981, plaintiff argues, then the defendants have reduced a plain participant's "accrued benefit."  In other words, plaintiff contends, because the retroactive application of the 95 Hour Rule affects both "Benefit Service" and "Vesting Service," it affects the amount of "accrued benefit."

    **B.**     **The Requirement of Numerosity.**

Plaintiff contests defendants' argument that the numerosity requirement is not met in this case.  Plaintiff acknowledges that he cannot definitely identify any other person adversely affected by the 95 Hour Rule, but argues that this information can only be derived from records in defendants' possession.  According to plaintiff, defendants have refused to produce records regarding the putative class despite plaintiff's discovery requests.

Plaintiff asserts that, pursuant to IRS regulations, defendants are required to submit

Annual Registration Statements identifying terminated participants with deferred vested benefits in the Plan.  According to plaintiff, he can identify persons who had sufficient actual service time to be vested under the 1976 Plan and who defendants failed to identify in these annual filings. Plaintiff has submitted the Plans Annual Registration Statements identifying such participants for 1981 and 1982.  Plaintiff has also submitted two documents listing the employees at the Sand Mountain facility in 1980.[36]  One document produced by plaintiff is entitled "Process Department Roster," and lists employees in different sections of the plant as of November 25, 1980.  The second document, which plaintiff identifies as a "layoff roster,"  is a handwritten list of employees that gives each employee's hire date, department, title and pay grade as of May 17, 1980.  Plaintiff notes that of the 189 employees listed on the layoff roster, 129 had hire dates prior to September 1, 1972.  However, plaintiff contends, only 13 of these employees were listed on defendant's Annual Statements for 1981 and 1982 as terminated employees with vested deferred interests in the Plan.  Plaintiff also points to the affidavit testimony of former Sand Mountain employee Richard Lusk ("Lusk"), who stated that Monsanto's management promised that those employed before September 1972 would be fully vested in the Plan.  (Lusk Affid. ¶ 8). Lusk also testified that he worked at the plant from 1972 to 1981.  (*Id.* at ¶ 4).  Plaintiff also points to Segers' testimony that he was told he would be vested in the Plan because he began working at the Sand Mountain facility before September 1972.  (Segers Depo., pp. 99-102). According to plaintiff, Lusk and Segers are not listed on defendant's Annual Statements for 1981 or 1982.  Plaintiff also contends that his counsel interviewed Walter Baker ("Baker"), another

------

[36] Plaintiff asserts that several documents listing employees that worked at the Sand Mountain facility were retrieved from the plant after Hutcheson revealed that the documents existed in his deposition.

former employee of the Sand Mountain facility, who indicated that he was hired in April of 1971, and that it was his understanding that he was entitled to a pension.[37]  Plaintiff maintains that Baker too is not listed on defendants' Annual Statements.

Plaintiff argues that he need not set forth the exact number of class members to satisfy the numerosity requirement.  *See Stewart v. Abraham,* 275 F.3d 220, 226-27 (3rd Cir. 2001) (explaining that "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met").  Further, plaintiff maintains, in the Eleventh Circuit "a plaintiff need not show the precise number of members in the class . . . [and if] the numerosity question is a close one, a balance should be struck in favor of a finding of numerosity, since the court has the option to decertify pursuant to Rule 23(c)(1)."  *Groover v. Michelin North America, Inc.,* 187 F.R.D. 662, 666 (M.D. Ala. 1999) (citing *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir.1983)).

**C.     The Requirements of Commonality and Typicality.**

Plaintiff reasserts the arguments put forth in his original brief concerning the commonality and typicality requirements.

**D.     Defendants' Objections to Class Certification.**

Plaintiff addresses defendants' statement that they have never kept records of actual hours worked by plan participants.  Plaintiff points to a document produced by defendants which gives an summary of the 1976 Plan ("1976 Plan Summary").  This document states that Vesting Service for calendar years before 1976 will be credited according to the 1000 Hours of Service requirement under the 1976 Plan "or on the basis of your Credited Service as determined under

---

[37] Plaintiff has not submitted an affidavit or other testimony by Baker.

prior Company pension plans – whichever is more favorable to you." ("1976 Plan Summary").

It also states, "[i]n general, an Hour of Service means each hour for which you are paid – either

directly or indirectly – or are entitled to payment for time not actually worked – i.e., holidays,

vacations, temporary disability, etc." (*Id.*)  Given this language, plaintiff concludes, Hours of

Service must include overtime clock hours under the 1976 Plan.

Plaintiff also addresses defendants' contention that there is no commonality among the

witnesses' testimony concerning defendants' alleged "promises" that Sand Mountain employees

would be given credit for additional service so as to vest under the Plan.  Given the

inconsistencies with the testimony, defendants assert that there is no basis to conclude that

plaintiff's assertions are typical of any other purported class member.  Plaintiff asserts that the

requirements of commonality and typicality are not adversely affected simply because all the

witnesses could not recall the exact cutoff date for vesting and specifically where, when, and who

informed them of the promise.  Plaintiff notes that the witnesses are testifying concerning facts

that occurred over 24 years ago.

Next, plaintiff discusses defendants' argument that commonality and typicality are not

present because individualized fact-finding would be necessary to determine class membership.

Plaintiff argues that identifying class members would require nothing more than examining

defendants' records to determine Hours of Service under the terms of the 1976 Plan, something

defendants are already required to do under ERISA.  Plaintiff argues that defendants keep pay

records on all employees, and that these records separately identify the amount of regular and

55

overtime pay earned each year.[38]  Plaintiff asserts that defendants can identify how much

overtime each employee worked in any given period by dividing overtime pay by the employee's

pay rate.  Plaintiff draws the court's attention to 29 CFR § 2530.200b-3(a), which states:

> Any records may be used to determine hours of service to be credited to
> employees under a plan, even though such records are maintained for other
> purposes, provided that they accurately reflect the actual number of hours of
> service with which an employee is required to be credited under § 2530.200b-2(a).
> Payroll records, for example, may provide sufficiently accurate data to serve as a
> basis for determining hours of service.

Plaintiff further disputes defendants' contention that class certification of his estoppel

claim is inappropriate because it would require individualized analysis regarding the reliance of

supposed class members.  Plaintiff argues that the promises made to employees at the Sand

Mountain facility at the time the plant was preparing to close represent the correct interpretation

of the 1976 Plan and ERISA's requirements.  Therefore, plaintiff maintains, reliance on

defendants' promise is and was reasonable under an objective standard, and there is no need for

individualized analysis.

Likewise, plaintiff argues, defendants' contention that class certification is inappropriate

because of the statute of limitations issue is without merit.  Plaintiff argues that the limitations

period began to run when benefits were formally denied him in a December 11, 2003 letter to his

counsel.  *See Crosby v. Bowater Inc. Retirement Plan For Salaried Employees of Great Northern

Paper, Inc.,* 212 F.R.D. 350, 357 (W.D. Mich. 2002) (stating, "[t]he ERISA limitation period,

under the law of this Circuit and the law of several other federal circuits, does not begin to run

---

[38] Plaintiff contends that defendants' assertion that they possess no pay records for years
prior to 1973 is without merit.  According to plaintiff, defendants presented him with copies of
his pay records, supposedly made from microfiche, for every year except 1972, the year in
dispute.

until a participant formally presents the claim for benefits to the pension administrator and has

had his claim formally denied"). According to plaintiff, the limitations period did not begin to

run when defendants first denied his claim in the April 6, 2001 letter because that denial did not

notify him of his rights to appeal or file a law suit. Plaintiff also argues that this letter misled

him to believe that he might receive benefits in the future because it stated that no benefits were

due to him "at this time."

      Plaintiff also addresses defendants' suggestion that the class cannot be certified because

class membership and proof of class claims entails taking testimony from witnesses with vague

memories who recall different versions of how they learned of events surrounding the plant's

closure, overtime, and the cut-off date for vesting purposes. Plaintiff explains the inconsistent

testimony by asserting that, when preparing to close the plant, defendants provided different

information to different groups of employees. Plaintiff has produced three prepared speeches,

which he claims Monsanto's personnel department used when discussing the closing with

employees. The three scripts are different and each is addressed to a different group of

employees: (1) Management/Professional Employees to be Placed ("Management"); (2) Exempt

Not to be Redeployed ("Exempt"); and (3) Non-Exempt.[39] According to plaintiff, Carver and

Hutchinson were supervisors and members of Management; Kitchens and Boozer were team

leaders and low level management; and Gilley, Johnson, Segers and Keel were Non-Exempt

---

[39] Plaintiff asserts that the three groups represent the employee hierarchy at the Sand
Mountain plant. According to plaintiff, Management represents upper management and
professionals, Exempt represents lower level management, such as Team Leaders, and Non-
Exempt refers to production workers subject to the Fair Labor Standards Act's overtime rules.
Plaintiff asserts that the Non-Exempt employees are those that are affected by the 95 Hour Rule.

production workers.[40]

Finally, plaintiff addresses defendants' arguments concerning his claim that the Sand Mountain plant was closed to prevent employees from becoming vested in the Plan.  Plaintiff notes that defendants' assert that many employees were offered the opportunity to transfer to different Monsanto facilities and continue to earn pension service.  However, according to plaintiff, primarily only members of management and possibly a few low level supervisors were offered an option to remain with the company in different positions.  Plaintiff asserts that he was one of the few non-exempt employees offered a transfer.[41]  Plaintiff acknowledges that the class definition's reliance on the effect of the 95 Hour Rule does not relate well to his claim that the Sand Mountain facility was closed to prevent plan participants from becoming vested.  However, plaintiff asks that the court certify this claim for class status and, should the court find it necessary, allow the addition of other representative plaintiffs.

### E.      The Requirement of Adequacy of Representation.

Plaintiff disputes defendants' argument that he is not an adequate representative of the proposed class.  Plaintiff maintains that his representation of the Plan under Count Five does not create a conflict of interest.  According to plaintiff, defendants argument that, as a representative

---

[40] Plaintiff notes that defendants have made much of the fact that plaintiff has been unable to produce the memorandum, detailing the cutoff date for vesting, that he asserts was passed out to employees by defendants' management.  However, plaintiff points out, the script prepared for the Non-Exempt group mentions a handout with benefits information that was to be distributed after the speech was read.

[41] To support these arguments, plaintiff points to the prepared scripts for the three different employee groups. *See supra.*  The script for the Management group indicated that the company planned to place those employees in different jobs with Monsanto.  The scripts for the Exempt and Non-Exempt employees indicated that the company planned to lay-off those employees.

of the Plan, he must blindly seek to enforce the Plan's rules is mistaken.  As a representative of

the Plan, plaintiff asserts, he is suing to ensure that the Plan's rules are in accordance with

ERISA's mandates.  Plaintiff notes that ERISA specifically allows participants to sue on behalf

of a plan to recover for breaches of fiduciary duty.  29 U.S.C. § 1132(a)(3).  Further plaintiff

asserts, ERISA permits a plan participant to seek an injunction against any act or practice that

violates the statute, to obtain equitable relief, and to redress such violations. *Id.*

Plaintiff maintains that defendants' contention that he cannot sue on behalf of the Plan

and the class because this pits some of the participants who benefit from the 95 Hour Rule

against the class participants is erroneous.  First, plaintiff argues, the 95 Hour Rule is not, as

defendants contend, a more generous method of calculating Hours of Service than the method

used under the 1976 Plan.  According to plaintiff, the 95 Hour Rule eliminates overtime for

production workers, technical and clerical employees.  These workers, plaintiff asserts, work

substantial amounts of overtime under a rotating shift schedule.  Furthermore, plaintiff contends,

should the court find merit in his claim for breach of fiduciary duty, the court can allow the Plan

to recover from the employer the benefits owned to the class, causing no net loss to the Plan and

other plan participants.

Plaintiff also contests defendants' argument that his counsel is inadequate because the

record does not contain any evidence that his counsel has experience with class claims or ERISA

actions.  According the plaintiff, he has not found a single case where the trial court or the

appellate court found that counsel was inadequate because of the lack of an established record of

experience.  The primary concern under this requirement, plaintiff contends, is that the class

representative and counsel vigorously pursue the class claims.  According to plaintiff, his counsel

59

has an established record before this court, and is competent to rigorously pursue the present class claims.

### F.      Certification Under Rule 23(b)(1) and (b)(2).

Plaintiff addresses defendants' argument that class certification is not appropriate under Rule 23(b)(1) because each potential class member's eligibility for benefits would require individualized analysis.  Plaintiff argues that if the court finds that defendants' application of the 95 Hour Rule violates ERISA, defendants would be required to do nothing more than they were required to do when the Plan became an ERISA Plan in 1976, that is, calculate the amount of service to be credited under the 1976 Plan using whatever records are available.  A simple calculation, plaintiff argues, does not equate to individualized analysis.

Plaintiff also argues that class certification under Rule 23(b)(2) is appropriate.  Under Rule 23(b)(2), plaintiff notes, class certification is proper if it is demonstrated that declaratory or final injunctive relief is suitable.  Here, plaintiff contends, class members would be made whole by the court enjoining the defendants' use of the 95 Hour Rule to estimate Hours of Service accrued under the 1976 Plan.  How defendants actually calculate Hours of Service accrued under the terms of the 1976 Plan and the demands of ERISA, plaintiff asserts, is not relevant to the class certification issue.

Plaintiff contends that defendants' argument that he is seeking the payment of benefits, and therefore is not entitled to equitable relief, is not a correct interpretation of the facts or ERISA.  *See* 29 U.S.C. § 1132(a)(3).  Plaintiff notes that he is seeking, among other things, to enjoin defendants' practice of applying the 95 Hour Rule retroactively to estimate Hours of Service instead of calculating actual Hours of Service as defined by the 1976 Plan.  Plaintiff is

also seeking other appropriate equitable relief such as an order directing defendants to calculate

"vesting" and "benefit" service in accordance with the 1976 Plan terms.  According to plaintiff,

whether or not the end result of the equitable relief sought is the receipt of benefits is irrelevant

to the issue at hand.[42]  Plaintiff concludes that Rule 23(b)(2) certification is appropriate where, as

here, defendants acted or failed to act on grounds applicable to the class, and their transgressions

may be redressed by equitable relief.

---

[42] Plaintiff draws the court's attention to *Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d 755 (7th Cir. 2003), which dealt with a class action seeking equitable relief.  The *Berger* court stated as follows:

> True, the declaration sought and obtained was merely a prelude to a request for damages (incorrectly described by the plaintiffs as a request for restitutionary relief equitable in nature--the monetary relief sought is not restitutionary, and if it were it would not be equitable, *Great-West Life & Annuity Ins. Co. v. Knudson*, *supra*, 534 U.S. at 213-14, 122 S.Ct. 708; *Honolulu Joint Apprenticeship & Training Committee v. Foster*, 332 F.3d 1234, 1237-38 (9th Cir.2003)). But a declaratory judgment is normally a prelude to a request for other relief, whether injunctive or monetary; so there is nothing suspicious about the characterization of the suit as one for declaratory relief. The hope that motivates casting a request for relief in declaratory terms is that if the declaration is granted, the parties will be able to negotiate the concrete relief necessary to make the plaintiffs whole without further judicial proceedings. No one wants an empty declaration. As long as the concrete follow-on relief that is envisaged will if ordered (that is, if negotiations for relief consistent with the declaration break down) be the direct, anticipated consequence of the declaration, rather than something unrelated to it, the suit can be maintained under Rule 23(b)(2).

> The reason for allowing opting out in other types of class action is that even though one class member's claim may overlap another's (common issues), it may be different in respects that makes him want to bring his own suit. There is nothing like that here. The declaration established the right of each of the class members, and the computation of the damages due each followed mechanically, as in *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 414-15 (5th Cir.1998); *see also Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898-99 (7th Cir.1999).

338 F.3d at 763-64.

Plaintiff addresses defendants' argument that the denial of his pension claim was based on his service record and so does not create a Rule 23(b)(2)-type claim.  Plaintiff asserts that the denial of his pension benefits was the result of defendants' general retroactive application of the 95 Hour Rule to estimate credited service for 1972 instead of crediting actual Hours of Service, including overtime, as required by the 1976 Plan.

### G.      Certification Under Rule 23(b)(3).

Plaintiff notes that defendants argue that class certification under Rule 23(b) is inappropriate because there is a lack of uniformity among the claims of the putative class members.  According to plaintiff, defendants confuse resolution and redress of the class claims with how defendants would have to calculate credited service if plaintiff is successful.  Plaintiff argues that resolution and redress of class claims will not require examination of specific circumstances, such as dates and length of service, the amount of overtime during any partial year of service, and the Plan terms applicable to any given year.  Instead, plaintiff argues, resolution will require legal analysis of defendants' acts under ERISA's requirements.  Should he be successful in this action, plaintiff asserts, redress will entail declaratory relief.  According to plaintiff, the fact that defendants will be required to correctly calculate class members' accrued credited service in terms of the appropriate Plan language as ERISA demands would follow mechanically.  *Berger*, 338 F.3d at 764.  Plaintiff concludes that defendants would have had to do such calculations under the terms of the 1976 Plan in any case, "but for" their alleged use of the "elapsed time method."

### H.      Count Three.

Finally, plaintiff addresses defendants' argument that Count Three, which seeks sanctions

for defendants' alleged failure to produce Plan documents upon plaintiff's request, is not an appropriate class claim. Plaintiff maintains that this count is appropriately a class claim because defendants failure to provide the requested documents affected plaintiff's ability to prosecute the class claims, in addition to his individual claims.

## CONCLUSIONS OF THE COURT

The court turns to *Cooper v. Southern Co.,* 390 F.3d 695 (11th Cir. 2004) for guidance and notes the following statements therein:

> The plaintiffs rely on the Supreme Court's often-cited admonition in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), that "nothing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Id.* at 177, 94 S.Ct. at 2152. However, we have noted that "[w]hile it is true that a trial court may not properly reach the merits of a claim when determining whether class certification is warranted, this principle should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements." *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir.1984) (citation omitted).
>
> Indeed, both the Supreme Court and this Court have noted since *Eisen* that evidence pertaining to the requirements embodied in Rule 23 is often intertwined with the merits, making it impossible to meaningfully address the Rule 23 criteria without at least touching on the "merits" of the litigation. *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n. 12, 98 S.Ct. 2454, 2458 n. 12, 57 L.Ed.2d 351 (1978) ("Evaluation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims." (citation omitted)); *Nelson v. U.S. Steel Corp.*, 709 F.2d 675, 679 (11th Cir.1983) (explaining that Rule 23(a) evidence "is often intertwined with the merits").

390 F.3d at 712.

– – – – – – – – – – – –

The typicality and commonality requirements are distinct but interrelated, as the Supreme Court has made clear:

The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

*Falcon*, 457 U.S. at 157 n. 13, 102 S.Ct. at 2370 n. 13. We have similarly explained that "the commonality and typicality requirements of Rule 23(a) overlap. Both requirements focus on whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Prado-Steiman*, 221 F.3d at 1278.

*Id.* at 713.

– – – – – – – – – – –

In addition, the plaintiffs sought to represent a very broad class that purported to represent all African-American employees of the defendants, at all levels of the corporate hierarchy of all the defendant companies. Because the plaintiffs asserted broad claims on behalf of a broad class, they were required to identify representative plaintiffs who shared those broad claims.

*Id.* at 715.

– – – – – – – – – – –

In the first place, the district court noted that Madden's reports did not incorporate variables that would allow for the comparison of individuals who were similarly situated with respect to managerial decision makers, job types, locations, departments, and the specific criteria relevant for the jobs in question. Madden did not tailor her analysis to the specific positions, job locations, or departmental and organizational structures in question; however, the wide-ranging and highly diversified nature of the defendants' operations requires that employee comparisons take these distinctions into account in order to ensure that the black and white employees being compared are similarly situated. *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656-57, 109 S.Ct. 2115, 2124-25, 104 L.Ed.2d 733 (1989) ("[A] Title VII plaintiff does not make a case of disparate impact simply by showing that, 'at the bottom line,' there is racial imbalance in the work force."); *see also Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 952 (11th Cir.1991) ("Statistics ... without a [proper] analytic foundation[ ] are virtually meaningless."); *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 319 (7th Cir.2003) ("The Supreme Court has emphasized the

importance of looking to the proper base 'group' when making statistical comparisons and examining all of the surrounding facts and circumstances which create the statistics themselves.").

*Id.* at 717.

− − − − − − − − − − −

Moreover, determining the level of damages to which each class member was entitled plainly would require detailed, case-by-case fact finding, carefully calibrated for each individual employee. The "complex, individualized determinations" necessary to fix the appropriate level of individual damage awards in this case are exactly the type that Murray and Allison make clear should not be considered "incidental" to the claims for injunctive and declaratory relief.

*Id.* at 721 (footnote omitted).

− − − − − − − − − − −

Therefore, "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1558 (11th Cir.1989) (citation and internal quotation marks omitted). Common issues will not predominate over individual questions if, "as a practical matter, the resolution of ... [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir.1996).

*Id.* at 722.

The court concludes that this case does not lend itself to class certification.  Plaintiff has not identified a single employee similarly situated to the plaintiff; much less a sufficient number for numerosity.  Among the variables which may be applicable to individuals are (1) the number of overtime hours worked; (2) whether employees accepted transfers and their pensions thereafter vested; (3) what representations were made and by whom; (4) dates of service; (5) overall hours worked, etc.

Whether viewed with regard to problems of manageability, numerosity, typicality or

commonality, the plaintiff has not met his burden of establishing that the case is appropriate for class certification.  The Motion for Class Certification filed on December 10, 2004 will be denied.

      This 4th of March, 2005.

_____
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**
