FILED

2005 May-31  PM 01:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **WENDELL F. GILLEY**, an individual and as class representative, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.: **CV-04-PT-0562-M** |
| **MONSANTO COMPANY, INC., a corporation; MONSANTO COMPANY SALARIED EMPLOYEES' PENSION PLAN; EMPLOYEE BENEFITS PLAN COMMITTEE; MONSANTO COMPANY EMPLOYEE BENEFITS EXECUTIVE COMMITTEE; AND PHARMACIA CORPORATION, a corporation,** | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

This cause comes on to be heard upon defendants Monsanto Company, Monsanto Company Salaried Employees' Pension Plan, Employee Benefits Plan Committee, and Pharmacia Corporation's Motion for Summary Judgment, filed on April 25, 2005, and Motion to Strike Demand for Jury Trial, filed on April 28, 2005.

**FACTS AND PROCEDURAL HISTORY**[1]

**I.      The Parties.**

---

[1] The court notes where facts appear disputed.  The facts are taken from evidence submitted in support and in opposition to defendants' Motion for Summary Judgment and plaintiff's Motion for Class Certification.

1

Plaintiff Wendell F. Gilley ("Gilley") is a former employee of Monsanto Company, Inc. ("Monsanto") who resides in Marshall County, Alabama.  (Amd. Cmpt. ¶ 2).  Monsanto is a corporation having done business or presently doing business in Alabama.  (*Id.* at ¶ 3).  On or about March 31, 2000, Monsanto merged into Pharmacia & Upjohn, Inc., changing its name to Pharmacia Corporation ("Pharmacia").  (*Id.* at ¶ 7).  At the same time, Monsanto Ag Company, Inc., a wholly owned subsidiary of Monsanto, changed its name to simply Monsanto Company, Inc. ("New Monsanto").  (*Id.*)

## II.     The Sand Mountain Facility.

In late 1971, Monsanto opened its Sand Mountain facility located on the Tennessee River near Guntersville, Alabama for the purpose of manufacturing nylon and polyester yarn. According to Monsanto's 1980 Annual Report, changing styles and consumer tastes had drastically reduced the demand for the yarn by the mid-1970s.  (1980 Monsanto Annual Report, p. 3).  During this time, the company also experienced increasing foreign manufacturing competition.  (*Id.*)  These problems led to Monsanto withdrawing from the entire line of business.  (*Id.*)  Production at the Sand Mountain plant ended in 1981.  (Carver Depo., p. 22). Monsanto was unable to sell the plant until 1995, when a local resident and former employee of the plant bought the property.  (Hutcheson Depo., p. 8).

## III.    The Pension Plans.

In 1971 Monsanto maintained a defined pension plan for its employees, the "Monsanto Company Salaried Employes' (*sic*) Pension Plan" ("1971 Plan").  In 1976, to comply with the recently enacted ERISA statute, Monsanto amended and restated the 1971 Plan ("1976 Plan"). Thereafter, the plan was amended occasionally, often in response to changing ERISA

2

regulations.[2]

All relevant versions of the Plan required an employee to amass ten years of "Credited Service" or "Vesting Service" to qualify for a pension.  (1971 Plan Art. II § 1(a); 1976 Plan § 6.1; Amd. 1976 Plan § 6.1; 1981 Plan § 6.1).  Under the Plan, employees with ten or more years of Vesting Service are entitled to a pension even if they leave the company before retirement age.  (*Id.*)  However, employees who leave the company before accruing ten years of Vesting Service are not entitled to a pension.  (1976 Plan § 6.3; Amd. 1976 Plan § 6.3; 1981 Plan § 6.3).

The 1971 Plan used the employee's period of "continuous service" for calculating vesting credit.  (1971 Plan Art. II § 1).  Participants received credit for the length of time they worked based on calendar days.  (*Id.* at Art. III § 1).  According to defendants, this method awarded no credit for a partial year of service.  Therefore, if an employee worked one day short of ten years from his starting date, the employee would not be vested.

On the other hand, the 1976 Plan gave credit for partial years of service, as required under ERISA.  Defendants assert that the 1976 Plan used ERISA's "elapsed time method" of calculating "Hours of Service" in lieu of counting actual hours worked.  (1976 Plan, §§ 18.1, 18.5).  According to defendants, the 1976 Plan awarded vesting credit by multiplying the fraction of a year during which an employee was employed by a standard work year (2080 hours).  (*Id.* at §§ 18.1, 18.5, 18.7).  When the resulting number exceeded 1,000, an employee received a full year's vesting credit.  (*Id.* at § 18.1(a)(i)).  Thus, a participant earned a full year of Vesting Service by working just over 25 weeks (or .48 years).

---

[2] Defendants have submitted an amended version of the 1976 Plan ("Amended 1976 Plan") entitled "Monsanto Company Salaried Employees Pension Plan (1976) (Conformed August, 1980)."  Collectively, all versions of the plan are herein referred to as "the Plan."

The plaintiff gives a different version of the vesting procedure under the 1976 Plan. According to plaintiff, under this Plan, an Hour of Service was defined as an hour for which an employee is directly or indirectly compensated by the employer for the performance of his/her job duties.  (1976 Plan, § 18.5).  Furthermore, an Hour of Service included: overtime clock hours; hours of service required to be taken into account to satisfy federal military service laws; hours of absence from active work because of regular paid vacations or holidays; hours of absence from active work because of occupational or non-occupational illness or disability or layoff.  (*Id.* at § 18.5(a)).  Plaintiff appears to take the position that, under the 1976 Plan, an employee received a year of Vesting Service for every 1,000 hours actually worked, without regard to the "elapsed time method" of calculation.[3]

---

[3] Section 18.1(a)(i)-(ii) of the 1976 Plan states:

> (i)     A participant will be credited with one year of Vesting Service for each Plan Year during which he completes at least 1,000 "Hours of Service" (as defined in subsection 18.5) with the Employers and the Subsidiaries.

> (ii)    If a participant completes less than 1,000 Hours of Service in any Plan Year he shall be entitled to a fractional portion of a year of Vesting Service for such Plan Year which faction shall be determined by dividing the number of such participant's Hours of Service during such Plan Year by the number of Hours of Service (not less than 1,000 hours) which are included in the participant's Standard Work Year (as defined in subsection 18.7).

Section 17.1 of the 1981 Plan contains substantially identical language.

Section 18.5 of the 1976 Plan states:

> An "Hour of Service" means an hour for which an employe (*sic*) is directly or indirectly compensated by the Employers or by a Subsidiary in the case of service with such Subsidiary, for the performance of duties for the Employers or such Subsidiary (including hours for which an employe (*sic*) has been awarded backpay by the Employers or such Subsidiary or by any governmental agency or judicial

4

Gilley has submitted an "Important Information" folder and a "Your Benefits" booklet

which were supplied to employees by Monsanto in 1976.  Together, the documents constituted

body to the extent such hours are not otherwise treated as Hours of Service).
Notwithstanding the preceding sentence, the following special rules shall apply:

(a)    To the extent not otherwise treated as Hours of Service the following shall
       constitute Hours of Service:

       (i)     Overtime clock hours;

       (ii)    Hours of service required to be taken into account to satisfy federal
               military service laws or regulations or to satisfy any other federal
               laws;

       (iii)   Hours of absence from active work because of regular paid
               vacations or holidays;

       (iv)    Hours of absence from active work because of occupational illness
               or disability not yet determined to constitute total and permanent
               disability;

       (v)     Hours of absence from active work during the first 12 months of an
               absence due to non-occupational illness or disability not yet
               determined to constitute total and permanent disability or due to a
               layoff;

       (vi)    Hours during an authorized leave of absence or during such shorter
               period as may be specified by the Plan Committee.

(b)    For purposes of subsection 18.6, Hours of Service shall also include hours,
       not otherwise treated as Hours of Service, for which participant is directly
       or indirectly compensated by the Employers or the Subsidiaries, or entitled
       to compensation from the Employers or Subsidiaries, for absence due to
       sickness, disability or other similar reason.

(c)    For purposes of subsection 18.1, Hours of Service shall also include hours,
       not otherwise treated as Hours of Service, for which a Part-Time Employe
       (*sic*) participant is credited and deemed to have accrued during a calendar
       month subsequent to December 1975, as provided by subparagraph
       18.1(1).

(d)    Hours of Service shall include Hours of Service accrued by a Qualified
       Disabled Terminated Employe (*sic*) for purposes of Vesting Service and
       Post-1975 Benefit Service, pursuant to subparagraphs 18.1(a)(iii) and
       18.4(b) of this Plan.

       Hours of Service may be computed and recorded under the "elapsed time"
       regulations if the Employer so selects.

(emphasis added).

5

the Summary Plan Description which ERISA required be provided to plan participants.

(Important Information p. 2).  Under a section entitled "Some Key Definitions," the "Important

Information" folder stated as follows:

> ACCRUED PENSION
>
> Your accrued pension as of any date is the monthly benefit payable to you for life
> starting on your normal retirement date based on your Benefit Service and the
> retirement income factor in effect when you retire–assuming no pension benefits
> will be continued to anyone else following your death after payments have begun.
>
> SERVICE
>
> There are two types of service defined under the Plan:
> * Vesting Service
>   <u>and</u>
> * Benefit Service.
>
> *Vesting Service* determines your *eligibility* for normal, early or disability
> retirement and "COMBO 85" –as well as your right to a vested pension if you
> leave the Company before you are eligible to retire.  Vesting Service is also used
> to determine eligibility for the protection provided by the automatic Spouse's
> Retirement Income Benefit.
>
> Starting January 1, 1976, you will be credited with one year of Vesting Service for
> each calendar year in which you complete 1,000 or more Hours of Service.  If you
> complete at least 501 but less than 1,000 Hours of Service in a calendar year, you
> will be credited with a fraction of a year of Vesting Service.  If you complete less
> than 501 Hours of Service during your first or final year on the job, you will also
> be credited with a fraction of a year of Vesting Service.  This fraction is
> determined by dividing the Hours of Service you actually complete that year by
> the standard number of Hours of Service that would have been completed that
> year by a regular full-time employe[e] at your location.
>
> In general, an Hour of Service means each hour for which you are paid–either
> directly or indirectly–or are entitled to payment for time not actually worked–i.e.,
> holidays, vacations, temporary disability, etc.
>
> Vesting Service for calendar years before 1976 is credited as described above–or
> on the basis of your Credited Service as determined under prior Company pension
> plans–whichever is more favorable to you.

6

Benefit Service is used to determine the *amount* of your pension.

Starting January 1, 1976, you will be credited with one year of Benefit Service for each calendar year in which you complete the standard number of Hours of Service that would have been completed that year by a regular full-time employe[e] at your location.  If you complete less than the standard number of hours, you will be credited with a fraction of a year of Benefit Service.  This fraction is figured by dividing the number of hours you actually complete that year by the standard number of Hours of Service for that calendar year which apply to all regular full-time employe[e]s at your location.

If you were of prior Company pension plans, your years of Benefit Service before January 1, 1976 are your years of Credited Service to January 1, 1976 under those plans.

(Important Information p. 429).  The "Your Benefits" booklet contains very similar language,

except that the first paragraph states as follows:

ACCRUED PENSION

Your accrued pension as of any date is the monthly benefit payable to you for life starting on your normal retirement date as calculated under the Plan formula in effect on that date, assuming no pension benefits will be continued to anyone else following your death after payments have begun.  Your accrued pension includes your Basic or Minimum Benefits and any Variable and/or Extended Benefits which may be payable.

(Your Benefits p. 41).

According to defendants, in 1979, the Plan was amended again following the issuance of

federal regulations that provided "equivalencies" to count Hours of Service.  (Amd. 1976 Plan).

The Plan's definition of "Hours of Service" was amended to use the regulation's 95-Hour Rule.

(Amd. 1976 Plan, § 18.5(f)).[4]  Under this rule, participants are credited with 95 Hours of Service

_____

[4] The provisions of § 18.5 in the 1976 Plan remained nearly unchanged in the Amended 1976 Plan.  However, the Amended 1976 Plan added a number of additional subsections to § 18.5, including subsection (f) which states:

In determining the Hours of Service of any employee who is compensated by the

7

for each bi-weekly period during which they work any amount of time.  (*Id.*)[5]

Plaintiff points to a memo dated September 24, 1979 from Cary E. Ashley, the Secretary of Monsanto's Employee Benefits Plans Committee ("Ashley Memo").  The memo discusses the adoption of the 95-Hour Rule and states in part:

> The Employee Benefits Plans Committee at its meeting this date, approved [the] request that the counting of overtime be excluded for purposes of determining hours of service under the Salaried Pension Plan.

According to plaintiff, under the 95-Hour Rule, the defendants no longer credited overtime hours towards Vesting Service as demanded by the terms of the 1976 Plan.  ("Ashley Memo").  Instead technical and clerical employees received a flat rate of 95 Hours of Service for each semimonthly payroll period regardless of the *actual* number of Hours of Service performed.  (*Id.*)

In 1981, Monsanto amended, restated and continued the 1976 Plan as the 1981 Monsanto Company Salaried Employees' Pension Plan ("1981 Plan").  Plaintiff points to the minutes of the January 23, 1981 meeting of the Board of Directors of defendant Pharmacia ("1981 Bd.

---

> Employers or the Subsidiaries on a basis not dependent on the number of hours worked by such employee, the Plan Committee may credit such employee with 95 Hours of Service for each semi-monthly payroll period in which such employee is directly or indirectly compensated by the Employers or Subsidiaries for the performance of duties for the Employers and the Subsidiaries, or may utilize such other method of estimating the period as may be authorized under the applicable regulations.

Section 17.5(f) of the 1981 Plan contains identical language.

[5] According to defendants, the 95-Hour Rule liberalized the counting of service and allowed employees with less than 21 weeks (that is, less than .41 years) of work to receive a full year's credit.  Defendants assert that federal regulations authorized pension plans to use equivalencies, such as the 95-Hour Rule or the elapsed time method, to enable plans to avoid record-keeping difficulties associated with the crediting of Hours of Service.  29 C.F.R. § 2530.200b-3(c).

Minutes"). Plaintiff observes that, during the same meeting, defendants ratified the decision to close the Sand Mountain facility and approved amendments to the Plan. ("1981 Bd. Minutes"). Plaintiff contends that those amendments included the 95-Hour Rule.

According to the 1981 version of the Plan, which went into effect on January 1, 1981, a participant's rights under the Plan were determined by the Plan document in place at the time the participant was separated from Monsanto, either because of retirement or cessation of employment. (1981 Plan § 1.1).[6]

## IV.   The Closing of the Sand Mountain Facility.

According to plaintiff, in response to the announcement that the Sand Mountain facility was closing, employees at the plant openly complained to management that Monsanto was shutting down the plant in order to keep the employees from receiving their pension benefits.[7]

---

[6] Section 1.1 of the 1981 Plan states:

> . . . The rights and benefits of employees of the Corporation and its subsidiaries who meet the eligibility requirements specified in Section 2 hereof on or after January 1, 1981 shall be determined under the Plan. The rights and benefits of any other person entitled to benefits under the Predecessor Plans shall be determined in accordance with the applicable provisions of the Predecessor Plan in effect at the time of the cessation of such person's active participation . . . in such Predecessor Plan whether by termination of employment, retirement, cessation or loss of eligible status, or otherwise, except as required by applicable law or regulation, or except as specifically provided or changed by subsequent amendments, including this amendment. . . .

Section 1.1 of the 1976 Plan contains similar language.

[7] Defendants deny that the Sand Mountain facility was closed to prevent employees from vesting in their pensions. Defendants point out that Monsanto's 1980 Annual Report explains that the company was experiencing difficult market conditions relating to the polyester produced at the facility. James B. Hutcheson ("Hutcheson"), a former Sand Mountain employee, testified that, at the time the facility was closed and for a number of years thereafter, the market for polyester yarn was poor. (Hutcheson Depo., p. 48). Defendants also note that several of the

Gilley testified that prior to the closing of the plant, he received a FYI (For Your Information) memorandum which stated that all personnel hired prior to September 1, 1972 would be eligible to draw retirement. (Gilley 2nd Affid. ¶ 16). Gilley stated that his supervisor, Johnny Boozer, also gave him this information. (*Id.*) According to Gilley, other members of Monstanto's management, including plant manager Larry Baird and a manager from the personnel department, discussed the FYI during a meeting in the cafeteria. (*Id.*) Gilley asserts that these managers promised that employees hired before September 1972 would be eligible for early retirement at 55 or regular retirement at 65. (*Id.*) Further, Richard Lusk, another former employee of the Sand Mountain facility, stated that he remembered management at the plant telling employees that anyone hired before September 1972 would receive enough credited time to make them fully vested. (Lusk Affid. ¶ 8).

Defendants deny that Monsanto management ever told Sand Mountain employees that those hired before September 1, 1972 would be vested. Defendants also assert that there is no memorandum or document which makes reference to a special promise of pension benefits for Sand Mountain employees.

C.B. Kitchens ("Kitchens"), a former employee at the Sand Mountain facility, testified that he remembered hearing a rumor that Monsanto would give employees a "grace period" so

---

Sand Mountain employees were offered new positions in different locations. Hutcheson testified that some employees in leadership positions were transferred to different locations. (*Id.* at 28). Additionally, Johnny M. Boozer ("Boozer") stated that a number of management personnel were given the opportunity to transfer. (Boozer Depo., p. 49). Defendants point out that Gilley testified that he was offered another position with Monsanto in Pensacola, but he declined it for personal reasons. (Gilley Depo., p. 74). Don E. Carver ("Carver") stated that, after the Sand Mountain facility closed, he transferred to a different Monsanto plant in South Carolina and, ultimately, retired with a pension. (Carver Depo., pp. 20-21, 39-40).

that they could reach the vesting threshold.  (Kitchens Depo., pp. 22-25).  Kitchens could not

remember the specifics of the rumor.  (*Id.*)  Kitchens also testified that he heard the rumor from a

co-worker rather than a superior, and that he believed the "grace period" was to be between 16

and 18 months.  (*Id.* at 22-23).   Hutcheson testified that all employees were given 12 additional

months of service under the Plan when the plant closed.  (Hutcheson Depo., p. 32).  According to

Hutcheson, this information was communicated to the employees during meetings with

management.  (*Id.*)  Ralph Keel ("Keel"), another former Sand Mountain employee, testified that

he remembers someone telling him that employees hired before August 1972 would be vested.

(Keel Depo., p. 15).  Boozer testified that the employees from the "original crew" hired in

November 1971 were  promised that they would be considered vested in the Plan.  (Boozer

Depo., p. 46).  Another former employee, Carver testified as follows:

> Q:   Okay.  I want you to tell me everything that you can recall about the
>       contents of the memo or memos that talked about pension service.
> A:   The only thing that I can remember was them stating that no one had been
>       there long enough to be vested and as a result that they would take the
>       people that had been there nine plus months and they would give them the
>       additional time to total ten years to where they would be vested with the
>       company in order that they could draw a retirement pay from Monsanto
>       upon their retirement.
> Q:   And I think you said nine plus months.  Did you mean nine plus years?
> A:   No, because I think the longest that we had anybody was about – that hired
>       in from that area in that time was maybe nine years and five months.

(Carver Depo., p. 69).

According to Paul Edward Johnson ("Johnson") meetings were held at the facility

regarding the pension benefits issue prior to the plant closing.  He testified:

> Q:   Do you remember what was said at the group meetings about pension
>       benefits?
> A:   Not really.  I just remember that the point was brought out – the point,

sticking point to me, that I remember was, that I lacked a month and eleven days having eligibility for retirement.  I worked eight full years, two partial years, and my understanding was I lacked a month and eleven days being vested for retirement, which would have meant the cut-off date for retirement was September the 1st.

. . .

A:   They told me that the cut-off date --

Q:   Okay.

A:   Cut-off date being September the 1st, they gave us time, added time to our current time that we had.

Q:   So, when you said they gave you a cut-off date, do you mean they told you anyone who was hired before September 1st --

A:   Correct.

Q:   – of 1972 would be vested?

A:   Correct.

Q:   Do you remember who said that?

A:   Some of the personnel people, I don't really – like I said, we had a number of them, but, you know, I made the statement, I guess, hundreds of times – people have asked me, will I draw Monsanto retirement and I said, no, I missed it a month and eleven days.  I hired in on October 11th, that's the reason – that's my birthday.  They hired me on my 18th birthday, so eleven days back would be September and you go back a full month, so that would be one month and eleven days.

(Johnson Depo., pp. 15-17).

Larry G. Segers ("Segers") also testified regarding the alleged promise that Sand Mountain employees' benefits would vest despite their not attaining 10 years of Vesting Service:

Q:   Besides the severance package, do you remember receiving any other benefits when the plant closed?

A:   Well, of course – this of course brings up the retirement thing.  Of course that was, you know, Ray Douglas like I said, there wasn't any memos that showed – that I remember seeing but Ray told us, said, well, they're going to – they're going to give you, you know – let me back up.  They wanted – you know, everybody was asking or a lot of folks were asking, you know, will we get any retirement benefits.  Well, they're going to – they said Monsanto is going to give you, you know, some extra time depending on when you're hired in and get – you may get vested, you know, and best I can remember what he said, you know, the cutoff time was sometime around September of '72, they were going to give you that extra time. Anybody hired back before then would, you know, get some kind of

> vestation or retirement and – but I don't remember getting any memo stating that or you know, I can't pull anything out that I can find, you know.  I just remember at the time I said, well, maybe that will be enough to pay the phone bill about 50 – in 30 years or whatever it is.

Q:     Do you remember anyone else in management telling you that besides Ray?

A:     I can't remember talking – you know, he was the meeting supervisor and I can't remember talking to anybody else that I can remember that told me that.

(Segers Depo., pp. 98-99).

## V.    Gilley's Employment History and Claim for Pension Benefits.

According to Gilley, he worked at the Sand Mountain facility from August 30, 1972[8] until March 31, 1981.  (Gilley 2nd Affid. ¶2).  He was on layoff status from March 31, 1981 until his termination on February 16, 1982.  Gilley testified that his first job with the company was as a process technician.  (*Id.* at ¶ 3).  His second position at Monsanto was as a plant service technician in the utilities department.  (*Id.* at ¶ 3).  Gilley testified that he was a non-exempt employee during his entire time at the Sand Mountain facility.  (*Id.* at ¶ 5).  As such, he was paid on an hourly basis (per diem basis) and received overtime pay pursuant to the Fair Labor Standards Act ("FLSA").  (*Id.*)[9]  According to Gilley, when he started as a process technician, his pay was $390.00 per month.  (*Id.* at ¶ 6).  In addition to this amount, Gilley maintains that he was paid, in a separate check, for overtime, including one day of mandatory scheduled overtime every complete shift rotation.  (*Id.*)  Gilley stated that, although he could not remember the precise number of hours, he worked a considerable amount of overtime in 1972.  (*Id.* at ¶ 7).  He

---

[8] A "Change of Employe[e] Status and Information Sheet," provided by defendants, indicates that Gilley was hired on August 31, 1972.

[9] Defendants, however, assert that Gilley was a salaried employee.

13

estimates that, in most pay periods in 1972, he received approximately as much overtime pay as regular pay.  (*Id.*)

Gilley stated that, when he first started working at the Sand Mountain facility, the plant was operating on a continuous rotating shift schedule, and he worked on the "C" shift.  (Gilley 2nd Affid. ¶ 8).  According to Gilley, the work week began on Sunday at 12:01 a.m. and ended Saturday at 12:00 p.m seven days later.  (*Id.*)  On the continuous rotating shift schedule, Gilley worked seven days on first shift (8-4), seven days on second shift (4-12), and seven days on third shift (12-8).  (*Id.*)  Gilley testified that the Sundays on which he worked the day shift were considered mandatory overtime.  (*Id.*)  This was because he was required to work six straight eight-hour shifts in one Sunday to Sunday work week.  (*Id.*)  On the rotating shift schedule, Gilley asserted, he and other process technicians worked a minimum of between 22 and 24 days per month including the one day of mandatory overtime per shift rotation.  (*Id.* at ¶ 9).  Additionally, because the Sand Mountain plant was a continuous operation plant, Gilley stated, employees were required to continue working if the next person scheduled to work in their area or on their machine did not arrive on time.  (*Id.* at ¶ 10).  Accordingly, Gilley asserts, he sometimes worked as much as 20 minutes overtime while waiting for the person on the next shift to arrive.  (*Id.*)  This time at work, Gilley testified, was not turned in as regular time or overtime. (*Id.*)

When he started working at the Sand Mountain plant, Gilley testified, if his schedule called for him to work on a holiday, he was required to do so.  (Gilley 2nd Affid. ¶ 11).  For working holidays, Gilley stated, he received his regular check plus a second check for overtime at time and a half.  (*Id.*)  Further, if he worked a holiday, Gilley received an equal amount of time

off as compensation or leave time.  (*Id.*)  Gilley stated that he specifically remembers working holidays in 1972, including Labor Day, Christmas Eve, Christmas and possibly Thanksgiving. (*Id.*)  Gilley testified that, when he first began working for Monsanto, he received two weeks vacation each year, in addition to sick leave.  (*Id.* at ¶¶ 12-13).  He also stated that non-exempt employees at Monsanto were given two or three personal days per year to handle personal emergencies.  (*Id.* at ¶ 14).  According to Gilley, Monsanto reduced non-exempt employees' pay for absences in excess of leave time.  (*Id.* at ¶ 15).  Finally, Gilley testified that he never requested termination from layoff status from Monsanto.  (Gilley 2nd Affid. ¶ 17).

According to Gilley, on or about January 31, 2001, he applied for early retirement benefits over the telephone with a representative of defendants'.  During that telephone conversation, Gilley asserts, the representative verified Gilley's eligibility under the Plan.  In a letter dated April 6, 2001 from the Pharmacia Benefits Center, Gilley was informed that the company's research had shown that he was not due any benefits under the Plan as he had not worked with the company the required ten years.  The letter stated "[t]here are no benefits due to you from the Monsanto Company Pension Plan *at this time*."  (emphasis added).  According to Gilley, he continued communications with the Benefit Service Center over the next two years regarding his pension benefits.  The Benefits Service Center sent Gilley a letter on June 24, 2003 which indicated that he was not entitled to a benefit as he had only nine and a half years of Vesting Service.

Gilley asserts that, on October 29, 2003, his counsel contacted the Benefit Service Center and requested information regarding the appeal process.  According to Gilley, on or about November 4, 2003, he filed his administrative appeal.  In a letter dated February 25, 2004,

15

Charles L. Belloli, the Secretary of Monsanto's Employee Benefits Plans Committee, informed Gilley's counsel that his appeal had been denied.  This letter explained that Gilley was not vested under the Plan because he had only 9.594 years of Vesting Service calculated as follows: 0.411 years of Vesting Service for 1972 (95 times nine (9) (the number of semi-monthly pay periods Gilley worked in 1972) divided by 2080 hours (the number of hours in a standard work year)); nine years for the period 1973 through 1981; and 0.182 years of Vesting Service for the period January 1, 1982 to February 16, 1982 (four times 95 divided by 2080 hours).[10]  According to Gilley, attached to this letter was a memorandum, dated September 24, 1979, regarding the Committee's adoption of the 95-Hour Rule as a proposed amendment to the 1976 Plan.

## VI.   Procedural History/Gilley's Allegations in this Action.

Gilley filed this action on March 17, 2004.  Gilley filed a First Amended Complaint on December 3, 2004.[11]  The Amended Complaint contains the following five counts alleging various ERISA violations: (1) Count One – claim under ERISA § 502(a)(3)[12]; (2) Count Two –

---

[10] According to defendants, Gilley would have still failed to meet the 10-year vesting requirement even if the continuous service or elapsed time method of calculation had been used. Defendants contend that, under such a method, Gilley would have received .337 years for 1972, 9 years for 1973 through 1981, and .129 years for 1982.

[11] The Amended Complaint asserted claims on behalf of a class of persons similarly situated as Gilley.  Gilley filed a Motion for Class Certification on December 10, 2004. However, that motion was denied by this court on March 4, 2005.

[12] Count One alleges in part:

> Plaintiff, Mr. Gilley, is a participant in the Monsanto Pension Plan.  Mr. Gilley has over ten years of Vesting Service under the terms of the 1976 Plan, and over ten years under the terms of the 1981 Plan if defendants' are enjoined from improperly applying the 95 Hour Rule retroactively in violation of ERISA. . . .

> In April 2001, Mr. Gilley received a letter denying him pension benefits on the

16

claim on behalf of plaintiff under ERISA § 502(a)(3) for violations of ERISA § 510 and under a

theory of equitable estoppel, and claim on behalf of the Plan under ERISA § 502(a)(2) and §

409[13]; Count Three – claim for statutory sanctions under ERISA § 502(c), or in the alternative

> basis that he was not vested under the Monsanto Pension Plan.  The letter failed to
> provide proper notice of the reason for the decision and failed to give notice to
> Mr. Gilley of the opportunity for a full and fair review as required by ERISA §
> 503(1) & (2).
>
> Mr. Gilley continued to communicate with Pharmacia/Monsanto regarding his
> pension benefits.  During this time Pharmacia/Monsanto never informed Mr.
> Gilley of his rights including his right to appeal the denial of the Committee's
> decision to deny him his pension benefits in continued violation of ERISA §
> 503(2). . . .
>
> On or about February 23, 2004, the Committee considered and denied Mr.
> Gilley's appeal. . . . the Committee took the position that Mr. Gilley was not
> vested under the 1981 Plan because he was only entitled to 95 Hours of Service
> for each semi-monthly pay period during 1972. . . .
>
> Defendants arbitrarily and capriciously denied plaintiff credit for his accrued
> Vesting Service for 1972.
>
> Defendants arbitrarily and capriciously denied plaintiff credit for a full year of
> Vesting Service from his last day of employment at Monsanto until twelve months
> thereafter on or about March 31, 1982. . . .

(Amd. Cmpt. ¶¶ 37-44).

[13] Count Two states in part:

> Defendants' are estopped from denying Mr. Gilley and other similarly situated
> participants their rightful pension benefits because the terms of the 1981 Plan are
> ambiguous in that Section 17.5 (*sic*) includes overtime within the definition of
> Hours of Service and simultaneously excludes overtime pursuant to the 95 Hour
> Rule, an amendment added to the 1976 Plan by the Committee and the Monsanto
> Company Employee Benefits Executive Committee . . . in late 1979 or early 1980.
> . . .
>
> [After announcing the closing of the Alabama plant, in] an effort to assuage the
> employees' concerns, a memorandum was sent to all employees stating that

under ERISA § 510[14]; Count Four – claim under ERISA § 502(a)(3) for equitable relief from

---

> anyone hired before September 1972 had enough credited service time to be fully vested under Monsanto's Pension Plan.
>
> Open meetings were held with employees regarding the plant closing. During these meetings management repeatedly reassured employees that anyone hired before September 1972 was fully vested under Monsanto's Pension Plan entitling them to full benefits upon retirement. . . .
>
> Defendants are estopped from denying participants at the Alabama facility hired prior to September 1972 their accrued credited service under the 1976 Plan and their pension benefits because they are fully vested under the terms of the Monsanto Pension Plan.
>
> Furthermore, the Committee, and/or the Executive Committee, and/or Pharmacia/Monsanto as administrator(s) and/or fiduciary(ies) failed to discharge their duties with respect to the Monsanto Company Salaried Employees' Pension Plan . . . and its participants as required by ERISA by applying the 95 Hour Rule in a retroactive fashion to deny plaintiff his credited service under the 1976 Plan and therein his pension benefits for the sole purpose of benefitting Pharmacia/Monsanto because if successful defendants could deny other similarly situated plan participant's *accrued* credited service and benefits in the future at a savings to the company. . . .

(Amd. Cmpt. ¶¶ 48-54).

[14] Count Three asserts in part:

> Plaintiff's counsel first requested a copy of the 1976 Plan in a letter dated November 20, 2003. Defendants failed to provide plaintiff's counsel with a copy of the 1976 Plan instead providing a 1980 *conformed copy* of the 1976 Plan in their Appendix to their Motion to Dismiss. On or about June 3, 2004, defendants finally provided counsel with a copy of the 1976 Plan after counsel complained in her filings with the court of defendants' attempts at misdirection.
>
> Plaintiff, Mr. Gilley as an individual and as class representative for all similarly situated participants, is entitled to statutory sanctions under ERISA § 502(c), or alternatively under ERISA § 510 should the court find relief under that section more appropriate, to redress defendants' interference with participants' attainment of benefits.

(Amd. Cmpt. ¶¶ 57-58).

18

violation of ERISA § 404[15]; Count Five – claim under ERISA § 502(a)(3) for violation of

ERISA  § 204(g), and on behalf of plan for violation of ERISA § 404.[16]

---

Defendants have produced plaintiff's counsel's November 20, 2003 letter which states:

> I received you letter and copies of benefits and pension plans for the year 1981. . . . While reviewing this material, I noticed that Monsanto made changes regarding the calculation of an employee's vested time under these plans sometime around 1976.  Since Mr. Gilley was hired in 1972, I would like to get copies of Monsanto's benefits and pension plans manuals for this time period as well. . .

[15] Count Four states:

> Plaintiff, Mr. Gilley, as an individual and as a representative participant on behalf of the plan was prevented from attaining rights under the Monsanto Pension Plan by defendants' closing of the Alabama plant at a time that prevented participants from becoming vested.

> Plaintiff, Mr. Gilley, on behalf of himself and the Monsanto Pension Plan and its participants, is entitled to appropriate equitable relief.

(Amd. Cmpt. ¶¶ 59-60).

[16] Count Five alleges in part:

> . . . Defendants by applying the 95 Hour Rule retroactively to accrued credited service under the 1976 Plan reduced the amount of *accrued* Hours of Service and Vesting Service under the plan.

> As a result of defendants' retroactive application of the 95 Hour Rule plaintiff and/or other similarly situated plan participants suffered a reduction or loss in their right to accrued benefit and/or their pension benefit.

> Furthermore, the Committee, the Executive Committee, and/or Pharmacia/Monsanto as Monsanto Pension Plan administrator(s) and/or fiduciary(ies) failed to discharge their duties with respect to the plan and its participants as required by ERISA in that the defendants amended the method of calculating Hours of Service under the 1976 Plan for the sole purpose of benefitting the defendants rather than the plan participants, by amending the plan in a manner that discriminated against certain plan participants, and by applying the amendment in a retroactive fashion thereby denying plan participant's accrued credited service under the Monsanto Pension Plan. . . .

19

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for

---

Plaintiff, Mr. Gilley, is a suitable class representative to sue on behalf of all similarly situated plan participants under ERISA § 502(a)(3) for injuries suffered as a result of the defendants' violation of ERISA § 204(g) and on behalf of the Monsanto Pension Plan for defendants' breach of their fiduciary duty to the plan and its participants. . . .

(Amd. Cmpt. ¶¶ 66-69).

discovery. *Comer*, 265 F.3d at 1192.  Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999).  Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

ARGUMENTS[17]

## I.      Defendants' Motion for Summary Judgment.

### A.      An Abuse of Discretion Standard of Review is Applicable Here.

According to defendants, in claims for ERISA benefits, an abuse of discretion standard of review applies where, as here, the Plan grants the plan administrator discretionary authority to determine eligibility for benefits or to construe the Plan's terms.  *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (holding *de novo* standard of review applies when plan does not give administrator discretion to determine eligibility).  Defendants point to § 12.2(a) of the 1981 Plan which gives the Plan Committee power:

> to determine all questions concerning administration and management arising under the Plan, including the power to determine the rights or eligibility of employees or participants and any other persons, and to remedy ambiguities, inconsistencies or omissions.

(1981 Plan § 12.2(a)).  Defendants argue that this court's review of the denial of benefits is not *de novo*, but rather is limited to whether the plan administrator's decision was reasonable.  *See Jett v. Blue Cross and Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989)

---

[17] This section summarizes the arguments made by the parties and does not necessarily reflect the conclusions reached by the court.

(applying arbitrary and capricious/abuse of discretion standard of review when plan gave administrator discretion to determine eligibility). So, defendants contend, as long as a reasonable explanation is offered by the plan administrator, that decision should not be disturbed even if another reasonable, but different interpretation may be made. *See HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 994 (11th Cir. 2001) (stating, "even if the court determines that the claimant's interpretation is reasonable, the claimant does not necessarily prevail" (footnote omitted)). Moreover, defendants argue, a plan participant may not submit—and a court may not consider—evidence outside the administrative record presented to the plan administrator during the administrative appeals process. *See Lee v. Blue Cross/Blue Shield of Alabama,* 10 F.3d 1547, 1550 (11th Cir. 1994) (stating, "[a]pplication of the arbitrary and capricious standard requires us to look only to the facts known to the administrator at the time the decision was made to deny . . . coverage").

**B.      Count One – Plaintiff Lacks Sufficient Vesting Service to Qualify for a Pension.**

**1.      Plaintiff Invokes ERISA § 502(a)(3), a Section Which Cannot Be Used to Claim Pension Benefits.**

Defendant notes that Count One refers to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). According to defendants, courts have held unanimously that § 502(a)(3) does not authorize an award of pension benefits. Under controlling Supreme Court authority, defendants contend, ERISA § 502(a)(3) may be used only to award "appropriate equitable relief" where no other form of relief provided by § 502 is applicable. *See Varity Corp. v. Howe,* 516 U.S. 489, 512 (1996) (finding that this "'catchall' provision[] act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy"). Defendants

22

argue, "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" *Id.* at 515.  Defendants maintain that courts of this circuit have applied the holding of *Varity* to bar actions under § 502(a)(3) when the plaintiff's claim is based on a denial of benefits.  *See Ogden v. Blue Bell Creameries U.S.A., Inc.,* 348 F.3d 1284, 1286-88 (11th Cir. 2003) (asserting, "an ERISA plaintiff who has an adequate remedy under Section 502(a)(1)(B) cannot alternatively plead and proceed under Section 502(a)(3)).  *Accord Crosby v. Bowater Inc. Retirement Plan,* 382 F.3d 587, 589 (6th Cir. 2004), *cert. denied* 125 S.Ct. 1844 (2005) (upholding dismissal of a claim for monetary relief in the form of a refund as improper under § 502(a)(3), and stating, "ERISA § 502(a)(3), which authorizes only suits for injunctive or other equitable relief, does not, in most situations, authorize an action for money claimed to be due and owing").  Defendants conclude that, because plaintiff cannot obtain payment of benefits under § 502(a)(3), they are entitled to summary judgment on Count One.

> **2.    Even if Plaintiff's Claim Were Pleaded Under Another Section of ERISA, Defendants Are Entitled to Summary Judgment Because the Undisputed Facts Show that Plaintiff Lacks the Required Vesting Service.**

It is defendants' position that, even if plaintiff's claim were characterized as a claim for benefits under ERISA § 502(a)(1)(B), summary judgment would still be required.  Defendants note that ERISA allows a plan participant "to recover benefits due to him <u>under the terms of his plan</u>, to enforce his rights <u>under the terms of the plan</u>, or to clarify his rights to future benefits <u>under the terms of the plan</u>."  ERISA § 502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B) (emphasis added).  According to defendants, the plan participant bears the burden of showing entitlement to

23

benefits under the terms of the Plan.  *Horton v. Reliance Standard Life Ins. Co.,* 141 F.3d 1038,

1040 (11th Cir. 1998).  Defendants contend that plaintiff must show that the plan administrator's

interpretation and application of the Plan's terms were an abuse of discretion.  *Jett v. Blue Cross*

*and Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989).

Defendants maintain that plaintiff's claim for benefits is defeated by the clear terms of the

Plan.  Defendants argue that the Plan requires ten years of Vesting Service to obtain a pension

and provides specific instructions on the calculation of Vesting Service.[18]  (1981 Plan §6).

Defendants further assert that, under the Plan, a participant receives 95 hours of Vesting Service

credit for every pay period in which the participant worked at least one hour.  (*Id.* at § 17.5(f)).

When the participant reaches 1,000 Hours of Service during the Plan year, defendants assert, he

or she receives one year of Vesting Service credit.  (*Id.* at § 17.1(a)(i)).  Defendants maintain that

a participant is entitled to a vesting pension after earning ten years of Vesting Service.[19]  (*Id.* at §

6).

According to defendants, the facts show that plaintiff lacks ten years of Vesting Service.

Defendants highlight the following facts: (1) plaintiff began work on August 31, 1972 and began

earning Vesting Service under the Plan on the same day; (2) plaintiff worked continuously until

his layoff in 1981; and (3) plaintiff continued to earn Vesting Service during his layoff until his

---

[18] According to defendants, the Plan expressly provides that the governing Plan document is the one in place at the time the employee separated from Monsanto, either due to retirement or termination of employment.  Defendants point to § 1.1 of the 1981 Plan.  *See supra.*  They conclude that the relevant version of the Plan in this case is the one that was effective at the time of plaintiff's termination in 1982, the 1981 Plan.

[19] According to defendants, the significance of a "vested" pension is that a participant may leave employment before reaching the required age for pension eligibility but nevertheless be entitled to receive a pension upon reaching the required age.  (1981 Plan §6).

termination on February 16, 1982.  Defendants contend that, when plaintiff applied for benefits under the Plan, his claim and subsequent appeal were denied because he had not accumulated ten years of Vesting Service credit under the terms of the Plan.  Defendants maintain that the Committee calculated his Vesting Service as follows:

Service from August 31, 1972 to December 31, 1972

| August 31, 1972 | 95 hours of Vesting Service |
|---|---|
| September 1 – December 31, 1972 | 760 hours of Vesting Service <br><br> (95 hours x 8 bi-weekly periods) |
| TOTAL FOR 1972 | 855 hours of Vesting Service |

Because the total hours are less than 1,000, defendants contend, Plaintiff received credit for a partial year of Vesting Service, calculated as follows:

$$\frac{855 \text{ Hours of Service}}{2{,}080 \text{ Hours in Standard Work Year}} = \textbf{0.411 years of Vesting Service}$$

Service From 1973 Through 1981

One full year of Vesting Service for each year    =    **9 years of Vesting Service**

Service from January 1, 1982 to February 16, 1982

January 1 to February 16, 1982    =    380 hours of Vesting Service
(95 hours x 4 bi-weekly periods)

Because the total hours are less than 1,000, defendants assert, plaintiff received credit for a partial year of Vesting Service, calculated as follows:

$$\frac{380 \text{ Hours of Service}}{2{,}080 \text{ Hours in Standard Work Year}} = \textbf{0.183 years of Vesting Service}$$

25

Total Vesting Service

| 1972 | 0.411 years |
|------|-------------|
| 1973-1981 | 9.000 years |
| 1982 | 0.183 years |
| TOTAL years of Vesting Service | **9.594 years** |

Defendants maintain that this calculation follows the Plan terms, and the decision of the

Committee based on this calculation should be affirmed.

Defendants note that plaintiff challenges the calculation of Vesting Service for 1972,

arguing that the 1976 Plan should govern the calculation of Vesting Service credit for that year.

Plaintiff asserts that, under the 1976 Plan, overtime house must be counted towards Hours of

Service.  According to plaintiff, when overtime is counted, he worked 1,000 hours before

December 31, 1972 and must receive one year of Vesting Service Credit.  Defendants argue that

plaintiff's position requires two incorrect assumptions.  First, defendants state, the argument

assumes that the 1976 version of the Plan calculates Vesting Service based on actual hours

worked.  Second, defendants explain, the argument assumes that plaintiff worked more than

1,000 hours during 1972.

Defendants highlight the Declaration testimony of Brian Buettner ("Buettner"), an

employee in Monsanto's Compensation and Rewards Group.  Buettner stated that, since at least

1971, Vesting Service has not been calculated based on actual hours worked.  (Buettner Decl. ¶

4).  Defendants note that the Plan for salaried employees was adopted effective January 1, 1951.

(1981 Plan § 1.1).  The Plan was amended and restated in 1956, 1961, 1966, and 1971.  (*Id.*)

According to defendants, Vesting Service was consistently calculated by using the total number

of years worked, and no credit was given for partial years of service.  Defendants maintain that this method came to be known after the passage of ERISA as the "elapsed time method."[20]

Defendants argue that the Plan was amended effective January 1, 1976 to conform to the requirements of the newly-enacted ERISA statute and regulations.  (1976 Plan § 1).  In particular, defendants note, Hours of Service was defined to comply with the ERISA regulations.  (*Id.* at §18.5).  As so defined, defendants assert, the term "Hours of Service" is repeated in various parts of the Plan, including sections relating to Benefit Service and Vesting Service.  According to defendants, the section on Vesting Service, however, does not require use of the "Hours of Service" because it also provided that Vesting Service could continue to be calculated using the elapsed time method.  Defendants maintain that this approach was authorized by regulations in effect at the time, which expressly acknowledged that the elapsed time method was "designed to enable a plan to lessen the administrative burdens associated with the maintenance of records of an employees hours of service."  41 Fed. Reg. 56462, 56484 (Dec. 28, 1976).  Defendants contend that the Plan elected to use the elapsed time method to calculate Vesting Service, and not actual hours worked as plaintiff alleges.

Defendants further argue that plaintiff's assumption about the number of hours he worked in 1972 is wrong.  According to defendants, even if actual hours worked were counted, the record shows that plaintiff did not work 1,000 hours in 1972 and is not entitled to a full year of Vesting Service.  Defendants have produced copies of plaintiff's Social Security records, which show that plaintiff earned $2,149.68 from Monsanto in 1972.  Based on these earnings, defendants argue,

---

[20] Buettner testified that, under the Plan effective January 1, 1976, Monsanto elected to use the elapsed time method for calculating Vesting Service.  (Buettner Decl. ¶ 4).

plaintiff could not have worked more than 887.2 hours.[21]  This number is less than 1,000 and therefore, according to defendants, insufficient to achieve a full year of service in 1972. Defendants maintain that discovery has shown that plaintiff has no pay records, check stubs or other documentary evidence to support his assertion that he worked extraordinary overtime hours in 1972.  Further, defendants assert, plaintiff's Social Security records demonstrate conclusively that he did not do so.

Defendants conclude that the Committee properly interpreted and applied the Plan terms, and the record shows that plaintiff worked less than 1,000 hours in 1972.

### C.    Count Two – There Is No Plan Ambiguity and No Interpretation of Such Ambiguity by Defendants.

It is defendants' position that plaintiff's promissory estoppel claim also fails.  Defendants note that Count Two alleges that they, orally and through a memorandum, promised Sand Mountain employees that anyone hired before September 1972 would receive enough credited service to be fully vested under the Plan.

According to defendants, the Eleventh Circuit has never recognized an estoppel claim for pension, as opposed to welfare, benefits claims.  Further, defendants contend, even if a promissory estoppel claim for pension benefits is recognized, plaintiff cannot satisfy the elements of such a claim.

---

[21] Buettner testified that Monsanto has maintained records showing that plaintiff earned a base salary of $420 per month for an annual salary of $5,040 in 1972.  (Buettner Decl. ¶ 5). Defendants have produced those records.  Defendants maintain that the $2,149.68 earned by plaintiff in 1972, as reflected in the Social Security Administration's records, is equal to 0.427 of his annual salary ($2,149.68 divided by the annual salary of $5,040).  According to defendants, the maximum amount of hours worked by plaintiff can be calculated by multiplying 0.427 by 2080 (the hours in a standard work year), which equals 887.2 hours worked during 1972. Buettner testified to this effect.  (*Id.* at ¶ 8).

In *Nachwalter v. Christie,* 805 F.2d 956 (11th Cir. 1986), defendants note, the Eleventh
Circuit held that there was no federal common law right to promissory estoppel under ERISA in
cases involving purported oral amendments to or modifications of benefits plans governed by the
Act.  805 F.2d at 960.  Defendants point out that the only exception for use of equitable estoppel
in ERISA cases, described by the court as "very narrow," is when "(1) the provisions of the plan
at issue are ambiguous, and (2) representations are made which constitute an oral interpretation
of the ambiguity."  *Katz v. Comprehensive Plan Of Group Ins.,* 197 F.3d 1084, 1090 (11th Cir.
1999).  *Accord Alday v. Container Corp. of America,* 906 F.2d 660, 666 (11th Cir. 1990).  Thus,
defendants argue, estoppel "only comes into play when the terms of a plan are ambiguous," and
"may only be used where the communications constituted an interpretation of that ambiguity."
*Alday,* 906 F.2d at 666.  According to defendants, these limitations follow from the requirement
that employee benefit plans be "established and maintained pursuant to a written instrument."  29
U.S.C. § 1102(a)(1).  Defendants point out that "Congress rejected the use of informal written
agreements to modify an ERISA plan."  *Adams v. Thiokol Corp.,* 231 F.3d 837, 843 (11th Cir.
2000) (quoting *Nachwalter,* 805 F.2d at 960 and citing *Johnson v. Central States, Southeast and
Southwest Areas Pension Fund*, 513 F.2d 1173, 1174-75 (10th Cir.1975), which stated that
benefits may not be enforced according to a company booklet and letter that are inconsistent with
the terms of a written pension plan).

Here, defendants continue, the record shows that plaintiff does not satisfy either element
of an ERISA estoppel claim.  According to defendants, plaintiff has neither identified an
ambiguous Plan term for which he sought an interpretation, nor any communication purporting to
interpret such ambiguity.  Indeed, defendants contend, the only document meeting the description

of the memorandum described in plaintiff's allegations refutes his claims.  Defendants point to an information sheet regarding the closing of the Sand Mountain facility.  The sheet states that Vesting Service may continue while on layoff status for up to twelve months.  Defendants argue that the memorandum does not promise 12 months of Vesting Service credit, and does not promise vested pension benefits to anyone.

According to defendants, there is another reason summary judgment should be entered on Count Two.  Count Two refers to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3).  These sections, defendants maintain, cannot be used to gain payment of pension benefits.  As discussed above, defendants note, § 502(a)(2) does not authorize an award of pension benefits.  Likewise, defendants argue, § 502(a)(3) does not provide for individual benefit claims.  The Supreme Court in *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134 (1985), defendants point out, held that § 502(a)(2) is limited to recoveries on behalf of the plan as a whole, and that a cause of action for individual benefits does not lie under this statutory section.  473 U.S. at 142.  *See also Seales v. Amoco Corp.,* 82 F.Supp.2d 1312, 1323 (M.D. Ala. 2000) (holding that *Russell* expressly abrogates the plaintiffs' effort to use the breach of fiduciary duty provisions as a means of recovering individual damages).  In order to plead successfully a claim on behalf of the Plan, defendants contend, the plaintiff must "set forth facts that, if proven, would establish a loss to the plan."  *Byars v. Coca-Cola Co.*, 2004 WL 1595399 at *8 (N.D. Ga. 2004) (emphasis added).  Because Count Two does not seek any recovery of a loss to the Plan, defendants conclude, summary judgment on this count is appropriate.[22]

---

[22] Defendants note that the Amended Complaint refers to § 510 of ERISA, which makes it unlawful to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee

**D.      Count Three – Plaintiff Was Provided Copies of All Required Plan Documents.**

Defendants note that Count Three seeks statutory penalties under ERISA § 502(c), 29 U.S.C. § 1132(c), based on defendants' purported failure to supply plaintiff with a copy of the 1976 Plan document.  However, defendants argue, ERISA does not impose such an obligation. Defendants acknowledge that ERISA § 104(b)(2) requires the plan administrator to make available copies of "the <u>latest</u> updated summary plan description and the latest annual report and the bargaining agreement, trust agreement, contract, or other instruments under which the plan was established or is operated . . ." 29 U.S.C. § 1024(b)(2).  Defendants maintain that there is no obligation to provide prior plan documents.  *Shields v. Local 705, Intern. Broth. of Teamsters Pension Plan,* 188 F.3d 895, 903 (7th Cir. 1999); *Colin v. Marconi Commerce Systems Employees' Retirement Plan,* 335 F.Supp.2d 590, 612-13 (M.D. N.C. 2004); *King v. Pension Trust Fund of Pension, Hospitalization and Benefit,* 2003 WL 22071612 at *16 (E.D. N.Y. 2003).  Because plaintiff has no statutory right to this document, defendants conclude, plaintiff cannot seek a penalty under § 502(c).

Further, defendants argue, summary judgment should also be granted on Count Three because plaintiff never made a specific request for the 1976 Plan document until after litigation was underway, and then it was provided promptly.  Defendants note that the First Amended

---

benefit plan. . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. . . ." 29 U.S.C. § 1140.  However, defendants argue, plaintiff has made no substantive allegations to this effect.  In addition, defendants contend, the statute of limitations for § 510 claims in Alabama is two years and thus the limitations period expired long ago.  *Musick v. Goodyear Tire & Rubber Co., Inc,* 81 F.3d 136, 137 (11th Cir. 1996) (stating "that a two-year statute of limitations is applicable to section 510 actions brought in Alabama, at least insofar as back pay, back benefits, and retirement eligibility credit are the remedies sought").

Complaint alleges that plaintiff's counsel requested a copy of the 1976 Plan document in a letter

dated November 20, 2003.  However, defendants contend, that letter asks merely for "copies of

Monsanto's benefits and pension plans manuals for this time period [around 1976] as well."

According to defendants, in response to this request, they promptly supplied plaintiff's counsel

with a summary plan description booklet and copies of the1971 Plan and the Amended 1976

Plan.[23]  Defendants maintain that plaintiff's counsel did not complain that they did not provide an

earlier version of the 1976 Plan until after the lawsuit was filed and they moved to dismiss.

Defendants assert that the document was thereafter sent to plaintiff's counsel by overnight

express.

### E.       Counts Four and Five – Defendants' Allegedly Wrongful Conduct Is Not Subject to Fiduciary Standards.

Defendants point out that Counts Four and Five allege that they breached their fiduciary

duties by closing the Sand Mountain Plant or amending the Plan to include the 95-hour rule.

However, defendants argue, under controlling case law, neither act is subject to fiduciary

standards.

ERISA defines a "fiduciary" as follows:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any
> discretionary authority or discretionary control respecting management of such
> plan or exercises any authority or control respecting management or disposition of
> its assets, (ii) he renders investment advice for a fee or other compensation, direct
> or indirect, with respect to any moneys or other property of such plan, or has any
> authority or responsibility to do so, or (iii) he has any discretionary authority or
> discretionary responsibility in the administration of such plan.

29 U.S.C.A. § 1002(21)(A) (emphasis added).  Defendants contend that an entity is a fiduciary

---

[23] Defendants have supplied a November 26, 2003 letter addressed to plaintiff's counsel indicating that these documents were attached to the letter.

32

only when and "to the extent" that it performs one of the prescribed duties.  Therefore,

defendants assert, an entity may be a fiduciary when doing certain things, but may still be entitled

to act in its own interest when conducting business not regulated by ERISA.  *Pegram v.

Herdrich*, 530 U.S. 211, 225 (2000); *Barnes v. Lacy,* 927 F.2d 539, 544 (11th Cir. 1991); *Gelles

v. Skrotsky,* 983 F.Supp. 1398, 1401 (M.D. Fla. 1997) (relying on *John Hancock Mutual Life

Insurance Co. v. Harris Trust & Savings Bank*, 510 U.S. 86, 93-99 (1993)).

When deciding to close a plant or amend a plan, defendants argue, a plan

sponsor/employer is no more the employees' fiduciary than when it decides what wages to offer

or whether to lay off workers.  *Johnson v. Georgia-Pacific Corp*., 19 F.3d 1184, 1188 (7th Cir.

1994).  *See also Burns v. Rice,* 39 F.Supp.2d 1350, 1356-58 (M.D. Fla. 1998) (relying on

*Johnson*); *Gelles v. Skrotsky*, 983 F.Supp. 1398, 1402 (M.D. Fla. 1997) (same).  Thus, defendants

conclude, they simply were not performing a fiduciary function when undertaking the alleged

conduct.  *See e.g., Barnes,* 927 F.2d at 544 (noting fiduciary duty only when and to the extent

one administers the plan); *McGath v. Auto-Body North Shore, Inc*., 7 F.3d 665 (7th Cir. 1993)

(holding no fiduciary duty owned to plaintiff when defendant amended the plan repeatedly for the

sole purpose of excluding plaintiff).

Defendants further assert that plaintiff's claims for breach of fiduciary duty are also

barred by the applicable statue of limitations.  ERISA § 413 provides that a breach of fiduciary

duty claim must be filed within the earlier of (i) three years from plaintiff's actual knowledge of

the breach or (ii) six years after the last act constituting the breach (or in the case of fraud or

concealment, six years after the date of discovery of the conduct).  29 U.S.C. § 1113.  Defendants

note that the Sand Mountain facility closed in 1981, and the Plan was amended to adopt the 95-

hour rule around 1979.  Defendants conclude that this lawsuit was filed over 20 years later, well past the maximum six years allowed by ERISA.

      **F.**      **Count Five – There Has Been No Reduction in Plaintiff's Benefits.**

Defendants note that Count Five alleges a violation of ERISA § 204(g)(1), 29 U.S.C. § 1054(g)(1), because the Plan was amended to adopt the 95-hour rule, which plaintiff alleges is less generous to him than if Monsanto had counted the actual hours worked, including overtime. According to defendants, this statutory section has no application to plaintiff's situation.

Defendants contend that ERISA § 204(g)(1) provides that the accrued benefit of a participant under a plan may not be decreased by amendment of the plan, except in circumstances not relevant here.  29 U.S.C. § 1054(g)(1).  Defendants argue that ERISA § 204 protects "accrued benefits," that is the amount of the benefit set aside for a particular individual.  In contrast, defendants assert, plaintiff's allegations involve "vesting," that is the determination of whether a participant has earned entitlement to a benefit.  *Ashenbaugh v. Crucible Inc., 1975 Salaried Retirement Plan*, 854 F.2d 1516, 1523-24 (3rd Cir. 1988).[24]  Defendants conclude that ERISA § 204 governs the amount of a participant's benefit, and does not concern the entitlement

---

[24] The *Ashenbaugh* court stated:

> We then contrasted "accrued benefits" with "vested" or "non-forfeitable" rights: The concepts of accrued on the one hand, and vested or "nonforfeitable", on the other, are related, but not the same. A participant becomes fully vested when he gains a nonforfeitable right to receive his entire accrued benefit. Vesting provisions do not affect the amount of the accrued benefit, but rather govern whether all or a portion of the accrued benefit is nonforfeitable. Accrual provisions provide a formula for calculating the amount of the normal retirement benefit which an employee has earned at any given time.

854 F.2d at 1524.

to a benefit.  According to defendants, all of plaintiff's allegations concern vesting and, therefore, § 204(g) is irrelevant.

Even if ERISA § 204(g) applied to the present claims, defendants argue, the facts show that plaintiff's Vesting Service was not reduced.  Under the elapsed time method, defendants assert, if credit for a partial year were calculated, plaintiff would have received at most 0.337 years credit for 1972 (123 days employed/365 days per year).  Under the 95-hour rule, defendants state, plaintiff received 0.411 years of credit.  Therefore, defendants conclude, plaintiff's Vesting Service credit was not reduced by the implementation of the 95-hour rule.

## II.    Plaintiff's Response.

### A.    A *De Novo* Standard of Review is Applicable Here.

Plaintiff contests defendants' arguments that an abuse of discretion standard of review is applicable to this case.  While his claims arise from defendants' denial of pension benefits, plaintiff argues, the essence of his claims are grounded in equity based on defendants' violation of several provisions of ERISA, including ERISA §§ 204(g), 510, and 404.  Accordingly, plaintiff contends, this court is not reviewing the denial of benefits, but rather deciding pure legal issues.  For example, plaintiff notes, one of the primary legal issues affecting his claims is whether defendants violated ERISA § 510 by amending the Plan in a discriminatory manner.  Also at issue is whether defendants violated ERISA § 204(g)(1) by applying that amendment in a retroactive fashion to intentionally interfere with certain participants' benefits in violation of ERISA § 510.  *See Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739 (2004) (holding that ERISA's "anti-cutback" rule prohibited an amendment expanding the categories of post-retirement employment that would trigger suspension of payment of early retirement benefits that

35

had already accrued).  Plaintiff maintains that the proper standard of review in a case where the court is determining a legal issue is *de novo*.  *Larocca v. Borden, Inc.,* 276 F.3d 22, 26 (1st Cir. 2002); *Simpson v. Ernst & Young,* 100 F.3d 436, 440 (6th Cir. 1996).  *See also Chao v. Malkani,* 216 F.Supp.2d 505, 512 (D. Md. 2002) (stating: "The issues now before the Court demand simple determinations of whether the defendants' actions were violations of ERISA. These are legal issues which the Court considers *de novo*").  Even if defendants maintained discretion to interpret the Plan and to make eligibility decisions, plaintiff asserts, they did not have discretionary authority to violate ERISA's mandates.

Plaintiff further contends that, even if the court determines this case involves a denial of benefits, the standard of review would still be less deferential than abuse of discretion.  When a plan administrator acts under a "conflict of interest," plaintiff notes, a court must apply a "heightened" arbitrary and capricious review to their determinations.  *Torres v. Pittston Co.,* 346 F.3d 1324, 1329 (11th Cir. 2003).  According to plaintiff, under the "heightened" arbitrary and capricious standard, a court applies a level of scrutiny somewhere between *de novo* review and the regular arbitrary and capricious standard when reviewing the administrator's interpretations of plan terms and facts.  *Id.* at 1329.  Here, plaintiff argues, there is clearly a "conflict of interest" between defendants' fiduciary and profit-making interest.  *See Williams v. BellSouth Telecommunications, Inc.,* 373 F.3d 1132, 1137-39 (11th Cir. 2004) (discussing the application of the three standards announced in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)).  Plaintiff states that this conclusion is not affected by the fact that Monsanto abdicated its claim processing duties to a third-party administrator, Fidelity, because Monsanto maintained the ultimate power to affect the disposition of specific claims.

36

## B.    Analysis of the Evidence.

Plaintiff first addresses defendants' contention that they never computed Vesting Service using actual hours worked under the Plan.  (Buettner Decl. ¶ 4).  According to plaintiff, Buettner's testimony on this issue is an admission that defendants violated ERISA mandates and the Plan.  Plaintiff further contends that Buettner's testimony is an admission that defendants breached their fiduciary duty to plan participants in order to increase profits for the company.  Plaintiff contests defendants' assertions that Vesting Service was calculated using the "elapsed time method."  Plaintiff notes that the Plan used and defined such concepts as Years of Service, Partial Years of Service, Plan Year, Hours of Service, Benefit Service, Breaks in Service, and 1,000 Hours of Service.  The phrase "elapsed time," plaintiff points out, appears in a single sentence in the 1976 and 1981 Plans.  This sentence was inserted, without a subheading, under the section defining Hours of Service.  It states: "Hours of Service may be computed and recorded under the 'elapsed time' regulation if the employer so elects."  (1976 Plan § 18.5; 1981 Plan § 17.5).  Plaintiff argues that this statement never appears in the summary plan description ("SPD") provided to employees.  Nor was it otherwise communicated to employees.  Plaintiff characterizes defendant's use of the elapsed time method as "secret," and argues that defendants' position is a distortion of basic contract law and ERISA mandates.  Plaintiff notes that, while the SPD need not restate every term of the Plan, ERISA demands that it must, at a minimum, inform employees of their eligibility and ineligibility for benefits.  *Moriarity v. United Technologies Corp.*, 947 F.Supp. 43, 51 (D. Conn. 1996).  *See also* 29 U.S.C.A. §§ 1022(a), 1024(b) (discussing SPD requirements).  According to plaintiff, when there is a conflict between the SPD and the Plan, the terms of the SPD controls.  *Burke v. Kodak Retirement Income Plan,* 336 F.3d

103, 110 (2nd Cir. 2003); *Burstein v. Retirement Account Plan For Employees of Allegheny Health Educ. And Research Foundation*, 334 F.3d 365, 380 (3rd Cir. 2003); *Martin v. Blue Cross & Blue Shield of Virginia, Inc.,* 115 F.3d 1201, 1204 (4th Cir. 1997); *Layaou v. Xerox Corp.*, 330 F.Supp.2d 297, 302 (W.D. N.Y. 2004).

Plaintiff next addresses defendants' argument that he had less than 1,000 Hours of Service for 1972.  Plaintiff notes that defendants contend that he was a salaried employee, and that the company did not keep records reflecting actual hours worked by salaried employees. Defendants conclude plaintiff had under 1,000 Hours of Service in 1972 by using the number of hours in the standard work week.

According to plaintiff, he began his employment at the Sand Mountain plant on August 30, 1972, as a process technician, a production level position.  (Gilley 2nd Affid. ¶¶ 2-3). Plaintiff maintains that process technicians were non-exempt employees, compensated on a basis dependent on the number of hours worked (hourly or per diem) and subject to FLSA standards. (*Id.* at ¶5).  According to plaintiff, process technicians were considered salaried only in that Monsanto allowed them to participate in the Plan.  Plaintiff points out that all versions of the Plan after 1971 state that Hours of Service include overtime hours, holidays, vacation, absence due to illness and layoff time.  Since at least 1991, plaintiff argues, defendants have been aware that it was improper to apply the 95-Hour Rule to reduce accrued credited service for participants of the Plan who were compensated on a per diem or hourly basis.[25]

Plaintiff takes issue with Buettner's testimony, arguing that he makes several incorrect

---

[25] Plaintiff has produced a January 29, 1991 memo from Monsanto's Law Department which states: "Note, that the [95-Hour] equivalency need not (and should not) be used for participants in the salaried plan who are paid by the hour."

assumptions.  Relying on two Change in Status and Employee Information Sheets ("status sheets"), Buettner testified that plaintiff's standard workweek was 40 hours.  (Buettner Decl. ¶ 6).  However, plaintiff asserts, the status sheets do not state how many hours he actually worked. Instead they list 40:00 under a section labeled "STD. WEEK (HRS MIN)."  According to plaintiff, based on the status sheets, Buettner assumes that he worked only 2,080 hours per year despite the fact that plaintiff was non-exempt and subject to FLSA.  According to plaintiff, the evidence shows that non-exempt production level employees worked a seven-day rotating shift for a total of 2,160 hours per year, including one day of mandatory overtime per month (96 hours of mandatory overtime per year).  As compensation for working 2,160 hours per year, plaintiff asserts, he was compensated $420.00 per month.

Plaintiff disputes Buettner's calculations.  According to plaintiff, Buettner begins by dividing plaintiff's total pay for 1972 ($2,149.68) by the assumed base pay rate of $5,040.00 and concludes that plaintiff's pay equals 0.427 of his annual salary.  (Buettner Decl. ¶ 8).  Plaintiff contends that Buettner then assumes the standard work year for true salaried employees of 2,080 hours and, multiplying, determines that plaintiff worked a maximum of 887.2 hours in 1972.  (*Id.* at ¶ 9).  It is plaintiff's position that there are several problems with Buettner's calculations and assumptions.  Plaintiff argues Buettner improperly assumed the standard work year for a true salaried employee instead of the standard hours worked by a non-exempt employee (2,160 hours per year, including 96 hours of mandatory overtime).

Plaintiff further contends that, based on his Social Security wages of $2,149.68, he worked at least 170 hours of overtime in 1972, including four days (32 hours) of mandatory overtime (regular pay of $390.00 per month or $420 per month including one day of mandatory

overtime).  According to plaintiff, he worked nine semi-monthly pay periods in 1972.  As a non-exempt employee on the seven-day rotating continuous shift, plaintiff asserts, he worked 90 actual hours per semi-monthly pay period.  Further, as a non-exempt employee, plaintiff contends, he received two weeks of vacation and five days of sick leave per year, for a total of 95 hours per semi-monthly pay period of credited service.  (Gilley 2nd Affid. ¶¶ 12-13).  Plaintiff concludes he is entitled to 855 (9 x 95) hours for nine semi-monthly pay periods of credited service, plus overtime, plus compensation time for working holidays.

### C.     Count Two – ERISA § 510 and/or ERISA § 404.

Plaintiff notes that, in Count Two, he claims that defendants should be prevented from applying the 95-Hour Rule to divest him of his accrued credited service under the 1976 Plan. "To sustain a valid § 510 claim, an employee must show: (1) prohibited (adverse) employer action (2) taken for the purpose of interfering with the attainment of (3) any right to which the employee is entitled." *Bodine v. Employers Cas. Co.*, 352 F.3d 245, 250 (5th Cir. 2003).

Plaintiff disputes defendants' position that this claim is not proper based on their arguments that the Plan is not ambiguous, and that plaintiff has not been able to produce any writing containing a promise of benefits.  Regarding the issue of ambiguity, plaintiff argues, both the Plan and the SPD contained the 1,000 Hours of Service Rule, while the defendants claim they never used that method of calculation.  Instead, defendants claim they calculated Vesting Service using the "elapsed time method" – a method plaintiff claims was not mentioned in the SPD.

Regarding the promise of benefits, plaintiff highlights his own affidavit testimony that, prior to the closing of the Sand Mountain facility, he received a FYI (For Your Information) memorandum which stated that all personnel hired prior to September 1, 1972 would be eligible

to draw retirement benefits.  (Gilley 2nd Affid. ¶ 16).  Further, plaintiff testified that defendants' management held a meeting with employees in the cafeteria during which the FYI was discussed. (*Id.*).  According to plaintiff, the management told the employees at that meeting that anyone hired before September 1972 would be eligible for early retirement at age 55 or regular retirement at age 65.  (*Id.*)  Plaintiff maintains that a number of his co-workers corroborated his testimony, including Richard Lusk, Edwin Driskill, and Paul Edward Johnson.  In addition to this testimony, plaintiff asserts, it would have been logical for defendants to choose September 1, 1972 as the cutoff date in light of the 1976 Plan terms.  According to plaintiff, eight and a half years of actual service from September 1, 1972 to February 26, 1981, under the terms of the 1976 Plan, would have resulted in ten years of Vesting Service.  According to plaintiff, this would be so if Vesting Service was calculated from the first to last day of employment, with the addition of one year due to layoff and one year for the six months (or 1,040 hours) worked as a partial year of service.

It is plaintiff's position that defendants retroactively applied the 95-Hour Rule in violation of ERISA § 204(g), recalculated plaintiff's accrued credited service, and denied him early retirement benefits.  According to plaintiff, this was done in hopes of establishing precedent for uniformly applying the 95-Hour Rule as a cost-saving measure for the company.  Therefore, plaintiff concludes, defendants breached their fiduciary duty to him and other plan participants by acting in the company's profit-making interest.

### D.    Count Three.

Plaintiff's claims in Count Three are based on defendants' failure to provide requested plan documents.  According to plaintiff, his counsel first requested a copy of the 1976 Plan in a

letter dated November 20, 2003.  However, plaintiff asserts, defendants provided only a copy of the 1980 conformed copy of the 1976 Plan (Amended 1976 Plan).  This version contained the 95-Hour Rule.  According to plaintiff, defendants blatantly mischaracterized the 1980 conformed plan as the 1976 Plan by stating that the enclosed documents fulfilled the plaintiff's counsel's request.  Plaintiff has produced a November 26, 2003 letter to his counsel from Charles L. Belloli, the Secretary of the Employee Benefits Plans Committee.  This letter indicates that the "Monsanto Company Salaried Employees' Pension Plan (1976)" had been attached.  Plaintiff asserts that he is entitled to sanctions under ERISA § 502(c), or alternatively under ERISA § 510, for this failure to provide plan documents.  It is plaintiff's position that defendants' production of the 1980 conformed plan was a deliberate attempt to conceal the actual 1976 Plan.  To support this position, plaintiff asserts, there are several conformed versions of the 1976 Plan, but only the 1980 version contains the 95-Hour Rule, and only that version was produced.

Plaintiff disputes defendants' argument that summary judgment is appropriate on this claim because plaintiff was not statutorily entitled to prior plan descriptions, and because plaintiff's counsel was not sufficiently specific in her request.  According to plaintiff, ERISA demands that participants be provided with information regarding amendments to the Plan within a five-year period.  29 U.S.C.A. § 1024(b)(4).[26]  Plaintiff asserts that her counsel specifically

---

[26] This section states:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. The administrator may make a reasonable charge to cover the cost of furnishing such complete copies. The Secretary may by regulation prescribe the maximum amount which will constitute a reasonable charge under the preceding sentence.

requested plan materials for 1976.  Further, plaintiff argues, he was prejudiced by defendants'

failure to provide the requested documents.  According to plaintiff, had he been provided with

the correct documents, his arguments in the appeal before the Committee would have been

framed differently.  Other than a general denial, plaintiff contends, defendants have presented no

evidence to warrant summary judgment on this count.  Plaintiff maintains that sanctions under

ERISA § 502(c)(1) are at the discretion of the trial court.  *McDonald v. Pension Plan of*

*NYSA-ILA Pension Trust Fund,* 153 F.Supp.2d 268, 290 (S.D. N.Y. 2001), *rev'd on other*

*grounds* 320 F.3d 151 (2nd Cir. 2003).  In determining whether to impose such sanctions,

plaintiff argues, the court is to consider the following factors: (1) the administrator's bad faith or

intentional conduct; (2) the length of the delay; (3) the number of requests made; (4) the extent

and importance of the documents withheld; and (5) the existence of any prejudice to the

participant or beneficiary.  *Id.*

### E.      Count Four.

Plaintiff maintains that he, individually and as a representative participant on behalf of

the Plan, was prevented from attaining rights under the Plan by defendants' closing of the Sand

Mountain plant at a time that prevented participants from becoming vested.  Plaintiff argues that

defendants offer no evidence to rebut plaintiff's claims in Count Four.  Instead, plaintiff asserts,

defendants argue that the decision to close the Sand Mountain facility was outside their fiduciary

responsibilities.

Plaintiff argues that, when an entity is acting as a fiduciary, ERISA imposes an

unwavering duty to make decisions with a single-minded devotion to plan participants.  *Gelles v.*

---

29 U.S.C. § 1024(b)(4).

43

*Skrotsky*, 983 F.Supp. 1398, 1402 (M.D. Fla. 1997).  "ERISA clearly recognizes such a situation where an officer of a corporation wears two hats."  *Id.* (discussing administrators differing duties depending upon whether they are acting as employees of the company or fiduciaries of the plan).  According to plaintiff, the question here is whether defendants were acting as fiduciaries when they decided to close the Sand Mountain facility, with the knowledge that many of the plant's employees had just below the amount of service time needed for vesting in the Plan.  According to plaintiff, defendants were acting in their fiduciary capacity and breached their duty by closing the facility at a time that would prevent plan participants from vesting.  *See Varity Corp. v. Howe,* 516 U.S. 489 (1996) (holding that employer was acting as a fiduciary and violated duties owed to plan participants).  Plaintiff has produced defendants' IRS forms 5500 for 1981 and 1982.  According to plaintiff, these forms show only a handful of Sand Mountain employees as being participants with a deferred vested benefit in the Plan.  According to plaintiff, a reasonable inference may be draw from this evidence that defendants never intended on paying retirement benefits to the nearly twelve hundred non-exempt employees at the Sand Mountain plant, despite the fact that many were vested under the Plan when the plant closed.[27]

### F.    Count Five.

Finally, plaintiff addresses defendants' position that he does not have a cause of action under ERISA § 204(g) because this section protects only accrued benefits (the amount of the benefit set aside for a particular individual), and not vesting (the entitlement to any benefit under the Plan).  Plaintiff asserts that this court dispelled this argument by its ruling on defendants'

---

[27] Plaintiff bases this argument on the assumptions that the same plan terms apply to other non-exempt employees, and that defendants would apply the same methods of calculating Vesting Service as they did in regard to plaintiff.

motion to dismiss.  Further, plaintiff contends, this court stated in a telephone conference with the parties that plaintiff would be entitled to judgment on this issue if he could prove that he had 1,000 Hours of Service under the terms of the 1976 Plan.

**III.     Defendants' Reply.**

**A.     Plaintiff Has Failed to Carry His Burden of Showing Ten Years of Vesting Service.**

It is defendants' position that plaintiff has failed to offer any competent evidence to support his claims, including his assertion that he is entitled to a full year of Vesting Service credit for his work between August 31, 1972 and December 31, 1972.

**1.     Plaintiff Ignores the Governing Terms of the Plan.**

Defendants argue that a participant's entitlement to pension benefits turns upon the terms of the Plan.  According to defendants, the "cornerstone of an ERISA plan is the written instrument."  *Hunt v. Hawthorne Associates, Inc.,* 119 F.3d 888, 891 (11th Cir. 1997). Defendants contend that the Plan must be read as a whole, and the court must attempt to give meaning to all portions of the plan.  *See Vann v. National Rural Elec. Co-op. Association Retirement and Security Program,* 978 F.Supp. 1025, 1040 (M.D. Ala. 1997) (stating, "[a]n interpretation that gives meaning to all parts of a contract is preferred to an interpretation that leaves some portions meaningless").

Defendants reemphasize their argument that the Plan does not require the counting of actual hours of service, but allows for the use of the "elapsed time" method.  Defendants note that this counting method is authorized by ERISA regulations, and that plaintiff makes no argument that the method itself is illegal.  According to defendants, plaintiff's disregard for the

alternative elapsed time method violates the fundamental rule that the Plan must be read as a whole.[28]  Defendants reassert their arguments that the administrator's decision to deny plaintiff benefits must be reviewed under an abuse of discretion standard.

> 2.  **The Social Security Records Produced in Discovery Show Plaintiff Had Insufficient Service During 1972.**

According to defendants, even if actual hours of service had been used to calculate Vesting Service, as plaintiff claims, plaintiff still would not have 1,000 hours of service in 1972. Defendants assert that plaintiff has produced no written records which reflect that he worked 1,000 hours in 1972.  Further, defendants argue, plaintiff admitted during his deposition that he could not recall the precise number of overtime hours he worked.  (Gilley Depo. pp. 121, 131).[29] Additionally, defendants reassert their arguments that, based on plaintiff's 1972 Social Security records, he could not have earned more than 887.2 hours of Vesting Service in that year.[30]

---

[28] Regarding plaintiff's assertions that the Plan conflicts with the SPD, defendants argue that plaintiff mistakenly cites cases from other circuits and ignores relevant Eleventh Circuit precedent.  According to defendants, under such a claim, a plaintiff must prove, not only that the Plan document and the SPD conflict, but also that the plaintiff actually relied to his detriment on the conflicting language.  *Branch v. G. Bernd Co.,* 955 F.2d 1574, 1579 (11th Cir. 1992). Defendants argue that, here, plaintiff did not rely on the SPD.  According to defendants, plaintiff testified in his deposition that he did not review the SPD issued in 1976.  (Gilley Depo. pp. 62, 66-67, 71-72).

[29] However, the court notes, Gilley testified that he worked approximately the same number of overtime hours as he worked regular hours in 1972.  (Gilley Depo., p. 121); (Gilley 2nd Affid. ¶7).

[30] Regarding their lack of payroll records for 1972, defendants assert that those records no longer exist for two reasons.  First, defendants argue, they never used actual hours to calculate Vesting Service under the Plan, and instead used methods allowed by ERISA to simplify record-keeping.  Second, defendants contend, Monsanto switched to a new payroll system in 1973. (Buettner Decl. filed in support of Defendants' Memorandum in Opposition to Plaintiff's Motion to Compel ¶ 5).  Even for the years 1973 forward, defendants maintain, the payroll records reflect earnings, and not hours worked.

Defendants address plaintiff's arguments that their calculations based on his 1972 Social Security records are incorrect. Plaintiff argues that defendants' calculations are based on an assumed 2080-hour standard work year, when there were actually a minimum of 2160 hours in his standard work year. Defendants argue that the "Standard Work Year" of 2080 hours is a defined term in the Plan (1976 Plan § 18.7; 1981 Plan § 17.7),[31] and is reflected on plaintiff's Change of Employment Status and Information Sheets. Defendants assert that the Plan's Standard Work Year applied to employees at plants and offices worldwide. According to defendants, it did not vary with the shift schedule at any plant. Even if the calculation were based on the 2160-hour work year suggested by plaintiff, defendants argue, plaintiff would still fall short of the required 1,000 hours.[32]

---

[31] Section 18.7 of the 1976 Plan states:

> Standard Work Year. With respect to any participant, his "Standard Work Year" shall mean the number of hours (not in excess of 40) included in one standard work week for a regular full-time employe[e] at the Participant's location of employment multiplied by 52.

Section 17.7 of the 1981 Plan states:

> Standard Work Week. With respect to any regular full-time employee covered under the Plan, his "Standard Work Week" shall man 40 Hours of Service and the "Standard Work Year" shall mean 2,080 Hours of Service. With respect to employees who are not regular, full-time employees, the "Standard Work Week" shall mean the average number of hours which are regularly scheduled to be worked each week by the employee, and the "Standard Work Year" for such employees shall mean the number of hours in the employee's Standard Work Week multiplied by 52.

[32] According to defendants, plaintiff acknowledges that in 1972 he earned $2,194.68 and had a base yearly pay of $5,040 ($420 per month). Therefore, defendants assert, the parties agree that plaintiff's 1972 earnings amounted to approximately 0.427 years' pay. Even if the Standard Work Year were 2,160, defendants contend, the Standard Work Year would amount to only 922 hours. To the extent plaintiff worked overtime, defendants conclude, the number of hours

According to defendants, plaintiff offers no alternative calculation of his own, but simply asserts, without support, that he worked at least 170 hours of overtime. Defendants note that plaintiff's brief also asserts that he worked nine semi-monthly periods. However, defendants argue, since the parties agree that plaintiff started at the end of August and was employed through December 31, 1972, he could only have worked 8.1 pay periods.

Defendants next address plaintiff's suggestion that he is entitled to additional hours of Vesting Service based on holidays or vacation time. This suggestion, defendants contend, is contrary to the Plan's terms. Defendants point out that the Plan counts as Hours of Service absences from work because of regular paid vacations or holidays and hours for which the participant is compensated for absences due to sickness, disability or similar reasons. (1976 Plan § 18.5(a)(iii), §18.5(b); 1981 Plan §17.5(a)(iii), § 17.5(b)). Therefore, defendants maintain, a participant receives credit for vacation or sick leave that is actually used (i.e. "compensated") and does not receive credit for unused leave. Defendants argue that the Social Security records reflect all compensation paid by defendants to plaintiff, regardless of whether the earnings resulted from overtime, holiday, sick leave, or otherwise. According to defendants, nothing in ERISA requires, and the Plan does not permit, the double-counting of Hours of Service earned by working on a holiday.

### 3. Plaintiff's Affidavit Does Not Create a Factual Dispute.

Defendants point out that plaintiff's affidavit does not state that he worked 1,000 or more hours during 1972. Instead it states:

> I recall that I worked considerable amounts of overtime in 1972 when the plant

---

decreases, as he was paid more for overtime.

first opened.  I cannot recall the precise number of overtime hours I worked in 1972 or any other year, but I estimate that in 1972 that most pay period[s] I would have approximately as much overtime pay as pay from my regular work.

(Gilley 2nd Affid. § 7).  Defendants argue that this speculation does not provide competent evidence to avoid summary judgment, particularly when considered in light of the Social Security records.  *See Henson v. Commissioner of Internal Revenue*, 835 F.2d 850, 854 (11th Cir. 1988) (holding that witness' statements that documents may not have been executed until 1975, which were contradicted by written documents, were "so equivocal that they do not constitute legitimate evidence regarding the date of the documents"); *Coats & Clark, Inc. v. Gay,* 755 F.2d 1506, 1510 (11th Cir. 1985) (holding that expert's affidavit filed in opposition to summary judgment was not sufficient to defeat the motion where the affidavit was "speculation and guesswork and ha[d] no significant probative value"); *Fabrica de Tejidos Imperial, S.A. v. Brandon Apparel Group, Inc.,* 218 F.Supp.2d 974, 978 (N.D. Ill. 2002) (finding that "general recollection" did not raise issue of fact to avoid summary judgment where there was contradictory documentary evidence).  Defendants argue that, under the law of this Circuit, plaintiff's affidavit should be rejected because it is self-serving, lacks specific evidence, and is from a party opposing summary judgment.  *See Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 714 (11th Cir. 1984) (stating, "[s]elf-serving statements by a plaintiff's corporate officers are not, alone, substantial enough evidence of antitrust injury for a plaintiff to survive a motion for summary judgment"); *Lovable Co. v. Honeywell, Inc.*, 431 F.2d 668, 674 (5th Cir. 1970 (finding that letter and affidavit lacking specific facts failed to meet the standards of Rule 56); *Mangrum v. Republic Industries, Inc.*, 260 F.Supp.2d 1229, 1245 (N.D. Ga. 2003) (stating, "[t]he unsupported, self-serving statements of the party opposing summary judgment are

49

insufficient to avoid summary judgment"); *McCord v. United Parcel Service, Inc.,* 2002 WL 31599467 (N.D. Ga. 2002) (stating, "Furthermore, unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment").

Further, defendants argue, even if it is accepted as competent evidence, plaintiff's affidavit shows that he worked less than 1,000 hours in 1972. Defendants highlight plaintiff's statement that he received approximately as much overtime pay as pay from regular work. If accepted as true, defendants assert, then at least half of plaintiff's $2,149.68 in earnings were paid at time-and-a-half. According to defendants, this statement, if accurate, proves that plaintiff worked even fewer hours than defendants had earlier suggested because a considerable number of hours were paid at a higher rate.

### B.   Plaintiff's Estoppel Claim Is Contradicted by the Written Record.

Defendants reassert their arguments that they are entitled to summary judgment on Count Two because plaintiff has failed to produce any written documentation of the alleged promise that Sand Mountain employees hired before September 1, 1972 would be vested in the Plan.

### C.   Defendants Supplied All Documents Required by ERISA.

Defendants reassert their arguments that they are entitled to summary judgment on Count Three.

### D.   There Was No Breach of Fiduciary Duty in Closing the Sand Mountain Plant.

Defendants reiterate their arguments that they were not acting in a fiduciary capacity when they closed the Sand Mountain facility. Defendants argue that courts cannot be placed in the position of second-guessing every business decision to determine whether it is in the best

interest of plan participants.  *See Adams v. Avondale Industries, Inc.*, 905 F.2d 943, 947 (6th Cir.

1990) (stating, "ERISA does not require that day-to-day corporate business transactions, which

may have a collateral effect on prospective, contingent employee benefits, be performed solely in

the interest of plan participants" (internal punctuation and citation omitted)).

Defendants further restate their arguments that plaintiff's claim for breach of fiduciary

duty is barred by the applicable statute of limitations.  Additionally, defendants argue, Count

Four fails on the facts.  Defendants highlight plaintiff's testimony that he had no evidence that

the Sand Mountain plant was closed to prevent employees' pensions from vesting.  (Gilley

Depo., p. 111).  Defendants assert that plaintiff and his own witnesses confirmed that the market

for double-knit polyester fabric was weakened by changes in consumer taste and foreign

competition.  (Gilley Depo., pp. 40-41; Hutcheson Depo., pp. 10-11; Carver Depo., pp. 52-53;

Lusk Depo., pp. 27-28).  Defendants also draw the courts attention to Monsanto's 1980 Annual

Report and the minutes from a January 23, 1981 Pharmacia Board of Directors meeting, both of

which indicate that the Sand Mountain facility was closed because of defendants' decision to

withdraw from the polyester fiber market.[33]

### E.    The Facts Show There Is No Claim for Accrued Benefits.

Defendants reassert their argument that plaintiff's claims involve only issues of

entitlement to a pension, and not questions of accrued benefit.  Therefore, defendants maintain,

---

[33] Regarding plaintiff's reliance on defendants' IRS 5500 Forms, defendants contend that there are many reasons a particular name would not have been included.  Such reasons include inadvertent error, or the fact that a person remains employed or lacks sufficient vesting service.  Therefore, defendants conclude, no conclusions can be draw from the forms.  Further, defendants argue, other than producing the forms, plaintiff has offered no evidence that the names of any Sand Mountain employees are missing from the documents.

plaintiff has no cause of action under ERISA § 204(g).  Moreover, defendants contend, the Plan contains different provisions for calculations of Benefits Service (accrual) and Vesting Service (vesting or entitlement to benefits).  According to defendants, plaintiff has made no argument regarding Benefit Service.

Further, defendants argue, the cases relied upon by plaintiff do not support his position. They assert that *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739 (2004) concerns conditions placed on the receipt of benefits already vested.  *Heinz*, defendants assert, actually supports their contention that § 204(g) only addresses accrued benefits and does not address Vesting Service credit.  Defendants maintain that *Jones v. American General Life and Accident Insurance Co.,* 370 F.3d 1065 (11th Cir. 2004), deals with claims under ERISA § 502(a)(3) and does not address § 204.

## IV.   Defendant's Motion to Strike Demand for Jury Trial.

Defendants move to strike plaintiff's jury trial demand.  According to defendants, the controlling law in this Circuit has long been that there is no right to a jury trial in actions pursuant to ERISA.  *Blake v. Unionmutual Stock Life Ins. Co. of America,* 906 F.2d 1525, 1526 (11th Cir. 1990) (stating, "plaintiffs are not entitled to a jury trial under ERISA when the issue is whether it was arbitrary or capricious for benefits to be denied"); *Chilton v. Savannah Foods & Industries, Inc.*, 814 F.2d 620, 623 (11th Cir. 1987); *Calamia v. Spivey*, 632 F.2d 1235, 1237 (5th Cir. 1980).  Defendants contend that this is because claims under ERISA are equitable in nature, even where the remedy for such claims for benefits might ultimately be the payment of money. *Blake,* 906 F.2d at 1526; *Hunt v. Hawthorne Associates, Inc.*, 119 F.3d 888, 907-08 (11th Cir. 1997).  Here, defendants contend, the equitable nature of the claims is reinforced by the demands

52

for equitable relief in the Complaint and the reliance on ERISA §§ 502(a)(2) and 502(a)(3), 29

U.S.C. §§ 1132(a)(2) and 1132(a)(3).  *See Cox v. Keystone Carbon Co.,* 861 F.2d 390, 393 (3rd

Cir. 1988) (holding no right to jury trial on claim under ERISA § 502(a)(3)).

Defendants maintain that every Court of Appeals that has addressed the issue has also

concluded that there is no right to a jury trial under ERISA.  *DeFelice v. American Int'l Life*

*Assurance Co. of New York*, 112 F.3d 61, 64 n.2 (2nd Cir. 1997) (joining "every other federal

circuit to have addressed this question" and gathering decisions from the Third, Fourth, Fifth,

Sixth, Seventh, Eighth, Ninth and Eleventh Circuits); *Adams v. Cyprus Amax Minerals Co.,* 149

F.3d 1156, 1158 (10th Cir. 1998) (joining other circuits); *Howard v. Parisian, Inc.,* 807 F.2d

1560, 1566-67 (11th Cir. 1987) (adopting Fifth Circuit's position that ERISA actions "are not

entitled to trial by jury," and noting that "[e]very other circuit addressing the issue has reached

the same conclusion").

## V.     Plaintiff's Response.

Plaintiff disputes defendants' assertions that the law is clear in the Eleventh Circuit

concerning the right to a jury trial in an ERISA action.  Plaintiff highlights *Blue Cross and Blue*

*Shield of Alabama v. Lewis,* 753 F.Supp. 345 (N.D. Ala. 1990), in which the court reinstated a

jury demand following the Supreme Court's decision in *Ingersoll-Rand Co. v. McClendon,* 498

U.S. 133 (1990).  The *Lewis* court stated, "the Supreme Court in *Ingersoll-Rand,* by holding that

extra-contractual damages can be recovered in a case in which an ERISA administrator commits

an egregious fraud or commits an aggravated act of bad faith, has overruled the Eleventh Circuit's

holding in *Blake* [*v. Unionmutual Stock Life Ins. Co. of America,* 906 F.2d 1525 (11th Cir.

1990)]."  753 F.Supp. at 348.  However, plaintiff acknowledges that, one year later, the same

53

court followed *Blake*, stating:

> This court believes that the Supreme Court has spoken clearly in its recent cases pointing toward its ultimate granting of jury trials in ERISA cases. This court predicts that when and if the Supreme Court addresses the issue, jury trials in ERISA cases will become routine when monetary relief is sought. Nevertheless, for the present, this court is bound to follow the current holding of the Eleventh Circuit that plaintiffs in ERISA cases in federal court are not entitled to trial by jury.

*East v. Long*, 785 F.Supp. 941, 942 (N.D. Ala. 1992).

Plaintiff argues that ERISA is silent as to the relief available to redress violations, and it is well settled "that absent clear Congressional direction to the contrary, the federal courts have the power to forge appropriate relief in causes of action brought pursuant to federal statutes." *East*, 785 F.Supp. at 943 (citing *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992)).  Plaintiff acknowledges that a year afer *East*, the Supreme Court, in *Mertens v. Hewitt Associates,* 508 U.S. 248 (1993), decided that only traditional "equitable relief" was available in a suit against nonfiduciaries who knowingly participate in a fiduciary's breach of duty.

Plaintiff further acknowledges that, in *Broaddus v. Florida Power Corp.*, 145 F.3d 1283 (11th Cir. 1998), the Eleventh Circuit stated:

> The district court was correct in granting FPC's motion to strike Broaddus's demand for a jury trial on the ERISA claim. Relief under ERISA is limited to equitable remedies. *See Chilton v. Savannah Foods & Industries, Inc*., 814 F.2d 620, 623 (11th Cir.1987)(holding that no right to a jury trial exists under ERISA and relying on *Calamia v. Spivey*, 632 F.2d 1235 (5th Cir.1980)); *Houghton v. SIPCO, Inc.*, 38 F.3d 953, 957 (8th Cir.1994)(holding that the "Supreme Court's decision in *Mertens v. Hewitt Assocs*., 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), confirms that there is no right to money damages or to a jury trial under ERISA.").

145 F.3d at 1287 n.\*\*.

Despite this case law, plaintiff maintains, the issue of whether or not a jury trial is

54

available for an ERISA claim is less than clear.  However, should the court determine that the

law is clear that there is no right to a jury trial in such cases, plaintiff advocates for a change in

law based on the circumstances of this case.  Plaintiff recites many of his claims against

defendants.  Plaintiff further argues that he is unaware of any case other than this one, in this or

any other circuit, in which participants were promised a pension only to be denied benefits

twenty or more years later.  Plaintiff concludes that the *Lewis* court's view of the constitutional

right to a jury trial and monetary damages in ERISA actions is correct.

**VII.   Defendants' Reply.**

Defendants point out that plaintiff acknowledges that both the Eleventh Circuit and the

United States Supreme Court have held that jury trials are not available in ERISA cases.  *Mertens*

*v. Hewitt Associates,* 508 U.S. 248, 248 (1993); *Broaddus v. Florida Power Corp.,* 145 F.3d

1283, 1287 n.** (11th Cir. 1998); *Blake v. Unionmutual Stock Life Ins. Co. of America*, 906 F.2d

1525, 1526 (11th Cir. 1990).  Defendants note that *Blue Cross and Blue Shield of Alabama v.*

*Lewis,* 753 F.Supp. 345 (N.D. Ala. 1990), relied upon by plaintiff, predates *Broaddus* and

*Mertens*.  Further defendants argue, the plaintiff in *Lewis*, unlike Gilley, was seeking monetary

damages under ERISA.  According to defendants, plaintiff has repeatedly represented that he is

seeking equitable relief in this case.  Defendants maintain that the superceded *Lewis* cannot

create a split of authority, and this court is bound by the appellate court's rulings.  *Johnson v.*

*DeSoto County Bd. of Com'rs,* 72 F.3d 1556, 1559 n.2 (11th Cir. 1996).  Therefore, defendants

conclude, plaintiff's jury demand must be stricken.

**CONCLUSIONS OF THE COURT**

This court need not, at this stage, re-examine all the issues raised by the parties.  Due to

55

the closeness of the vesting issue, both under the facts and the law, this court is of the opinion that it is best that the court conduct a trial so that factual determinations may be made after a full hearing.  The trial, of course, will be non-jury pursuant to established Eleventh Circuit law. There may be ambiguities which must be resolved with regard to the interaction between and the applicability of the various plans.  For other thoughts of the court, see the court's conclusions filed when it denied defendants' Motion to Dismiss.  The court will consider all of the discussion above and its earlier discussion after it has decided the facts and made a final determination as to the appropriate standard of review.

This 31st of May, 2005.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**